NOBODY IN PARTICULAR PRESENTS, INC., Ogden Resurrection Project, Inc., Swank Management, Inc., and N.I.P.P., LLC, Plaintiffs,

v.

CLEAR CHANNEL COMMUNICATIONS, INC., SFX Entertainment, Inc., d/b/a Clear Channel Entertainment, Clear Channel Broadcasting Inc., Jacor Broadcasting of Colorado, Inc., Citicasters Co., Citicasters Licenses, Inc., and Tsunami Communications, Inc., Defendants.

No. CIV.A. 01 N 1523 BNB.

United States District Court,
D. Colorado.

April 2, 2004.

John Allen Francis, Dale R. Harris, Geoffrey H. Simon, Davis, Graham & Stubbs LLP, Walter L. Gerash, Gerash Law Firm, PC, Denver, CO, for Plaintiffs.

Sean Patrick Costello, Jones, Day, Reaves & Pogue, Cleveland, OH, Bruce A. Featherstone, Matthew D. Collins, Featherstone DeSisto LLP, Denver, CO, for Defendants.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

In this case, a concert promoter and its affiliates seek damages and an injunction for alleged antitrust violations and tortious conduct by its competitor. Plaintiffs Nobody In Particular Presents, Inc. ("NIPP"), Ogden Resurrection Project, Inc., Swank Management, Inc., and N.I.P.P., L.L.C., claim that Defendants Clear Channel Communications, Inc. ("Clear Channel Communications"), SFX Entertainment, Inc. d/b/a/ Clear Channel Entertainment, Inc. ("SFX/Clear Channel Entertainment"), Clear Channel Broadcasting, Inc., Jacor Broadcasting of Colorado, Inc. ("Jacor"), Citicasters Co., Citicasters Licenses, Inc., and Tsunami Communications, Inc. (collectively "Clear Channel") engage in anticompetitive conduct that violates (1) the Sherman Act, 15 U.S.C.A. §§ 1–2 (West 1997), (2) the Colorado Antitrust Act, Colo.Rev.Stat. § 6–4–105 (1999), (3) the Colorado Consumer Protection Act, Colo.Rev.Stat. § 6–1–101 (1999), and (4) Colorado common law prohibiting tortious interference with contracts and prospective business relations. This matter is before the court on (1) "Defendants' Motion for Summary Judgment," filed October 7, 2002, (2) "Defendants' Motion for Summary Judgment," filed November 1, 2002, (3) "Combined Motion and Memorandum for Summary Judgment of Parent Defendant Clear Channel Communications, Inc., On All Claims," filed November 1, 2002, and (4) "Defendants' Motion to Exclude Expert Testimony," filed August 6, 2003. Jurisdiction is based on 28 U.S.C.A. §§ 1331, 1337 (West 1993), and 15 U.S.C.A. § 15 (West 1997).

### FACTS

#### I. Factual Background

##### A. The Parties

Plaintiff NIPP is a music concert promoter in the Denver, Colorado area. (First Am. Compl. & Jury Demand ¶ 3 [filed August 8, 2002] [hereinafter "Am. Compl."]; admitted at Defs.' Answer and Affirmative Defenses to Pls.' First Am. Compl. ¶ 3 [filed August 21, 2002] [hereinafter "Answer"].) Founded in 1987, it has been a fixture in the Denver music industry since that time. (Id.) NIPP has promoted music concerts by jazz, folk, rock, and blues artists, including Beck, Pearl Jam, Sarah McLachlan, and the Neville Brothers. (Id.) It has promoted music concerts at numerous music venues in Denver, including the Ogden Theater, the Bluebird Theater, the Denver Botanic Gardens Amphitheater, Red Rocks Amphitheater, the Gothic Theater, and the Pepsi Center. (Statement of Undisputed Material Facts ¶ 13 [filed November 1, 2002] [hereinafter "Statement of Undisputed Facts"]; admitted at Pls.' Resp. to Defs.' Statement of Undisputed Material Facts ¶ 13 [filed December 23, 2002] [hereinafter "Resp. to Statement of Undisputed Facts"].) NIPP controls concert-promotion access to the Ogden Theater, the Bluebird Theater, and the Denver Botanic Gardens Amphitheater. (Id. ¶ 13; admitted in pertinent part at Resp. to Statement of Undisputed Facts ¶ 13.) The parties dispute whether NIPP allows other concert promoters to use these venues.

(*Id.* ¶ 13; *disputed at* Resp. to Statement of Undisputed Facts ¶ 13.)

Clear Channel Communications, a Texas corporation and holding company, is one of the largest radio and entertainment conglomerates in the world. It owns significant holdings in radio, television, billboard advertising, concert venues, and the concert promotions industry, through its numerous wholly-owned subsidiaries. (Combined Mot. and Mem. for Summ. J. of Parent Def. Clear Channel Communications, Inc. on All Claims, Statement of Undisputed Material Facts ¶ 2 [filed December 23, 2002] [hereinafter "CCC Mot. for Summ. J."]; *admitted at* Pls.' Resp. to Undisputed Material Facts, Statement of Additional Disputed Facts, and Resp. to Mot. and Mem. for Summ. J. of Parent Def. Clear Channel Communications, Inc., Resp. to Undisputed Material Facts ¶ 2 [filed December 23, 2002] [hereinafter "Resp. to CCC Mot. for Summ. J."].) Clear Channel Communications' wholly-owned subsidiaries include defendants SFX/Clear Channel Entertainment and Jacor. Eight years ago, Clear Channel Communications was just one of numerous radio station owners, unknown to most people living outside of San Antonio, Texas, where the company is based. (CCC Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 1; *admitted at* Resp. to CCC Mot. for Summ. J., Resp. to Undisputed Material Facts ¶ 1; Sarah Greene, *Clear Channel v. Competition Act of 2002: Is There A Clear End In Sight?*, 12 Depaul–LCA J. Art & Entm't L. 387, 402 [2002].) At that time, Clear Channel Communications owned 43 radio stations and 16 television stations through its subsidiaries. (12 Depaul–LCA J. Art & Entm't L. at 402.) After Congress enacted the Telecommunications Act of 1996, however, Clear Channel Communications began acquiring broadcast and entertainment companies at amazing speed. (*Id.*) Today, Clear Channel Communications consists of what was once seventy separate broadcast companies, owning 1200 radio stations, or 10% of the radio stations in the United States. (Defs.' Br. at 14.)

In May 1999, Clear Channel Communications entered the Denver radio market when it acquired Jacor. (Mem. in Supp. of Defs.' Mot. for Summ. J. at 15 [filed November 1, 2002] [hereinafter "Defs.' Br."]; Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 3 [filed December 23, 2002] [hereinafter "Pls.' Resp."].) As a result of this acquisition, Clear Channel Communications' subsidiaries now own and operate eight radio stations in Denver, the maximum allowed by the Federal Communications Commission ("FCC"). (Statement of Undisputed Facts ¶ 11; *admitted at* Resp. to Statement of Undisputed Facts ¶ 11.) These stations include five FM stations, KBCO, KBPI, KFMD, KRFX, and KTCL, and three AM stations, KHOA, KOA, and KTLK. (*Id.* ¶ 11; *admitted at* Resp. to Statement of Undisputed Facts ¶ 11.)

Additionally, as a result of the $4.4 billion dollar acquisition of SFX in 2000, SFX/Clear Channel Entertainment, Clear Channel Communications' national concert promotions division, is the largest concert producer and entertainment promoter in the nation. (Statement of Undisputed Facts ¶ 11; *admitted at* Resp. to Statement of Undisputed Facts ¶ 11; 12 Depaul–LCA J. Art & Entm't L. at 402.) Additionally, Clear Channel Communications has a radio concert promotions division, previously known as Clear Channel Concerts, and now as Clear Channel Radio Festivals. (Statement of Undisputed Facts ¶ 11; *admitted at* Resp. to Statement of Undisputed Facts ¶ 11.) Both of these divisions operate in Denver. (*Id.* ¶ 11; *admitted at* Resp. to Statement of Undisputed Facts ¶ 11.) Clear Channel Communications also owns or has control over more than 100 music concert venues

nationwide. (12 Depaul–LCA J. Art & Entm't L. 387, 402.) SFX/Clear Channel Entertainment and Clear Channel Concerts/Clear Channel Radio Festivals promote music concerts by jazz, folk, rock, and blues artists. It has promoted these music concerts at numerous music venues in Denver and has exclusive access to the Fillmore Auditorium in Denver. (*Id.* ¶ 11; *admitted at* Resp. to Statement of Undisputed Facts ¶ 11.)

The parties dispute the extent to which Clear Channel Communications participates in the operation of its subsidiaries, such as its radio stations and SFX/Clear Channel Entertainment. Clear Channel argues that Clear Channel Communications merely acts as a holding company, while NIPP asserts that Clear Channel Communications acts as an operating company, determining the strategy and culture for all subsidiaries. (CCC Mot. for Summ. J.; *disputed at* Resp. to CCC Mot. for Summ. J.)

### B. Concert Promotion in Denver

Music concert promoters are in the business of planning and promoting music concerts for the ticket-purchasing public. Specifically, a concert promoter bids on a particular musician or band in order to obtain the right to promote the artist's concert. In bidding on an artist, the concert promoter must often deal with the artist's manager or record label, which, in the jargon of the industry, is the entity that produces and sells the artist's recordings. (Pls.' Resp., Exs. Vol. 2, Ex. 35 [Dep. of Sabrina Saunders at 44, 116–118], Ex. 30 [Dep. of Michael O'Connor at 425–427], Ex. 22 [Dep. of David Loncao at 37–40].) The concert promoter then arranges for the venue, ticketing, and advertising, among other things. Concert promoters advertise concerts using radio, television, the internet, newspapers, magazines, posters, and flyers. (Defs.' Br., Exs. Vol. 1, Ex. A–7 [Am. Compl. ¶ 21]; Am. Compl.

¶ 21.) If the concert generates little interest and few ticket sales, the promoter absorbs the loss. Conversely, if the concert is hugely successful, the promoter keeps the profits.

Some promoters promote concerts of all kinds of music, while others may promote, for example, only rock or jazz concerts. Similarly, many venues will accept concerts by artists of all kinds of music, while others will not. (Statement of Undisputed Facts ¶ 26; *admitted at* Resp. to Statement of Undisputed Facts ¶ 26.) Artist agents may represent both rock and non-rock artists, and record labels often produce recordings for both kinds of artists; however, some agents represent only rock artists, and record companies and talent agencies may have separate divisions that deal with only rock artists. (Statement of Undisputed Facts ¶ 27; *admitted in pertinent part* at Resp. to Statement of Undisputed Facts ¶ 27.)

There are a large number of music concert promoters in the Denver, Colorado area, compared to other cities of its size. (Defs.' Br., Exs. Vol. 2, Ex. A–19 [Dep. of David Kirby at 149–151].) In recent years, however, three music promoters have emerged as the main promoters in terms of revenue and the number of concerts promoted: Plaintiff NIPP, Defendants SFX/Clear Channel Entertainment and Clear Channel Concerts/Clear Channel Radio Festivals, and House of Blues. (Defs.' Br., Exs. Vol. 1A, Ex. A–1 [Decl. of Gustavo Bamberger ¶ 50, Table 11]; Pls.' Resp., Exs. Vol. 1, Ex. 1 [Decl. of Owen Phillips, Table 5]; Statement of Undisputed Facts ¶¶ 14–16; *admitted at* Resp. to Statement of Undisputed Facts ¶¶ 14–16.)

From the late 1960's to the mid 1990's, Barry Fey and his company, Fey Concerts, were the leading concert promoters in Denver. (Defs.' Br., Exs. Vol. 1, Ex. A–13 [Dep. of Jesse Morreale at 57–58], Exs. Vol. 2, Ex. A–18 [Dep. of Douglas Kauff-

man at 60], Ex. A–27 [Dep. of Christopher Swank at 248–250].) During that time, many individuals who have roles in the Denver concert promotion business today worked for Fey Concerts, including Jesse Morreale, Chuck Morris, Bill Bass, and Brent Fedrizzi. (*Id.*, Exs. Vol. 1, Ex. A–13 [Morreale Dep. at 64, 71].) In 1987, Doug Kauffman founded NIPP, which competed with Fey Concerts in the Denver market. (*Id.*, Exs. Vol. 2, Ex. A–18 [Kauffman Dep. at 53–54], Ex. A–27 [Swank Dep. at 249].) In August 1997, Fey sold his interest in Fey Concerts to Universal Concerts and retired, triggering a mass exodus of his employees and introducing more competition in the concert promotions industry. (*Id.*, Exs. Vol. 1, Ex. A–13 [Morreale Dep. at 95–100].) Morreale started the concert promotions company, Gess Presents; Chuck Morris started the company Bill Graham presents/Chuck Morris presents and hired Fedrizzi as a talent buyer; and Bass founded Bill Bass Concerts. (*Id.*, Exs. Vol. 1, Ex. A–13 [Morreale Dep. at 97], Exs. Vol. 2, A–16 [Dep. of Brent Fedrizzi at 10–15].)

In 1998, SFX, a national concert promotion company, acquired Bill Graham Presents and formed a partnership with Chuck Morris Presents. (*Id.*, Exs. Vol. 2, Ex. A–16 [Fedrizzi Dep. at 11–12].) In 1998, NIPP and Kauffman were joined by Jesse Morreale and Christopher Swank, who owned the Bluebird Theater. (*Id.*, Exs. Vol. 2, Ex. A–18 [Kauffman Dep. at 13–14].) In 1999, Clear Channel Communications acquired SFX and affiliated with Don Straussburg of the Fox Theater in Boulder. (Statement of Undisputed Facts ¶ 11; *admitted at* Resp. to Statement of Undisputed Facts ¶ 11, 16.) In 1999, House of Blues, another national concert promotion company, acquired Universal Concerts and, later, Bill Bass Concerts. (Defs.' Br. at 17.)

In 1999, according to NIPP, Clear Channel, NIPP, and House of Blues combined to hold 47% of the market share in revenue for all music concert promotion in Denver. (Pls.' Resp., Exs. Vol. 1, Ex. 1 [Phillips Decl., Table 5].) In 2001, according to NIPP, they combined to hold 76%. (*Id.*, Exs. Vol. 1, Ex. 1 [Phillips Decl., Table 5].) The parties dispute the exact market share held by each entity in all concert promotion in Denver. The following tables show the dispute of their market share for 1999 and 2001.

Plaintiff NIPP asserts the following breakdown of market share for all music concerts:

| Year | Promoter | Revenue | Concerts | Concert Promo Market |
|------|----------|---------|----------|----------------------|
| 1999 | Clear Channel | | | .27% |
| | NIPP | $ 3,734,565 | 344 | 10.86% |
| | House of Blues | | | 36.28% |
| 2001 | Clear Channel | $25,000,000 | | 43.81% |
| | NIPP | $ 2,963,518 | 324 | 5.25% |
| | House of Blues | $14,127,205 | | 26.67% |

(*Id.*, Exs. Vol. I, Ex. 1 [Phillips Decl., Table 5]; Resp. to Statement of Undisputed Facts ¶¶ 14–16.)

Defendant Clear Channel claims the following breakdown existed in 2001 for all music concerts:

| Year | Promoter | Revenue | Concerts | Concert Promo Market |
|------|----------|---------|----------|---------------------|
| 2001 | Clear Channel | $19,886,613 | | 40% |
| | NIPP | $ 3,888,000 | 369 | 4.1% |
| | House of Blues | $11,810,621 | | 25.6% |

(Defs.' Br., Exs. Vol. 1A, Ex. A–1 [Bamberger Decl. ¶ 50, Table 11]; Statement of Undisputed Facts ¶¶ 14–16.)

In the rock music concert market, NIPP claims that, in 1999, Clear Channel held a 0.45% market share, House of Blues held a 32.51% market share, and NIPP held a 16.89% market share. (Pls.' Resp., Ex. 1 [Phillips Decl., Table 5].) In 2001, according to NIPP, Clear Channel held a 50.48% share, House of Blues held an 18.85% share, and NIPP held an 8.2% share. (*Id.*, Ex. 1 [Phillips Decl., Table 5].)

Other promoters in the Denver market include Soda Jerk Presents, Alex Crothers, Eric Pirritt, Dan Steinberg, and Jason Coulter. (Statement of Undisputed Facts ¶ 16; *admitted at* Resp. to Statement of Undisputed Facts ¶ 16.) In 2001, however, these promoters, in the aggregate, made up less than one percent of the market. (Defs.' Br., Exs. Vol. 1A, Ex. 1 [Bamberger Decl., Table 11]; Resp. to Statement of Undisputed Facts ¶ 16.) Other promoters that made up more of the market in Denver in 2001, such as Concerts West and Jam Productions, promoted no concerts in Denver during 2002. (Pls.' Resp., Exs. Vol. 1, Ex. 2 [Morreale Decl. ¶ 31].)

### C. Radio Denver

### 1. Play Lists

In the radio industry, stations usually have a particular music format. Different types of formats in radio include: country music formats, contemporary hit formats, adult contemporary formats, rock music formats, urban music formats, talk radio formats, jazz radio formats, and world music formats, among others. (Arbitron.)[1] Some rock music formats include Modern Rock, Active Rock, Alternative, and Classic Rock. (Arbitron.)

There are, at least, fifty radio stations in the Denver area. (Statement of Undisputed Facts ¶ 54; *admitted at* Resp. to Statement of Undisputed Facts ¶ 54.) Of these fifty, Clear Channel owns eight. (*Id.* ¶ 54; *admitted at* Resp. to Statement of Undisputed Facts ¶ 54.) Of the five FM stations owned by Clear Channel, four, KBPI, KBCO, KRFX, and KTCL, have a rock format according to Arbitron. (Arbitron.) The parties dispute the number of other stations that have a rock format in the Denver radio market because they dispute what qualifies as a rock format. (Statement of Undisputed Facts ¶¶ 50–53; *disputed at* Resp. to Statement of Undisputed Facts ¶¶ 50–53.) Additionally, the parties dispute whether radio stations can easily switch formats. (*Id.* ¶¶ 55–56; *disputed at* Resp. to Statement of Undisputed Facts ¶¶ 55–56.)

Radio stations create a play-list of songs based on the station's format, and the disc jockey must adhere to the play-list. How a station creates its play-list is disputed by the parties. Clear Channel argues that it makes its decisions about which songs to play based on the popularity of the song with its audience, according to polling data. (Defs.' Br., Exs. Vol. 1, Ex. 24 [Dep. of Michael O'Connor at 383–385]; Pls.'

---

1. Arbitron is an international marketing and research firm serving radio broadcasters, cable companies, advertisers, advertising agencies, and outdoor advertising companies. Arbitron's core business is measuring network and local market radio audiences across the United States. Both parties cite to Arbitron research in their briefs because Arbitron is the radio industry standard for polling data.

Resp., Exs. Vol. 2, Ex. 24 [Dep. of Mark Mays at 91–93].) NIPP argues that, although polling data plays some role, Clear Channel also makes its decisions based on which concerts Clear Channel is or is not promoting, and which "indies" have paid Clear Channel the most money. (Pls.' Resp. at 18–24, 29–30, Exs. Vol. 2, Ex. 20 [Dep. of David Kirby at 129–132].)

"Indies," in the industry's jargon, are independent record promoters that represent record labels. (*Id.*, Exs. Vol. 2, Ex. 18 [Dep. of Theodore Guggenheim at 113–116], Exs. Vol. 3, Ex. 82 [Joint Statement of Current Issues in Radio].) The record labels pay the independent promoters, who, in turn, pay radio stations for "access." (*Id.*, Exs. Vol. 2, Ex. 36 [Dep. of Barbara Scull at 33–36], Ex. 22 [Dep. of David Loncao at 18–19].) "Access" allows the independent promoter to meet with the radio station and present marketing and polling data about the popularity of songs on the record label's albums. (*Id.*, Exs. Vol. 2, Ex. 24 [M. Mays Dep. at 92–93, 101].) Many commentators and NIPP view the independent record promotion market as a mechanism by which record labels pay for play of their songs, while simultaneously avoiding liability for "payola." (*Id.* at 30; *United States v. Goodman*, 945 F.2d 125 [6th Cir.1991].)

Payola, or paying radio stations for record spins, has been outlawed by federal law since the 1930's. 47 U.S.C.A. § 508 (West 2001 & Supp.2003). Clear Channel receives millions of dollars from indies each year; however, it denies that indies' payments influence Clear Channel's decisions to add songs to its radio play lists. (*Id.*, Exs. Vol. 2, Ex. 24 [M. Mays Dep. at 93].) For record labels that are in the business of selling records, radio air play of their records and live concerts by their artists are essential to generate demand for the records themselves. (*Id*, Exs. Vol. 2, Ex. 36 [Scull Dep. at 29], Ex. 39 [Dep. of

Todd Sievers at 129–130].) Accordingly, record labels and their indies are highly dependent on, and in regular contact with, radio stations concerning air play for their records. Similarly, record labels are often in direct contact with concert promoters. (*Id.*, Exs. Vol. 2, Ex. 30 [O'Connor Dep. at 425–426], Ex. 35 [Saunders Dep. at 44–46, 116–117].)

### 2. Advertising and Concert Promotions

Although radio stations receive income from independent promoters at the behest of record labels, radio stations derive most of their income from advertisers who pay for advertising spots. (*Id.* at 21–23, 44.) Radio stations with the largest audiences can command the highest advertising rates from advertisers. (Defs.' Br., Exs. Vol. 1A, Ex. A–3 [Aff. of Lee Larsen ¶¶ 3–4].) When a promoter seeks to advertise a concert on radio, therefore, it competes with advertisers of other goods and services. (*Id.*, Exs. Vol. 3, Ex. A–61 [Dep. of Ashley McGhee at 10–12].)

What makes concert promoters different from a regular advertiser, however, is the potential benefit the radio station receives from advertising a concert of a popular artist. By advertising the concert, the radio generates more interest in the artist, which encourages listeners to listen to the radio to hear about the artist's concert and to hear the artist's songs. (*Id.*, Exs. Vol. 2, Ex. A–24 [O'Connor Dep. at 385–386].) Radio stations, therefore, often "promote" concerts for free, above and beyond the advertising time paid for by the concert promoter, by mentioning the concert on-air, holding ticket giveaways, and conducting interviews with artists. (*Id.*, Exs. Vol. 2, Ex. A–26 [Dep. of Bob Richards at 253–255, 275, 311–312].) Such free promotion greatly benefits the concert promoter, as well as the station, by generating publicity

and demand for the concert. (*Id.*, Exs. Vol. 2, Ex. A–26 [Richards Dep. at 255–256, 311–312].)

NIPP has purchased and continues to purchase advertising time on Clear Channel radio stations. (*Id.*, Exs. Vol. 1A, Ex. A–3 [Larsen Aff. ¶ 8, Attach. A.].) Clear Channel radio stations have also provided NIPP with free promotional support for its concerts in the past, though Clear Channel admits that they provide less now. (*Id.*, Exs. Vol. 1A, Ex. A–3 [Larsen Aff. ¶ 8, Attach. A.].) NIPP claims, however, that, since Clear Channel entered the concert promotion business, Clear Channel radio stations have withheld free promotional support from NIPP for its concerts. (Pls.' Resp. at 25–27.)

In 1999, NIPP only purchased radio advertising for approximately 8% of its concerts. (Statement of Undisputed Facts ¶ 38; *admitted in pertinent part at* Resp. to Statement of Undisputed Facts ¶ 38.) Although NIPP does not purchase radio advertising for all of its concerts, especially not for its low-budget productions, it almost always purchases radio advertising for its shows predicted to generate more than $10,000 in revenue. (Pls. Br., Exs. Vol. 1, Ex. 2 [Morreale Decl. ¶¶ 13–14]; Resp. to Statement of Undisputed Facts ¶ 38.) In 1999, NIPP claims that more than 70% of its revenue came from concerts that relied on radio advertising. (Resp. to Statement of Undisputed Facts ¶ 38.)

In a market encompassing all Denver radio stations, Clear Channel's share of radio advertising revenue was 46.8% in 2000. (Statement of Undisputed Facts ¶¶ 50; *admitted in pertinent part at* Resp. to Statement of Undisputed Facts ¶ 50.) In a market encompassing only rock-format radio stations, depending of which party's definition of rock-format is utilized, Clear Channel's market share in terms of advertising revenue may be as high as 87.3%. (Statement of Undisputed Facts ¶¶ 50, 53; *admitted in pertinent part at* Resp. to Statement of Undisputed Facts ¶ 50, 53.)

### D. Anti–Competitive Conduct

NIPP complains about several different kinds of conduct that, NIPP contends, violate federal and state antitrust laws and the common law.

### 1. Using Radio Air Play to Coerce Artists in Concert Promotions Decisions

NIPP complains that Clear Channel uses its position in rock-format radio to intimidate and coerce rock artists and their record labels into signing with SFX/Clear Channel Entertainment and Clear Channel Radio Festivals for promotion of the artists' concerts. (Pls.' Resp. 9–17.) Specifically, NIPP claims that rock artists and labels are afraid that Clear Channel radio stations will refuse to give artists' songs as many spins as Clear Channel would if the artist signed with SFX/Clear Channel Entertainment or Clear Channel Concerts/Clear Channel Radio Festivals. (*Id.*) According to NIPP, the dependency of record labels on radio for spins and the resultant promotion of records enables Clear Channel to wrongfully exploit this relationship with labels to book concerts. (*Id.*, Exs. Vol. 2, Ex. 30 [O'Connor Dep. at 425–426].)

NIPP cites testimony and messages from former Clear Channel employees and record label owners to support their position. One of the central figures in Clear Channel's radio operations in Denver is Michael O'Connor, the program director for KTCL and director of programming for all five Clear Channel FM stations in Denver. (*Id.*, Exs. Vol. 2, Ex. 29 [O'Connor Dep. at 356–358].) Ted Guggenheim, a former talent buyer for Clear Channel

Concerts/Clear Channel Radio Festivals, testified that record labels could have inferred from conversations with O'Connor that the label's artist would not get spins unless Clear Channel was allowed to promote the artist's concert. (*Id.*, Exs. Vol. 2, Ex. 18 [Guggenheim Dep. at 102].) Additionally, Sabrina Saunders, the music director at KTCL, testified that, when record labels made O'Connor unhappy, O'Connor punished labels by withholding spins of their artists' records. (*Id.*, Exs. Vol. 2, Ex. 35 [Saunders Dep. at 122, 133–134].)

Jason Martin, a representative of Roadrunner Records, testified that, in 2000, O'Connor threatened to pull Roadrunner's records off of Clear Channel stations when NIPP gave KXPK, KBPI's competition, the right to do promotional support for the "Tattoo the Earth Tour," which featured several Roadrunner artists. (*Id.*, Exs. Vol. 2, Ex. 23 [Dep. of Jason Martin at 112].) In order to dampen Clear Channel's wrath, Dave Lancao, another representative of Roadrunner Records, upon O'Connor's demand, sent an electronic message to the artist managers of Roadrunner's artists suggesting they avoid using NIPP as their concert promoter in Denver to avoid losing air play. (*Id.*, Exs. Vol. 2, Ex. 22 [Loncao Dep. at 82–83, 104, 146–147].)

In 1999–2000, Clear Channel refused to have any dealings with Reprise Records, and O'Connor sent electronic mail messages to the label stating, "we are out of business with your label;" "I have left instructions for KTCL to have NO relations with Reprise ... I want nothing to do with Reprise Records;" and "you can all go f*ck yourselves as far as I'm concerned." (*Id.*, Exs. Vol. 3, Ex. 52 [Electronic Mail Message from O'Connor to Sievers of 3/28/2000], Ex. 53 [Electronic Mail Message from O'Connor to Sievers of 5/1/2000], Ex. 54 [Electronic Mail Message from O'Connor to Sievers of 5/1/2000].) In

an effort to regain favor with Clear Channel, Reprise encouraged its band Orgy to allow SFX/Clear Channel Entertainment to promote the band's Denver concert. (*Id.*, Exs. Vol. 3, Ex. 55 [Letter from Sievers to Michael Papale of 6/27/2000], Ex. 55A [Letter from Sievers to Saunders of 8/22/2000], Ex. 43 [Electronic Mail Message from Sievers to Saunders of 8/25/2000], Ex. 43A [Electronic Mail Message from Sievers to O'Connor].) After the concert was booked, Reprise complained to O'Connor, "[We] can't help but feel taken advantage of with only 126 spins to date on KTCL; why did we do this show! It cost us $80 per spin!" (*Id.*, Exs. Vol. II., Ex. 44 [Electronic Mail Message from Sievers to O'Connor of 10/24/2000].)

In September 2000, Margie Weatherly, a record label representative, sent an electronic mail message to O'Connor asking for reasons that songs by one of her artists, Vast, were being played less on KTCL. (*Id.*, Exs. Vol. 3, Ex. 42 [Electronic Mail Message from Weatherly to O'Connor of 9/18/2000].) Instead of answering her question, O'Connor responded by asking Weatherly whether or not Vast was going to book its Denver Christmas show with SFX/Clear Channel Entertainment. (*Id.*, Exs. Vol. 3, Ex. 42 [Electronic Mail Message from O'Connor to Weatherly of 9/18/2000].) He concluded his message by stating, "[if] you will investigate these issues, I would love to have a conversation with you about 'where we stand.'" (*Id.*, Exs. Vol. 3, Ex. 42 [Electronic Mail Message from O'Connor to Weatherly of 9/18/2000].) The next day, Weatherly sent a message to O'Connor assuring him that the concert booking with SFX/Clear Channel Entertainment was being finalized and adding, "NOW LET'S SEE SOME SPINS, BABY!!!!!!!!!!" (*Id.*, Exs. Vol. 3, Ex. 42 [Electronic Mail Message from Weatherly to O'Connor of 9/19/2000].) In the weeks prior to Weatherly's first message

to O'Connor, Vast's number of spins on KTML had dropped from twenty-three per week to six per week. After Weatherly confirmed the concert booking, KTCL increased the weekly spins for Vast to twenty. (*Id.*, Exs. Vol. 1, Ex. 8 [Decl. of Victoria Lovato, Ex. C].)

NIPP cites numerous other examples of such conduct. On September 27, 2001, the band "Puddle of Mudd" confirmed a concert booking with NIPP for a concert on November 12, 2001. (*Id.*, Exs. Vol. 1, Ex. 2 [Morreale Decl. ¶¶ 37–38].) Data showing number of spins for Puddle of Mudd's songs show that for the three months preceding September 27, 2001, KBPI played the band's songs steadily more than twenty times per week. (*Id.*, Exs. Vol. 1, Ex. 2 [Morreale Decl. ¶¶ 37–38], Ex. 8 [Lovato Decl., Ex. F].) The week ending September 23, 2002, KBPI played the band's songs 25 times; however, the week ending September 30, the spins dropped to eleven, and the following week to zero. (*Id.*, Exs. Vol. 1, Ex. 2 [Morreale Decl. ¶¶ 37–38], Ex. 8 [Lovato Decl., Ex. F].) Thereafter, KBPI resumed playing the band's songs, but not at pre-September 27 levels. (*Id.*, Exs. Vol. 1, Ex. 2 [Morreale Decl. ¶¶ 37–38], Ex. 8 [Lovato Decl., Ex. F].)

Clear Channel Communications has, to a certain extent, admitted this behavior in its own intra-company communications. In an electronic message to Clear Channel radio program directors in Denver, O'Connor urged them to encourage record labels' involvement with the labels' artists' bookings:

> I encourage you to communicate our new policy concerning artist promotion to labels in advance so they understand why we might potentially be in a position to ignore their artist's appearance in the Denver market. Quite simply, if a local promoter is unwilling or unable to properly compensate us for our ... valuable audience reach, then we will be forced to ignore the show. Label will be in a better position to intervene [with artists] on your behalf if outside promoters resist this new policy and attempt to put you at a disadvantage.

(*Id.*, Exs. Vol. 3, Ex. 41 [Electronic Mail Message from O'Connor to All Denver Clear Channel Radio Program Directors, Music Directors, and Promotions Directors of 6/19/2001].) In an electronic mail message to Tom Owens, the Vice President of Programming for Clear Channel Radio, O'Connor admitted:

> This is happening a lot in Denver ... using threat of airplay to take shows away from another promoter in the market. Very VERY Dangerous. I know for a fact that an SFX talent buyer did what I described below despite my soft peddling of the issue. Am collecting letters of denial every time this comes up so that the radio side is covered. It has come up at least five times in the last 3 months.

(*Id.*, Exs. Vol. 3, Ex. 64 [Electronic Mail Message from O'Connor to Tom Owens of 3/26/2001].)

### 2. *Refusing Promotional Support on Radio to NIPP Concerts*

Additionally, NIPP argues that Clear Channel Communications denies free promotional support and advertising to concert promoters besides SFX/Clear Channel Entertainment and Clear Channel Concerts/Clear Channel Radio Festivals. (*Id.*) According to NIPP, before Clear Channel entered the concert promotion business, it was customary for local concert promoters to have regular contact with radio program, music, and promotions directors, and the stations would usually give free promotional support, such as ticket giveaways and on-air mentions, for any concert in the same musical style as the radio station's format. (*Id.*, Exs. Vol. 2, Ex. 12 [Dep. of Michael DuCharme at 22–23], Ex. 21 [Dep. of Justin Levy at 89–

90], Ex. 31 [Dep. of at 200–202].) Now, Clear Channel allegedly gives preferential treatment to its concert promotion business and limits or denies the historical levels of support previously provided to other promoters. (*Id.*, Exs. Vol. 2, Ex. 12 [DuCharme Dep. at 23–30], Vol. 3, Ex. 41 [Electronic Mail Message from O'Connor to All Denver Clear Channel Radio Program Directors, Music Directors, and Promotions Directors of 6/19/2001].)

Additionally, according to NIPP, no outside promoters are allowed contact with Clear Channel's radio program, music, and promotions directors. (*Id.* at 26.) As evidence of this policy, NIPP cites the following electronic mail message that O'Connor sent to all radio program, promotions, and music directors at Denver Clear Channel rock radio stations on June 19, 2001:

This notice will serve as an update to our policy concerning dealing with outside promoters.

1. No program, promotion, or music director is to have direct contact with either House of Blues, Nobody in Particular Presents, or any other non-clear-channel concert entity.. (sic) This includes telephone, fax, and, especially, email conversations.. (sic)... There is to be no direct contact with any outside promoter for any reason whatsoever without my approval.

2. You are free to continue to have direct conversations with labels and SFX concerning concert promotion in the Denver market.

3. Effective immediately, there will be no "added value" attached to spot buys placed by concert promoters. You can negotiate NTR promotions or trade ticket giveaways, ... but only after the promoter has placed a commercial buy on the station.... Airtime WILL NO LONGER be given for free under any circumstances without mine or Donnie's approval. This policy does not apply to

SFX/Clear Channel Entertainment/our (sic) our local Radio Concert Division.

4. I encourage you to communicate our new policy concerning artist promotion to labels in advance so they understand why we might potentially be in a position to ignore their artist's appearance in the Denver market.....

(*Id.*, Exs. Vol. 3, Ex. 41 [Electronic Mail Message from O'Connor to All Denver Clear Channel Radio Program Directors, Music Directors, and Promotions Directors of 6/19/2001].) Clear Channel raised the price at which NIPP can purchase commercial advertising, and O'Connor and Richards sometimes instruct their staff at KBPI and KTCL to give no promotional support to NIPP. (*Id.*, Exs. Vol. 2, Ex. 12 [DuCharme Dep. at 23–30], Ex. 35 [Saunders Dep. at 57–58], Ex. 18 [Guggenheim Dep. at 120–121].)

NIPP cites a concert by the bands Styx and Bad Company in 2001, which was promoted by House of Blues. (*Id.* at 24.) When House of Blues decided to use KKHK (the "Hawk") to promote the show, Clear Channel wrote messages internally stating, "Let's crush the Hawk and HOB on this show ... hope you will tow the line ... do not give free impressions to this Hawk festival on any of your stations ... avoid accepting advertising ... let's get our f*cksticks out." (*Id.*, Exs. Vol. 3, Ex. 45 [Electronic Mail Message from O'Connor to Clear Channel Directors of 3/20/2001].) Additionally, O'Connor wrote, "[w]e are not going to accept any advertising or promotional schedule for the HOB Styxx show ...." (*Id.*, Exs. Vol. 3, Ex. 76 [Electronic Mail Message from O'Connor to Clear Channel Radio Directors of 3/20/2001].)

### 3. Hiring NIPP's Media Director and Talent Buyer

NIPP complains about the manner in which Clear Channel hired NIPP's media

director and talent buyer, Michael DuCharme, in October 2000. (*Id.* at 27–28.) DuCharme worked at NIPP from August 1998 until October 2000. When Clear Channel hired DuCharme, he never returned to work at NIPP, but, instead, in the middle of the night, cleaned out his office, deleted files from his NIPP computer, and removed and destroyed various other files. (*Id.*, Exs. Vol. 2, Ex. 12 [DuCharme Dep. at 136–142], Ex. 28 [Morreale Dep. at 376–378], Ex. 31 [Ore Dep. at 156–157], Ex. 37 [Swank Dep. at 377–381], Ex. 38 [Dep. of Jerri Theil at 73–76].) Only after he had deleted and taken his files did DuCharme inform NIPP that he had been hired by Clear Channel Concerts/Clear Channel Radio Festivals. (*Id.*, Exs. Vol. 2, Ex. 12 [DuCharme Dep. at 136–137].) Additionally, DuCharme took many of NIPP's artist clients to Clear Channel. (*Id.*, Exs. Vol. 2, Ex. 28 [Morreale Dep. at 224–229].)

#### 4. *Other Conduct*

Finally, NIPP briefly complains that Clear Channel engages in several other anti-competitive practices. First, NIPP claims that SFX/Clear Channel Entertainment sometimes bids significantly more to promote an artist's concert than the artist requests, driving up the costs to competing bidders and causing higher ticket prices for the consumer. (*Id.*, Exs. Vol. 1, Ex. 4 [Mickelson Decl. ¶¶ 5–6, 10].) Specifically, NIPP points to evidence that Clear Channel charges monopolistic prices for rock concert tickets. (Defs.' Br., Ex. A–8 [Prelim. Economic Report of Phillips at 25–26].) According to NIPP's expert and available Pollstar data, in 2000, NIPP charged an average $13.32 per rock concert ticket, Clear Channel Concerts/Clear Channel Radio Festivals an average $18.10, SFX/Clear Channel Entertainment an average of $33.69, and House of Blues an average of $31.69. (*Id.*, Ex. A–8 [Prelim. Economic Report of Phillips, Ex. E].) From 2000 to 2001, the average increase in

price of rock concert tickets in the Denver area was 3.7%. Consistent with this average, NIPP raised the price of its rock concert tickets by 3.8% to $13.83. (*Id.*, Ex. A–8 [Prelim. Economic Report of Phillips at 25, Ex. E].) Similarly, in 2001, House of Blues raised its rock concert tickets by 2.2% to $32.40. (*Id.*, Ex. A–8 [Prelim. Economic Report of Phillips at 25, Ex. E].) Rock concerts promoted by Clear Channel Concerts/Clear Channel Radio Festivals experienced a 46.5% increase in ticket prices to $26.51 per ticket, and rock concerts promoted by SFX/Clear Channel Entertainment increased by 23.5% to $41.59 per ticket. (*Id.*, Ex. A–8 [Prelim. Economic Report of Phillips at 25, Ex. E].) NIPP argues that this pricing data is evidence of monopoly power.

Second, NIPP claims that Clear Channel has made numerous derogatory comments about NIPP to artists, their management, and record labels; these comments include statements that (1) NIPP does not pay its bills to radio stations for advertising, and (2) NIPP has made other misrepresentations to record labels and their artists. Third, according to NIPP, Clear Channel's practice of booking entire national tours of artists excludes other promoters from competing for their concerts in local markets. (*Id.*, Exs. Vol. 1, Ex. 4 [Mickelson Decl. ¶¶ 10–11], Ex. 2 [Morreale Decl. ¶ 30].) Fourth, NIPP claims that Clear Channel's refusal to allow other promoters to book concerts at the Fillmore Auditorium in Denver and its preferential access to the Pepsi Center, Denver's sports arena, and the City Lights Pavilion, give Clear Channel an improper competitive advantage. (*Id.*, Exs. Vol. 1, Ex. 4 [Mickelson Decl. ¶¶ 8].)

### II. *Procedural History*

On August 6, 2001, NIPP filed a complaint in this court against Clear Channel

Communications, SFX/Clear Channel Entertainment, Clear Channel Radio, Inc., Clear Channel Broadcasting, Inc., KBCO, KBPI, KRFX, and KTCL. (Compl. & Jury Demand [filed August 6, 2001] [hereinafter "Compl."].) In its complaint, NIPP alleges that Clear Channel is liable for violation of sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1–2 (West & Supp.2003), for (1) monopolization, (2) attempted monopolization, (3) unlawful tying, and (4) withholding an essential facility. (Compl.¶¶ 59–89.) Additionally, NIPP argues that Clear Channel is liable for violation of the Colorado Antitrust Act, Colo. Rev.Stat. § 6–4–105, violation of the Colorado Consumer Protection Act, Colo.Rev. Stat. § 6–1–101, tortious interference with contractual relations, and tortious interference with prospective business relations. (Compl.¶¶ 90–121.) On October 5, 2001, defendants filed a motion to dismiss for lack of jurisdiction and other issues. (Mot. to Dismiss [filed October 5, 2001].) On July 19, 2002, the court denied defendants' motion to dismiss. (Courtroom Minutes from July 19, 2002.)

On August 8, 2002, NIPP filed its first amended complaint, wherein it added plaintiffs Ogden Resurrection Project, Swank Management, and NIPP, LLC, and defendants SFX, Jacor, Citicasters Co., Citicasters Licensing Co., and Tsunami Communications. (Am.Compl.) NIPP also dismissed its claims against KBCO, KBPI, KRFX, KTCL, and Clear Channel Radio. (Id.) NIPP did not alter the claims for relief in its amended complaint. (Id.) On August 21, 2002, defendants filed their Answer and affirmative defenses with the court. (Answer [Filed August 21, 2002].)

On October 7, 2002, defendants filed a motion for summary judgment without supporting materials. On November 1, 2002, defendants again filed a motion for summary judgment, but included supporting exhibits and memoranda. (Defs.' Mot.

for Summ. J. [filed November 11, 2002].) In their motion, defendants make numerous arguments in support of dismissing the case. First, Clear Channel argues that NIPP has failed to state a claim under federal or state antitrust laws because (1) it has not properly defined the relevant market under antitrust law; (2) NIPP cannot show monopoly power; and (3) NIPP has no evidence of instances of anticompetitive conduct on the part of Clear Channel Communications or its subsidiaries. (Defs.' Br. at 32–64.) Clear Channel further argues that NIPP's antitrust claims fail because (1) NIPP cannot prove a "tying arrangement," since a tying product does not exist, and (2) NIPP has no claim under the "Essential Facilities Doctrine" as radio stations are not an essential facility. (Id. at 75–82.) Additionally, Clear Channel asserts that, since NIPP has not demonstrated specific instances of tortious conduct directed toward NIPP, it cannot prove its claims for violation of the Colorado Consumer Protection Act, tortious interference with contract, or intentional interference with prospective business relations. (Id. at 83–86.)

On December 23, 2002, plaintiffs filed their response to defendants' motion for summary judgment. (Pls.' Resp.) Therein, NIPP argues that it has stated proper claims for relief under federal and state antitrust laws, the Colorado Consumer Protection Act, and the common law against tortious interference. Specifically, NIPP claims that (1) the markets of "rock concert promotions" and "rock radio stations" are definable, (2) Clear Channel has monopoly power in the rock radio market and has a dangerous probability of acquiring it in the rock concert promotions market, and (3) Clear Channel has engaged in anti-competitive conduct by threatening artists with loss of radio air play to gain leverage in the concert promotions industry. (Pls.' Resp. at 9–32,

37–90.) Additionally, NIPP asserts that there is evidence of a tying arrangement, and radio stations are an essential facility for the promotion of rock concerts. (*Id.* at 91–100.) Finally, NIPP argues that it has produced admissible evidence to support its state claims for violation of the Colorado Consumer Protection Act, tortious interference with contract, and tortious interference with prospective business relations. (*Id.* at 101–106.)

On November 1, 2002, Defendant Clear Channel Communications, the parent company of all other defendants, also filed its own motion for summary judgment. (CCC Mot. for Summ. J.) In its motion, Clear Channel Communications argues that, although it is the parent company to the alleged wrongdoers in this case, it cannot be held liable for the alleged misconduct of its separately incorporated radio or concert promotion subsidiaries, because it is merely a shareholder in these entities and does not operate the radio stations or engage in concert promotions. (CCC Mot. for Summ. J. at 1, 6–12.) On December 23, 2002, NIPP filed its response to Clear Channel Communications motion for summary judgment. (Resp. to CCC Mot. for Summ. J.) In its response, NIPP argues that Clear Channel Communications is liable for its subsidiaries' wrongdoings both directly and as an alter ego of its subsidiary. (*Id.* at 6–22.)

On August 6, 2003, defendants filed a motion to exclude the testimony of NIPP's expert witness, Dr. Owen Phillips. (Defs.' Mot. to Exclude Expert Test. [filed August 6, 2003] [hereinafter "Mot. to Exclude Expert"].) On November 3, 2003, NIPP filed a response to this motion. (Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude Expert Test. [filed November 3, 2003] [hereinafter "Resp. to Mot. to Exclude Expert"].) On December 19, 2003, Clear Channel Communications filed a reply in support of its motion to exclude. (Reply Mem. in Supp.

of Defs.' Mot. to Exclude Expert Test. [filed December 19, 2003] [hereinafter "Reply in Supp. of Mot. to Dismiss"].) All motions having been fully briefed, the court may now appropriately rule upon them.

## ANALYSIS

### I. Legal Standard for Summary Judgment

Pursuant to rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Concrete Works, Inc. v. City & County of Denver,* 36 F.3d 1513, 1517 (10th Cir.1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.,* 36 F.3d at 1518 (citing *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. at 2554). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553; *see* Fed.R.Civ.P. 56(e).

A genuine issue of fact does not exist, and summary judgment is appropriate, if the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106

S.Ct. at 2510. If the nonmoving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249, 106 S.Ct. at 2511. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 252, 106 S.Ct. at 2512. The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir. 1985). Additionally, the court, when ruling on a motion for summary judgment, must construe the facts in the light most favorable to the nonmoving party. *Id.*

Federal courts applying state law ascertain and apply the proper state law with the goal of insuring that the result obtained is the one that would have been obtained in state court. *Occusafe, Inc. v. EG&G Rocky Flats, Inc.,* 54 F.3d 618, 621 (10th Cir.1995) (citing *Allen v. Minnstar, Inc.,* 8 F.3d 1470, 1476 [10th Cir.1993] ). To determine which state's substantive law to apply, a federal court applies the choice of law provisions of the state in which the court sits. *Trierweiler v. Croxton and Trench Holding Corp.,* 90 F.3d 1523, 1532 (10th Cir.1996) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–1022, 85 L.Ed. 1477 [1941] ). Under Colorado 'choice of law' law, Colorado law applies to this case because Colorado has the most significant relationship to plaintiffs' claims, considering that the allegedly tortious and anticompetitive behavior occurred in Colorado and all parties operated in Colorado at the time of the alleged tortious behavior. *First Nat'l Bank in Fort Collins v. Rostek,* 182 Colo. 437, 514 P.2d 314, 320 (1973);

*ITT Specialty Risk Servs. v. Avis Rent A Car Sys., Inc.,* 985 P.2d 43, 47 (Colo.Ct. App.1998).

## II. Parent Clear Channel Communications' Motion for Summary Judgment

In its motion for summary judgment, Parent Clear Channel Communications asks the court to dismiss it as a defendant. (CCC Mot. for Summ. J.) According to Clear Channel Communications, it cannot be held directly liable or liable as an alter ego to its subsidiaries, SFX/Clear Channel Entertainment and Jacor, for the allegedly wrongful conduct at issue in this case. (*Id.* at 6–12.) The court addresses each argument in turn.

### A. Direct Liability

 First, Clear Channel Communications argues that it cannot be held directly liable for antitrust violations under the Sherman Act because it is a holding company and not a seller, supplier, participant, or competitor in any of the product and geographic markets relevant to this case.[2] (*Id.* at 6.) NIPP counters that Clear Channel Communications sufficiently participates in the behavior of SFX/Clear Channel Entertainment and Jacor to be directly liable under the Sherman Act, because Clear Channel Communications directs and encourages the anticompetitive conduct. (Resp. to CCC Mot. for Summ. J. at 4.) According to NIPP, Clear Channel Communications acts as an operating company, as opposed to a holding company, and can, therefore, be held directly liable. (*Id.*)

Absent allegations or evidence of "independent conduct" on the part of the parent, there is no basis upon which to hold a

---

**2.** NIPP alleges that the relevant markets are the markets for rock radio and rock concerts in the Denver, Colorado metropolitan area.

parent directly liable for the acts of a subsidiary. *Invamed, Inc. v. Barr Labs.*, 22 F.Supp.2d 210, 219 (S.D.N.Y.1998); *Drinkwine v. Federated Publ'ns, Inc.*, 780 F.2d 735, 741 (9th Cir.1985); *Gemco Latinoamerica, Inc. v. Seiko Time Corp.*, 685 F.Supp. 400, 403 (S.D.N.Y.1988); *Reynolds Metals Co. v. Columbia Gas Sys., Inc.*, 669 F.Supp. 744, 750 (E.D.Va.1987). The question is what level of independent conduct is sufficient to hold a parent directly liable for anticompetitive effects occurring at the subsidiary level. Clear Channel Communications' apparent response to this question is that a parent must be an actual seller, competitor, or participant in the market before it can be held liable under the antitrust laws. (CCC Mot. for Summ. J. at 6.) Clear Channel Communications, however, never endeavors to define the terms "seller, competitor, or participant." It appears to take the position that a parent corporation must actually be a named party to a transaction in the market in order to qualify as a market participant.

NIPP counterargues that the terms "seller" and "participant" have a broader meaning under antitrust laws, encompassing parents who direct their subsidiary's behavior in a relevant market. NIPP bases its argument on the Supreme Court's holding in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 773–774, 104 S.Ct. 2731, 2743, 81 L.Ed.2d 628 (1984). In *Copperweld*, the court held that a parent cannot be held liable for conspiring with its subsidiaries to engage in anticompetitive conduct under section 1 of the Sherman Act, because the parent and subsidiaries are, for antitrust purposes, a single enterprise acting with a unity of purpose. *Id.* According to NIPP, therefore, a parent can be directly liable for a subsidiary's anticompetitive conduct when it directs and orchestrates such conduct, because parents and subsidiaries may be considered a single enterprise by the Sherman Act.

Clear Channel Communications claims, however, that no court has ever found a parent liable for the acts of a subsidiary under the antitrust laws, absent alter ego liability. In support of its argument, Clear Channel Communications cites cases holding that, absent allegations or evidence of independent conduct on the part of the parent, there is no basis upon which to hold a parent directly liable for the acts of a subsidiary. *Invamed*, 22 F.Supp.2d at 219; *Drinkwine*, 780 F.2d at 741; *Gemco Latinoamerica*, 685 F.Supp. at 403; *Reynolds Metals*, 669 F.Supp. at 750. Specifically, when a plaintiff alleges, as the only basis for liability against a parent, that the parent owns the subsidiary that engaged in wrongful conduct, such allegation is insufficient to hold a parent directly liable for the wrongful conduct. *Id.* Clear Channel Communications' argument, however, misses the mark because, in contrast to the cases which it cites, independent conduct on the part of the parent has been alleged in this case, and the question is whether this independent conduct is sufficient under antitrust laws to implicate direct liability.

If a parent corporation, through its own employees and agents, is directing, controlling, and encouraging a wholly-owned subsidiary's anticompetitive conduct, the subsidiary dare not defy its sole shareholder's policies. To conclude that a parent can direct and require anticompetitive conduct of its subsidiaries, like any principal directing the conduct of an agent, and then escape antitrust liability by hiding behind its separate incorporation is counterintuitive. Furthermore, the Supreme Court has suggested that direct liability may exist for parent corporations under the Sherman Act. *Copperweld*, 467 U.S. at 777, 104 S.Ct. at 2744–2745 (stating in dicta that

"[a]ny anticompetitive activities of corporations and their wholly-owned subsidiaries meriting antitrust remedies may be policed adequately without resort to the intra-enterprise conspiracy doctrine.... The *enterprise* is fully subject to § 2 of the Sherman Act ....")." Additionally, lower courts have recognized that parent corporations can be held directly liable for independently participating in the antitrust violations of their subsidiaries. *Reading Int'l, Inc. v. Oaktree Capital Mgmt., LLC,* 2003 WL 22928728 (S.D.N.Y. Dec. 10, 2003) (slip copy); *Carl Hizel & Sons, Inc. v. Browning–Ferris Indus., Inc.,* 590 F.Supp. 1201, 1202 (D.Colo.1984).

In *Reading Int'l,* an independent movie theater sued two large, national movie houses, Loews and Regal Entertainment, which each owned large multiplexes in competition with plaintiff. Additionally, the plaintiff sued shareholders of these movie house companies, including Oaktree Capital Management ("Oaktree") that held 40% of the shares in Loews and 17% of Regal Entertainment. *Reading Int'l,* 2003 WL 22928728 at *4. Defendants argued that Oaktree could not be held accountable under the Sherman Act, absent alter ego liability, because Oaktree was not a competitor in the relevant market. *Id.* The court in *Reading Int'l* rejected this argument. In reaching its conclusion, the court analogized the definition of competitor under the Sherman Act to the definition of competitor under the Clayton Act. Specifically, the court stated:

'A parent corporation is not a competitor of another corporation merely because its subsidiary is.' On the other hand, to interpret [the Clayton Act] as meaning that the business activity of the subsidiary can never be considered in determining whether the parent is a competitor within the meaning of section 8 would assume that Congress intended to permit such a simple and obvious means of avoidance as to render the statute

meaningless, and would ignore the Supreme Court's admonition that the antitrust laws are 'aimed at substance rather than form.' This reasoning holds equal force in determining liability under section 2 [of the Sherman Act], as each of these sections of antitrust laws shares the primary concern of preventing the undue aggregation of market power.

*Id.* at 17 (quoting *U.S. v. Crocker Nat'l Corp.,* 656 F.2d 428 [9th Cir.1981] [reversed on other grounds]). The *Reading Int'l* court recognized that wrongful conduct may occur at the parent level resulting in anticompetitive effects reverberating at the subsidiary level. *Id.* The court, therefore, held that a parent may be directly liable for anticompetitive conduct at the subsidiary level when the parent sufficiently controls the subsidiary. *Id.*

This court finds the above analysis persuasive and holds that a parent can be considered a competitor in a market where its subsidiary is a participant if, and only if, the parent sufficiently controls, dictates, or encourages the policies of the subsidiary. When the parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act. *Id.; Copperweld,* 467 U.S. at 777, 104 S.Ct. at 2744–2745.

Clear Channel Communications argues that NIPP has failed to sufficiently allege or demonstrate independent conduct on the part of Clear Channel Communications. Here, however, the allegations in the complaint and the contents of the record create a dispute of material fact as to whether Clear Channel Communication engaged in sufficient independent conduct to be deemed a competitor in the rock concert and rock radio markets at issue in

this case. In the amended complaint, NIPP specifically alleges as to Clear Channel Communications:

This is an action for damages and injunctive relief arising out of the unlawful and anticompetitive practices of a major radio broadcasting and concert promotion conglomerate, Clear Channel Communications, Inc.—by itself and through its various subsidiaries and affiliates—to prevent NIPP and others from competing to offer concert promotions services in the Denver, Colorado metropolitan area ....... Upon information and belief, Clear Channel intends to continue and extend its anticompetitive, predatory and exclusionary conduct ....... Clear Channel Communications states as follows, "We can now leverage our broadcasting assets to reach listeners who have an affinity for music to promote our live entertainment events and ultimately increase ticket revenue.... "Opportunities for synergies" among Clear Channel's various business divisions "are explosive and are in the very early innings."

(Am.Compl.¶¶ 1, 50.) Additionally, NIPP makes allegations concerning "Clear Channel," which collectively includes Clear Channel Communications:

Clear Channel has repeatedly used its size and clout to coerce artists ... to use Clear Channel to promote their concerts or else risk losing airplay or other on-air promotional support on radio stations owned or otherwise controlled by Clear Channel.... Clear Channel is leveraging its market power over certain dedicated formats of local FM radio ... to unlawfully acquire, maintain and extend its market power over the local concert promotion business in the relevant market.

(Am.Compl.¶¶ 46–47.) These allegations clearly refer to Clear Channel Communications, as do others. Additionally, these main allegations focus on Clear Channel Communications' coordinated use of its different subsidiaries to increase the power of its subsidiaries and, hence, itself, in various markets. This allegation of coordinated action emanating from the parent is sufficient to state a claim against Clear Channel Communications for direct liability.

Furthermore, the record supports a finding that Clear Channel Communications directs and controls the policies and behavior of its subsidiaries. First, management of Clear Channel Communications sets the vision, strategy, and culture of all subsidiaries. (Resp. to CCC Mot. for Summ. J., Ex. 5 [ M. Mays Dep. at 39, 85].) Mark Mays, President and Chief Operating Officer of Clear Channel Communications, and Randall Mays, Chief Financial Officer of Clear Channel Communications, testified that Clear Channel Communications operates its subsidiaries as divisions of the company, with each division, such as entertainment and radio, reporting up to Mark Mays at Clear Channel Communications. (*Id.*, Ex. 5 [M. Mays Dep. at 43–44], Ex. 6 [R. Mays Dep. at 26].) According to Randall Mays, written reports from Jacor on its radio operations in Denver are regularly required to be submitted to its parent company and ultimately Clear Channel Communications. (*Id.*, Ex. 6 [R. Mays Dep. at 38–39].)

Furthermore, Clear Channel Communications participates in the budgeting process for all subsidiaries and reviews subsidiaries' plans for achieving revenue. (*Id.*, Ex. 5 [M. Mays Dep. at 64].) Clear Channel Communications controls subsidiaries' budgets by writing most of the checks that the subsidiaries require so the divisions cannot spend money on capital acquisitions without consulting with Clear Channel Communications for funding. (*Id.*, Ex. 5 [M. Mays Dep. at 84–85].) Clear Channel Communications handles

the payroll for all of its subsidiaries' Denver radio employees. (*Id.*, Ex. 6 [R. Mays Dep. at 40].) Finally, according to Clear Channel's 10–K filings, Clear Channel Communications "routinely reviews staffing levels and operating costs ... [and] advises local managers on broad policy matters and is responsible for long-range planning, allocating resources, and financial reporting, and controls." (*Id.*, Ex. 4 [10–K Filing at 100].)

Mark Mays further testified that Clear Channel Communications coordinates meetings between managers from the different subsidiaries "to try and encourage networking within the company ... to try to get people to work better together." (*Id.*, Ex. 5 [M. Mays Dep. at 51].) Clear Channel Communications has gone so far as to create a Synergy Department to facilitate communication and cooperation between the different subsidiaries. (*Id.*, Ex. 5 [M. Mays Dep. at 51].) Additionally, Randall Mays testified that Clear Channel Communications takes advantage of synergies between radio and live entertainment by using radio stations to cross-promote live entertainment. (*Id.*, Ex. 6 [R. Mays Dep. at 125–126].) Because a reasonable jury could conclude, based on the evidence in the record, that Clear Channel Communications operates as an operating company, controlling and managing the conduct of its subsidiaries, rather than as a holding company, summary judgment is inappropriate on the issue of Clear Channel Communications' potential direct liability.

### B. Alter Ego Liability

 Even if Clear Channel Communications did not engage in sufficient independent conduct to be directly liable for alleged violations of the Sherman Act, NIPP has properly alleged and set forth sufficient evidence to create a triable issue of fact as to whether Clear Channel Communications may be held liable as an alter ego of its wholly-owned subsidiaries.

A corporation may be held liable for the acts of its subsidiary, and its corporate veil may be pierced, where the subsidiary is merely an alter ego of the principal.[3] *Nat'l Labor Relations Board v. Greater Kansas City Roofing,* 2 F.3d 1047, 1054 (10th Cir.1993). A subsidiary is the alter ego of its parent when (1) there is such a unity of interest and lack of respect given to separate identity of parent and subsidiary that personalities and assets of parent and subsidiary are indistinct, and (2) adherence to the corporate fiction sanctions fraud, promotes injustice, or leads to an evasion of legal obligations. *Id.* Among the specific factors used in determining whether the parent and subsidiary have maintained their separate identities are: (1) whether the subsidiary is operated as a separate entity; (2) whether parent and subsidiary have commingled funds; (3) whether the subsidiary has failed to maintain adequate minutes and records; (4) whether the parent owns and controls the subsidiary; (5) whether the subsidiary lacks corporate assets or is undercapitalized; (6) whether the subsidiary is used as a mere shell, instrumentality or conduit of the parent; (7) whether the parent and subsidiary have disregarded the legal formalities and failed to maintain an arms-length relationship, and (8) whether there has been a diversion of the subsidiary's assets for use by the parent. *Id.* 1047 n. 6.

Here, Clear Channel Communications first argues that NIPP has failed to plead

---

**3.** There is a lack of case law regarding whether state or federal alter ego common law is properly applied in federal antitrust cases. Because federal law and Colorado state law are very similar, the result would be the same whether federal or state law were applied. Accordingly, the court will apply federal law because the majority of the relevant claims fall under federal law.

facts which, if established, would show that piercing the corporate veil is warranted. NIPP has, however, sufficiently plead facts pertaining to one or more of the forgoing factors. NIPP alleges in its complaint that Clear Channel Communications has used its subsidiaries to engage in legal misconduct for its own benefit. (Am. Compl.¶ 1.) NIPP alleges that Clear Channel Communications wholly-owns its subsidiaries, SFX/Clear Channel Entertainment, Jacor, Clear Channel Concerts/Clear Channel Radio Festivals, Clear Channel Broadcasting, Citicasters Co., Citicasters Licenses, Inc., and Tsunami Communications, Inc. (Am.Compl.¶¶ 8–14.) Additionally, NIPP alleges that Clear Channel Communications controls its subsidiaries and treats its subsidiaries' assets as its own. (Am.Compl.¶ 26.) Finally, NIPP alleges that Clear Channel Communications controls its subsidiaries' assets so as to leverage those assets to aid other subsidiaries in accomplishing illegal ends. (Am. Compl.¶ 50.) Because these allegations bear on several factors necessary to prove alter ego liability, the court finds that NIPP's amended complaint is sufficient to set forth a claim for alter ego liability. *See Accordia Northeast, Inc. v. Thesseus Int'l Asset Fund,* 205 F. Supp.2d 176, 181–182 (S.D.N.Y.2002); *William E. Black Invs., Inc. v. Eric Envtl., Inc.,* 1998 WL 801837 (N.D.Ill.1998).

Secondly, Clear Channel Communications argues that the record does not contain sufficient evidence proving alter ego liability for NIPP's claim to survive summary judgment. NIPP has, however, adduced sufficient evidence. As stated earlier, the record supports a finding that Clear Channel Communications directs and controls the policies and behavior of its subsidiaries with such a unity of interest and lack of respect given to separate identity of parent and subsidiary that personalities and assets of parent and subsidiary are indistinct. First, management of Clear Channel Communications sets the vision, strategy, and culture of all subsidiaries. (Resp. to CCC Mot. for Summ. J., Ex. 5 [ M. Mays Dep. at 39, 85].) Mark Mays and Randall Mays testified that Clear Channel Communications operates its subsidiaries as divisions of the company, with each division, such as entertainment and radio, reporting up to Mark Mays at Clear Channel Communications. (Resp. to CCC Mot. for Summ. J., Ex. 5 [M. Mays Dep. at 43–44], Ex. 6 [R. Mays Dep. at 26].) Accordingly, there is evidence that Clear Channel Communications' subsidiaries are not operated as separate entities but are controlled by Clear Channel Communications. *Greater Kansas City Roofing,* 2 F.3d at 1054 n. 6.

Second, Clear Channel Communications controls subsidiaries' budgets by writing most of the checks that the subsidiaries require so the divisions cannot spend money on capital acquisitions without consulting with Clear Channel Communications for funding. (*Id.,* Ex. 5 [M. Mays Dep. at 84–85].) Additionally, Clear Channel Communications handles the payroll for all of its subsidiaries' Denver radio employees. (*Id.,* Ex. 6 [R. Mays Dep. at 40].) Accordingly, a dispute of fact exists as to whether Clear Channel Communications and its subsidiaries commingle their funds and the subsidiaries lack corporate assets to manage their own business affairs. *Greater Kansas City Roofing,* 2 F.3d at 1054 n. 6.

Additionally, written reports from Jacor on its radio operations in Denver are regularly required to be submitted to its parent company and ultimately Clear Channel Communications. (*Id.,* Ex. 6 [R. Mays Dep. at 38–39].) As stated earlier, Clear Channel Communications participates in the budgeting process for all subsidiaries and reviews subsidiaries' plans for achieving revenue. (*Id.,* Ex. 5 [M. Mays Dep. at

64].) Clear Channel Communications "routinely reviews staffing levels and operating costs ... [and] advises local managers on broad policy matters and is responsible for long-range planning, allocating resources, and financial reporting, and controls." (*Id.,* Ex. 4 [10–K Filing at 100].) Accordingly, evidence exists demonstrating that (1) the subsidiaries may be used as mere shells and instrumentalities of the Clear Channel Communications and (2) they have disregarded the legal formalities and failed to maintain an arms-length relationship. *Greater Kansas City Roofing,* 2 F.3d at 1054 n. 6.

Finally, evidence demonstrates that a reasonable jury could conclude that Clear Channel Communications utilizes its separate subsidiaries for a common goal of inequitable, anticompetitive conduct. *Greater Kansas City Roofing,* 2 F.3d at 1054. Clear Channel Communications coordinates meetings between managers from the different subsidiaries. (*Id.,* Ex. 5 [M. Mays Dep. at 51].) Clear Channel Communications has created a Synergy Department. (*Id.,* Ex. 5 [M. Mays Dep. at 51].) And Clear Channel Communications takes advantage of synergies between radio and live entertainment by using radio stations to cross-promote live entertainment. (*Id.,* Ex. 6 [R. Mays Dep. at 125–126].) Based on the record before the court, NIPP has raised sufficient evidence and disputes of material fact regarding Clear Channel Communications' relationship with its subsidiaries to survive summary judgment on its claim for alter ego liability.

## III. Defendants' Motion for Summary Judgement

Defendants' motion for summary judgment seeks dismissal of plaintiffs' claims

based on plaintiffs' alleged failure to provide sufficient evidence to support the elements of each claim. Specifically, defendants seek dismissal of plaintiffs' federal antitrust claims under the Sherman Act, plaintiffs' state antitrust claims under Colorado statute, and plaintiffs' other state law claims for tortious interference with contract, tortious interference with prospective business advantage, and violation of Colorado's Consumer Protection Act. The court addresses each of plaintiffs' claims in turn.

### A. Antitrust [4]

Clear Channel argues that summary judgment should be granted as to all of NIPP's antitrust claims because NIPP can prove no set of facts showing that: (1) Clear Channel has imposed a tying arrangement on rock artists, requiring that artists choose Clear Channel for concert promotions if artists wish to "buy" radio air play for their records; (2) Clear Channel possesses monopoly power in the rock-concert promotions market; (3) Clear Channel has attempted to monopolize the rock-concert promotions market; and/or (4) Clear Channel has denied NIPP and other promoters access to radio promotions, which are an essential facility. (Defs.' Br. 1–4.) Conversely, NIPP claims that disputes of relevant fact permeate NIPP's antitrust action to such an extent that summary judgment is inappropriate. (Pls.' Resp. at 1.) Although NIPP's different antitrust claims require different elements of proof, proof of a relevant product market is required for all of NIPP's antitrust claims. Because all of NIPP's antitrust claims require examination of the threshold issue of relevant product market, the court first addresses this issue.

4. Because Colorado antitrust law mirrors federal antitrust law under the Sherman Act, the court will solely examine plaintiffs' claims under federal law as dispositive of plaintiffs' state law claims.

Thereafter, the court examines each of NIPP's antitrust claims individually.

### 1. Relevant Market Definition

■ The first step in analyzing an antitrust claim is to determine the relevant product market in which the defendant is operating. *Telecor Communications, Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1130 (10th Cir.2002). In order to state a claim under antitrust law, plaintiff must define this market. *Id.* The relevant market consists of both a geographic market and a product market. *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 756 (10th Cir.1999); *Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1567 (10th Cir.1991). Here, the parties concede that the relevant geographic market is the Denver metropolitan area. Accordingly, the scope of the product market is the only market issue in this case. *Telecor*, 305 F.3d at 1130.

NIPP has classified the relevant product markets as (1) the market for rock music concert promotions/tickets and (2) the market for advertising and promotional support on rock music radio. (Pls.' Resp. at 42–51, 52–60.) According to NIPP, these product markets are properly defined as relevant because Clear Channel's anticompetitive behavior has impacted various inputs, thereby affecting output in these markets. In the alternative, NIPP claims that a product market exists for all music concert promotion services, not just rock music. (*Id.* at 51–52.) Conversely, Clear Channel argues that NIPP has failed to define a relevant market because NIPP has provided no economic data to support its allegations. (Defs.' Br. at 33–35, 37–38.)

There is no subject matter in antitrust law more confusing than market definition. *Telecor*, 305 F.3d at 1130. The concept of market definition itself oversimplifies the very complex interactions between a number of differently situated buyers and sellers, each of whom has different costs, needs, and substitutes. *Id.* at 1131 (citing *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 [10th Cir.1994] ). At its simplest, the relevant product market is that market which is relevant to the legal issue before the court. *Id.* at 1130. By defining the relevant market, the court strives to identify firms that compete with each other and the alleged anticompetitive conduct restraining trade in the market. *Id.* (citing *SCFC ILC*, 36 F.3d at 966). The definition of the relevant market is a question of fact for the factfinder, and the plaintiff has the burden of proof on the issue. *Id.*

More specifically, a product market is composed of products reasonably interchangeable for the purposes for which they are produced. *Id.* The definition of relevant market, therefore, turns on a determination of available substitutes. *Id.* Available substitutes are demonstrated if, when prices are appreciably raised or volume appreciably curtailed for the product within the geographic area, supply from other sources can be expected to enter promptly enough or in large enough amounts to restore the old price and volume. *Id.* (citing *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 [10th Cir. 1994] ). Reasonable interchangeability, therefore, includes analysis of cross-elasticity of demand. *Id.* at 1131. Demand for a product is said to be "elastic" if an increase in the price causes less of the product to be purchased. *See id.* There is said to be "cross-elasticity of demand" between two products if rising prices for product A cause consumers to switch to product B. *See id.* The inference is that consumers readily substitute one product for the other and that the products, therefore, probably compete in the same market.

#### a. Choosing the Relevant Market

At the outset, it is important to note that NIPP's allegations implicate numerous dif-

ferent buyers and sellers, and, consequently, numerous different potentially relevant product markets. Accordingly, the first determination necessary in defining the market in this case is locating, in a meringue of transactions and exchanges, the sellers, the buyers, and the products at issue. Only after determining these broader issues can the court focus on the narrower issue of the scope of the product market based on reasonable interchangeability.

The identity of the relevant product to be studied to determine the market varies based on the level of commerce where the plaintiffs argue the defendants have monopolized competition. *Telecor*, 305 F.3d at 1132. Within the universe of a product market, therefore, there may exist a submarket—a portion of the product market that, for purposes of the specific antitrust case, is considered a separate market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Submarket analysis is par and parcel of the reasonable interchangeability test. *White and White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983). Similarly, the identity of the relevant consumer for the purposes of determining market definition is not necessarily the end-user of the product, but, rather, is also determined based on the level of commerce effected by defendant's behavior. *Telecor*, 305 F.3d at 1132–1133; *Full Draw*, 182 F.3d at 753; *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481–482, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992) (citations omitted).

For example, in *Telecor*, a telephone company, Telecor, accused a competitor, Southwestern Bell, of monopolizing the market for pay-telephone services. *Id.* at 1132–1133. Specifically, Telecor com-plained that Southwestern Bell had locked all owners of pay-telephone locations into punitive, long-term contracts with Southwestern Bell, so location owners could not allow other telephone companies to place their pay-telephones on the location owner's property. *Id.* at 1133. In seeking to define the relevant product market, Southwestern Bell argued that cellular telephones were a part of the relevant market because cellular telephones are reasonably interchangeable with pay phones by the end-consumers using telephones. *Id.* The Tenth Circuit rejected Southwestern Bell's proposed market definition and held that the relevant consumer for purposes of market definition was the location owner, who would not view cellular telephones as a reasonable substitute for pay-telephone contracts. *Id.* In essence, the court recognized that, because Southwestern Bell competed with Telecor for pay-telephone locations, the owners of those locations, not the end-users of telephones, constituted the relevant market, even though this market was only one component or input to the universe of end-consumers of telephones. *Id.* Specifically, the court stated:

> A monopolist may [not] act with impunity so long as end-use consumer prices are unaffected.... [The Sherman Act] does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.... The Supreme Court has clearly held that antitrust laws apply not only to restraints on output markets, but to input markets as well, including both labor and input commodities.... [Restraints on input markets] fall under antitrust purview be-

cause [they] will eventually adversely affect [end]-consumers.

*Id.* at 1133–1134, 1136 (quoting *Mandeville Island Farms v. Am. Crystal Sugar Co.,* 334 U.S. 219, 235–236, 68 S.Ct. 996, 92 L.Ed. 1328 [1948]; *Brown v. Pro Football, Inc.,* 50 F.3d 1041, 1061 [D.C.Cir.1995] ).

Defining the relevant set of consumers is the first issue prescribed by the parties. In some of its antitrust claims, NIPP defines the relevant market as the market for the sale of rock music concert tickets, where the seller is the rock promoter and the **buyer is the rock-concert going public.** Clear Channel argues that the relevant markets for the monopolization and attempted monopolization claims are two specific input markets, (1) the market for all music concert promotional services, where the seller is the promoter and the **buyer is the artist,** and (2) the market for all advertising on all radio, where the seller is the radio station and the **buyer is the advertiser.** (Defs.' Br. at 36, 43–46.) Based on NIPP's allegations regarding the alleged anticompetitive conduct, several different markets are relevant, depending upon which claim the court is analyzing.

### *(1) The Market for Live Music Concerts (Monopolization and Attempted Monopolization Claims)*

In NIPP's monopolization and attempted monopolization claims, NIPP alleges competitive injury in the end-use product market, which is the market for tickets to rock music concerts, where the seller is the music concert promoter and the buyer is the concert-going public. (Pls.' Resp. at 42–47.) NIPP alleges that Clear Channel's conduct injures competition in this market by denying Clear Channel's competitors access to several different inputs crucial to competition in the market for rock music concert ticket sales. (Exs. to Mem. in Supp. of Defs.' Mot. for Summ. J., Ex. A–08 [Prelim. Economic Report of Owen R. Phillips,

Ph.D. at 4].) NIPP describes these inputs as rock artists, rock radio advertising, rock radio promotional support, concert venues, and promotions employees. (*Id.,* Ex. A–08 [Prelim. Economic Report of Dr. Phillips at 4].) Specifically, NIPP argues that (1) Clear Channel manipulates artists into choosing Clear Channel concert promotion services by threatening loss of radio air play if the artist uses a competitor to promote a concert; (2) Clear Channel engages in predatory pricing by offering rock artists substantially higher amounts than sought by the artist, thereby significantly outbidding its promotions competitors and recouping its losses by charging ticket purchasers higher monopolistic prices; (3) Clear Channel denies its promotions competitors historical access to advertising, promotional support, and air play on its rock radio stations; and (4) Clear Channel uses predatory practices to steal NIPP's employees. (Pls.' Resp. at 80–90.) Because Clear Channel's anticompetitive conduct allegedly affects NIPP's access to these inputs, the separate product markets for these inputs are also implicated. These input markets include the market for promotional services, radio air play, advertising, and promotional support, which are addressed below.

Clear Channel argues that analysis of the output market is inappropriate because, absent harm in the separate input markets, there can be no harm in the output markets. (Defs.' Br. at 36.) According to Clear Channel, therefore, only the input markets should be analyzed. Clear Channel would analogize this case to *Telecor* where the court limited its analysis to the input market. *Telecor,* 305 F.3d at 1132. This case, however, is not analogous to *Telecor* because, in *Telecor,* the defendant's behavior affected only one market, a single input market, while, here, defendants' behavior is asserted to affect several

input markets, plus the downstream output market. *Id.*

In an antitrust case, when evaluating many different instances of conduct by defendant, the conduct as a whole must always be analyzed, rather than compartmentalized, because it is the cumulative impact of the conduct on consumers which is the relevant inquiry in a monopolization claim. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509, 1522 n. 18 (10th Cir. 1984) (affirmed in *Aspen Skiing,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467); Philip E. Areeda, Roger D. Blair & Herbert Hovenkamp, Antitrust Law ¶ 310 (2d ed.2000). Although compartmentalized examination of the separate input market would be proper if only one input were implicated, when many different instances of conduct allegedly affect different inputs and collectively injure competition in a downstream output market, the relevant market is the downstream market, which is the only level of commerce at which the behavior can be examined collectively.

Even if Clear Channel's conduct does not injure competition in each separate input market individually, its conduct in all of the input markets may injure competition in the downstream market collectively. *See Aspen Skiing,* 738 F.2d at 1522 n. 18. Accordingly, the court believes that the first relevant market where the parties compete is the market for live music concert tickets, where the parties, among others, sell tickets, and concert attendees buy them. That is, it must examine the reasonable interchangeability of the rock concerts and non-rock concerts to the concert-going public in order to determine whether NIPP sets forth sufficient evidence to define the scope of the relevant market for the monopolization and attempted monopolization claims.[5]

### (2) The Two Markets Relevant to the Tying Claim

### (a) The Market for Promotions Services

In NIPP's tying claims, NIPP asserts that Clear Channel manipulates rock artists into choosing Clear Channel's concert promotion services by implying that artists' songs will not receive air play on the rock radio stations that Clear Channel controls. (Pls.' Resp. at 91–92.) The first relevant product market stemming for the tying claim is the market for promotion services, where the promoter is the seller and the artist is the buyer. The rock artist chooses which promoter will promote the artist's concert based on the quality of the promoters' promotions skills and the amount the promoter bids on the artist. The artist may be considered the consumer of concert promotions services from the promoter, even though the money flows in

5. Should the jury conclude that the relevant market is the output market for rock concert tickets, the jury will have to examine Clear Channel's control over inputs necessary for the production of concert tickets in order to evaluate the anticompetitive nature of Clear Channel's conduct. Because Clear Channel's alleged control over all of these inputs stems from its alleged control over rock radio stations, NIPP introduces evidence of Clear Channel's control over the rock radio market in the Denver metropolitan area. While such evidence will be useful, and perhaps necessary, to demonstrate Clear Channel's control over inputs and monopolistic leveraging to control the downstream market, it is unnecessary at the relevant market definition stage of the analysis of NIPP's monopolization and attempted monopolization claims. There is only one relevant market definition for NIPP's monopolization and attempted monopolization claims, despite the fact that numerous inputs are implicated. The rock radio market is implicated in NIPP's other antitrust claims, however.

the opposite direction—from the promoter to the artist. *See Todd v. Exxon Corp.,* 275 F.3d 191 (2d Cir.2001).

In the *Todd* case, employees of oil companies sued the companies for conspiring to set wages below market price. *Todd,* 275 F.3d at 202. The employees alleged that this behavior amounted to price-fixing in violation of antitrust laws. *Id.* The companies argued that the employees had failed to properly define a relevant market because they failed to show that different types of employment services provided by the employees, such as accounting, lawyering, and engineering, were reasonably interchangeable to the companies, which were argued to be the buyers or consumers in the transaction. *Id.* The court rejected the companies' reasoning and held that the relevant product for purposes of defining the market was employment opportunities, not employment services. *Id.* The relevant question, therefore, was whether employment at different oil companies was reasonably interchangeable in the eyes of the consumer employee. *Id.* In this sense, the court considered the employees of oil companies as consumers "purchasing" employment opportunities from competing oil companies, despite the fact that oil companies paid for employee services, and not vice versa. *Id.*

*Todd* is analogous to this case. Because promoters, including plaintiffs and defendants, compete to promote artists' concerts, just as the oil companies competed to retain employees in *Todd,* artists may properly be viewed as consumers of promotion services in this case. Accordingly, to define the market, the court must examine promotions services reasonably interchangeable to rock artists, the relevant consumers.

#### (b) The Market for Radio Air Play

█ In NIPP's tying claims, NIPP's allegations concerning Clear Channel's threats to artists and their record labels to withhold radio air play implicates the radio market. (Pls.' Resp. at 52–53.) In such a market, the radio station is the seller of radio air play of an artist's songs. The troubling questions are whether consideration, so as to create a potential market, is exchanged for radio air play and, if so, whether such exchange can constitute a relevant market.

Clear Channel argues that there is no market for radio air play because the sale of such is illegal under federal law. (Defs.' Br. at 81–82.) Just because a practice is illegal, however, does not mean it does not occur. Based on the court's review of the record, NIPP has set forth sufficient evidence that, through covert use of "indies" and concert promotion services contracts, Clear Channel may actually be selling air play. Accordingly, a reasonable jury may find that Clear Channel sells radio air play to artists, which constitutes a black market.

Does a black market qualify as a relevant market for antitrust purposes? Clear Channel argues that, because the sale of radio air play, also known as "payola," is illegal under federal law, it cannot constitute a relevant market. (*Id.*) Although no significant case law exists on this issue, this court is confident that antitrust law was not enacted to protect a competitor who compounds his wrong by using his market power in an illegal market to restrain competition in another, legal market. The court believes that a close reading of *Trans World Airlines, Inc. v. Am. Coupon Exch., Inc.,* 682 F.Supp. 1476 (C.D.Cal.1988), (*aff'd in part, vacated in part on other grounds,* 913 F.2d 676 [9th Cir.1990]) supports this view. In *Trans World Airlines,* the counterclaimant sought to recover for antitrust injury in a market for the trade of frequent flyer awards. *Id.* at 1487. The court held that, because the airline industry had contractu-

ally prohibited trade of frequent flyer awards, there was no legal, relevant market, despite the fact that counterclaimant traded in the market. *Id.* In effect, the court reasoned that plaintiff's trade in a black market should not be rewarded, and found that no legitimate product market existed because anticompetitive effects were alleged to have occurred in an illegitimate market. *Id.*

This case is distinguishable from *Trans World Airlines,* however. Here, plaintiffs allege that defendants, not plaintiffs, trade in a black market and utilize this trade to gain leverage in a legitimate, legal market. In contrast to the facts presented in *Trans World Airlines,* the alleged anticompetitive effects here occur in a legitimate market, not the black market. Furthermore, defendants seek protection from antitrust liability for their alleged sales in this black market based on the illegal nature of their own conduct. Although no case law exists on this subject, the court finds that, if a defendant's illegal conduct in an illegal market propels it to monopolistic control in a legal market, the defendant cannot escape the purview of antitrust law by hiding behind the illegality of the market over which it exerts control. Just as this court is confident that antitrust laws do not protect competitors in a black market from anticompetitive effects in that market, the court is equally convinced that a black market can be considered a relevant market for antitrust purposes when the behavior in the black market is alleged to have anticompetitive effects in a legitimate, legal product market. Accordingly, the court must examine reasonable interchangeability of rock radio air play with non-rock radio air play to the rock artist.

### (3) The Market for Rock Radio Advertising and Promotional Support (Essential Facilities Claim)

In its essential facilities claim, NIPP seeks to define the relevant market as rock radio advertising and promotional support, where the seller is the rock radio station and the consumer is the concert promoter. Clear Channel, in turn, argues that the relevant market is all radio advertising, or even all media advertising, where the seller is the radio station or the media company and the consumer is any advertiser, not just a concert promoter. (Defs.' Br. at 43–49.) The parties do not dispute that the market for advertising serves as the appropriate area of inquiry in regards to NIPP's essential facilities claim. Accordingly, the court must examine whether NIPP has produced sufficient evidence to support the scope of its proposed market definition.

### b. Defining the Boundaries of the Chosen Market

Having determined the potential market areas, the court must now define the scope of these potential markets. The parties vigorously dispute the scope of the relevant markets. NIPP claims that all of the markets should be defined in terms of rock music. (Pls.' Resp. at 42–60, 92–95.) More specifically, to NIPP, the relevant markets are rock concert tickets, rock music promotions services, rock radio air play, and rock radio advertising and promotional support. Clear Channel counters that all of the markets should be defined in terms of all music, not just rock. (Defs.' Br. at 39–49.) To Clear Channel, therefore, the relevant markets are all music concert tickets, all music concert promotions, all radio air play, and all radio advertising and promotional support. Clear Channel further argues that NIPP has no economic data to support its proposed narrow markets and that this failure is fatal to NIPP's antitrust claims. (*Id.* at 32–35.)

As stated earlier, the scope and definition of the market is determined by exam-

ining reasonable interchangeability, which includes the cross-elasticity of demand for a product, or whether consumers view product A as a substitute for product B. *Telecor,* 305 F.3d at 1131. Economists determine cross-elasticity of demand by dividing the percent change in quantity demanded of product A by the corresponding percent change in price of product B. Dictionary of Marketing Terms (2003). If the calculation yields a positive number, products A and B are reasonable substitutes for consumers. *Id.*

In determining cross-elasticity of demand, an antitrust plaintiff may not limit a market to a select group of customers without identifying a difference in the product supplied to that group of customers. *T. Harris Young & Assocs., Inc. v. Marquette Elec., Inc.,* 931 F.2d 816, 824 (11th Cir.1991). A different product market may be founded upon a distinction between products in degree as opposed to a distinction between products in kind. *Int'l Boxing Club of New York, Inc. v. United States,* 358 U.S. 242, 249–250, 79 S.Ct. 245, 249, 3 L.Ed.2d 270 (1959). Within the universe of a product market, therefore, there may exist a submarket—a portion of the product market that, for purposes of the specific antitrust case, is considered a separate market. *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962) (citing *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 593–595, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 [1957]). The boundaries of an antitrust submarket are determined by examining practical indicia, such as (1) industry and public recognition of the submarket as a separate economic entity and (2) the product's unique and distinct uses, qualities, price, price sensitivity, production facilities, customers, and vendors. *Id.; Lantec, Inc. v. Novell, Inc.,* 146 F.Supp.2d 1140, 1148 (D.Utah 2001), (*aff'd,* 306 F.3d 1003 [10th Cir.2002]).

For example, in *International Boxing Club,* the Supreme Court found that the promotion of championship, professional boxing contests was a product market distinct from the promotion of all boxing or all professional boxing contests, despite the fact that most of the inputs for both services were the same. *Int'l Boxing Club,* 358 U.S. at 249–250, 79 S.Ct. at 249. Specifically, the court noted that although all boxing contests include one ring, two boxers, one referee, the same rules, and an audience, championship boxing was a separate market because of its distinctive uses, qualities, and price. *Id.* at 250, 79 S.Ct. at 250. The fact that two products may involve many of the same inputs, therefore, is not determinative of the definition of the relevant product market. *Id.*

 In defining the scope of the market, the court also examines cross-elasticity of supply, which measures the responsiveness of producers to price increases. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1436 (9th Cir.1995). Even if consumers do not view product A as a substitute for product B, if producers of product A can readily shift their production facilities to produce product B in response to a price shift in product B, then the sales of both should be included in the relevant market. *Id.* For example, in *Rebel Oil,* the court found that full-service and self-service gasoline were in the same market even though consumers did not view them as interchangeable, because full-service gasoline stations could easily convert their facilities to self-service stations if self-service stations raised their prices to monopolistic levels. *Id.*

Clear Channel argues that all of NIPP's proposed market definitions fail as a matter of law because NIPP's expert, Dr. Owen Phillips, did not calculate cross-elasticity of demand for any of the proposed markets in his expert reports. (Reply in

Supp. of Defs.' Mot. for Summ. J. at 18 [filed January 24, 2003] [hereinafter "Defs.' Reply"].) Clear Channel asserts that a relevant market cannot be defined without the use of economic criteria through a formal study of cross-elasticity of demand. (*Id.*) Although NIPP concedes that Dr. Phillips did not undertake a formal economic study, NIPP argues that market definition can and must be proven through other practical indicia besides cross-elasticity of demand because calculations of cross-elasticity of demand are difficult when analyzing the entertainment industry. (Pls.' Resp. to Mot. to Exclude Expert at 11–12.) Specifically, Dr. Phillips claims that calculating cross-elasticity of demand in this case was not possible because price shifts above 5% over an extended period of time are necessary in order to accurately measure cross-elasticity of demand. (*Id.*, Ex. A [Second Decl. of Owen Phillips ¶¶ 5–6].)

The lynchpin in determining the boundaries of the relevant market is "the rule of reasonable interchangeability." *United States v. E.I. du Pont Nemours & Co.*, 351 U.S. 377, 394–395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). The question, therefore, is whether reasonable interchangeability can be determined for antitrust purposes without economic analysis of cross-elasticity of demand. Although the Tenth Circuit has not addressed this specific issue, *Lantec*, 146 F.Supp.2d at 1148, the court finds that a plaintiff may, through sufficient evidence of other indicia of market definition, define a relevant market without economic study of cross-elasticity of demand, especially when economic analysis of cross-elasticity of demand is infeasible based on pricing data. *Bacchus Indus., Inc., v. Arvin Indus., Inc.*, 939 F.2d 887 (10th Cir.1991) (holding that the plaintiff properly defined the relevant market by presenting lay testimony concerning distinctive uses and qualities of product); *Queen City Pizza, Inc. v. Domi-*

*no's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) (holding that, since the test for reasonable interchangeability includes factual inquiry into the commercial realities faced by consumers, and price, use, and qualities of the product, plaintiff's failure to prove various factors was fatal to its claim); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993) (stating that "reliable measures of supply and demand elasticities provide the most accurate estimates of relevant markets. However, it is usually necessary to consider other factors that can serve as useful surrogates for cross-elasticity data. In the case of product market definition, these factors may include ... distinctive uses, characteristics, ... industry [recognition] ..., consumers['] [perceptions], ... and price ...."); *Satellite Television & Assoc. Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351 (4th Cir.1983) (holding that, since the test for reasonable interchangeability includes consumers' perceptions, plaintiff's failure to prove such was fatal to its claim); *Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Assoc.*, 273 F.Supp.2d 933 (S.D.Ohio 2003) (holding that when the relevant product is not fungible, failure to examine cross-elasticity of demand is not fatal to claim as long as plaintiff presents evidence of distinctive price, use, and qualities); *Indep. Ink, Inc. v. Trident, Inc.*, 210 F.Supp.2d 1155, 1170–1171 (C.D.Cal.2002) (holding that in order to prove relevant market definition, plaintiff must proffer market data and figures, *or* other relevant material adequately describing the nature, cost, usage, or other features of competing products); *Lantec, Inc. v. Novell, Inc.*, 146 F.Supp.2d 1140, 1148 (D.Utah 2001), (*aff'd*, 306 F.3d 1003 [10th Cir.2002]) (holding that the absence of expert testimony on cross-elasticity of demand was not, *per se*, fatal to the plaintiff's antitrust claims, but that, because

plaintiff failed to present sufficient evidence of factors delineated in *Brown Shoe* and *Eastman Kodak,* judgment as a matter of law was appropriate); *Brooks Fiber Communications of Tucson, Inc. v. GST Tucson Lightwave, Inc.,* 992 F.Supp. 1124 (D.Ariz.1997) (holding that relevant market may be narrowed, despite cross-elasticity of demand, to account for identifiable submarkets); *Maris Distrib. Co. v. Anheuser–Busch, Inc.,* 2000 WL 33403622 (M.D.Fla.2000) (holding that triable issue of fact existed as to determination of market definition, despite the fact that plaintiff failed to calculate cross-elasticity of demand). With these broad principles in mind, the court examines plaintiffs' evidence to determine if it is sufficient to sustain a jury verdict on the issue of market definition, despite NIPP's failure to calculate cross-elasticity of demand. *Id.* at 1435.

### (1) Market for Rock Music Concerts (Monopolization and Attempted Monopolization Claims)

The scope of the market is usually a question of fact for the jury. *Telecor,* 305 F.3d at 1131 (citing *Westman Comm'n Co. v. Hobart Int'l Inc.,* 796 F.2d 1216, 1220 [10th Cir.1986] ). In rare circumstances, however, insufficient evidence of market definition in the record may require the court to grant summary judgment against the plaintiff on the issue of market definition. NIPP argues that the relevant product is solely rock concert tickets because the concert-going public does not view rock concert tickets as reasonably interchangeable with non-rock concert tickets, such as tickets to classical music performances or concerts by country artists. (Pls.' Resp. at 45–51.) Alternatively, NIPP argues that the relevant market is the market for all live music concerts. (Pls.' Resp. at 51–52.)

As previously noted, the boundaries of an antitrust market may be determined by examining practical indicia, such as (1) industry and public recognition of the submarket as a separate economic entity, and (2) the product's unique and distinct uses, qualities, price, price sensitivity, production facilities, customers, and vendors. *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1524; *Lantec,* 146 F.Supp.2d at 1148. NIPP's expert witness, Dr. Owen Phillips, while failing to perform economic tests for cross-elasticity of demand, has investigated other practical indicia that tend to delineate a relevant market, as set forth in *Brown.* Accordingly, Dr. Phillips' conclusions based on his investigation, if found credible by the jury, are sufficient to support a jury's definition of the market as rock concert ticket sales.

First, Dr. Phillips assimilated data supporting the assertion that the industry and the public view rock concerts as a separate and distinct market from non-rock concerts. Dr. Phillips cites industry reporters and publications, such as Billboard, Radio and Records, and Arbitron, as distinguishing between rock music and non-rock music in their reporting. (Pls.' Resp., Ex. 1 [Phillips' Decl. at 17].) Additionally, Dr. Phillips' cites consumer polls indicating that music tastes vary greatly by demographic, and concert-goers tend not to view country or classical concerts as substitutes for rock concerts, or country or classical radio stations as substitutes for rock radio stations. (Pls.' Resp., Ex. 1 [Phillips' Decl. at 14].)

Second, Dr. Phillips set forth evidence that rock concerts have uses and qualities distinctive from non-rock concerts. Although both rock and non-rock concerts are used by the end-consumer for entertainment value, a rock music aficionado, does not get the same use out of a country music concert as a rock music concert, if one believes Dr. Phillips' testimony on consumer preferences. (*Id.,* Ex. 1 [Phillips'

Decl. at 14].) Just as Dr. Phillips' observations concerning consumer preferences indicate that rock concerts have a distinctive customer base, common sense supports NIPP's assertion that consumers do not view non-rock concerts as substitutes for rock concerts.

Clear Channel argues that rock concerts do not have distinct qualities from non-rock concerts because all concerts involve similar venues, similar ticket services, similar vending, and similar advertising. (Defs.' Br. at 36.) Although rock concerts may involve the same venues, ticketing services, and vending companies as utilized in non-rock concerts, Dr. Phillips' demonstrates that rock concerts most certainly do not involve the same advertising and promotional inputs. (Pls.' Resp., Ex. 1 [Phillips' Decl. at 6] ). Testimony by numerous industry insiders demonstrates that the promotional inputs for rock concerts include rock radio and print advertising, rock radio promotional support, and rock radio air play. (Pls.' Resp., Ex. 2 [Morreale Decl. ¶ 19], Ex. 4 [Mickelson Decl. ¶ 3], Ex. 20 [Kirby Dep. at 51–52], Ex. 21 [Levy Dep. at 157], Ex. 22 [Loncao Dep. at 33–36].) For rock concerts, all promotional support through radio advertising and air play must be directed to a specific demographic, the listener that typically enjoys rock music. (Pls.' Resp., Ex. 1 [Phillips' Decl. at 6] ). Advertising in newspapers and media directed toward individuals over forty years of age, while appropriate for promoting country music or oldies artists, does not substitute as sufficient promotion for rock concerts. Accordingly, NIPP has provided sufficient evidence that rock concerts have distinct uses and inputs, namely distinct radio support.

Third, Dr. Phillips cites evidence of distinct price and of pricing patterns for rock concerts. (Pls.' Resp., Ex. 1 [Phillips' Decl. at 44]; Defs.' Br., Ex. A–8 [Prelim.

Economics Report of Owen R. Phillips, Ph.D. at 25–26].) Dr. Phillips sets forth average ticket prices for both rock, rock-pop, and all music concerts. (Pls.' Resp., Ex. 1 [Phillips' Decl., Tables 6–7 at 41–44].) Based on Dr. Phillips' analysis of consumer and industry perceptions, a review of all of the testimony from members of the industry, and Dr. Phillips' review and analysis of pricing data, NIPP has set forth evidence of the practical indicia necessary to define the relevant market as *tickets for rock music concerts*.

Alternatively, a reasonable jury could surely find that NIPP has set forth evidence of practical indicia showing a distinct market for *all live music concerts*. First, the music concert industry recognizes itself as distinct from other non-live performances, and it tracks its own sales through industry agencies such as Bill-Board and Pollstar. (Pls.' Resp., Ex. 1 [Phillips' Decl. at 16].) Dr. Phillips' states, based on his review of lay testimony and industry publications, that live music concerts have distinct qualities not shared by other live events or recorded events, including interaction with the crowd, specific lighting, a different noise level, a distinct length of event, distinct concessions, and a distinct atmosphere. (Pls.' Resp., Ex. 1 [Phillips' Decl. at 16].) The music concert industry has production facilities and vendors which are different from other entertainment industries, such as the sports industry or movie industry. (Pls.' Resp., Ex. 1 [Phillips' Decl. at 16].) Additionally, NIPP states that the prices for live music concert tickets are distinct from price of movie tickets or tickets to sporting events. (Pls.' Resp., Ex. 1 [Phillips' Decl. at 16].) Clear Channel does not dispute any of NIPP's common sense assertions, as practical indicia of an independent relevant market for live music concerts. Accordingly, NIPP has set forth sufficient evi-

dence for a jury to find a relevant market for all live music concerts.

As stated earlier, besides practical indicia, cross-elasticity of supply is another tool to define the relevant market. In evaluating cross-elasticity of supply, the question raised is whether a monopolistic increase in the price of rock concert tickets would cause other non-rock promoters to enter the market and provide rock concert tickets at lower prices. There are several reasons why supply elasticity does not exist the market for rock concert tickets and the market for all live music concert tickets. First, in the Denver geographic market, access to inputs for production of rock concerts has allegedly been restricted by a single competitor, Clear Channel. Allegedly, Clear Channel has restricted access to artists, radio promotional support, radio advertising, and radio air play, by utilizing its control of rock radio stations in Denver. Allegedly, this single competitor has increased the cost for these inputs to a point where no competitor could enter the market for rock concert tickets and provide tickets at lower prices than the competitor who has control of the cost of these inputs.

NIPP has provided relevant evidence that these restricted inputs create a supply-side barrier to entry for other promoters. *Full Draw*, 182 F.3d at 756 (holding that anticompetitive conduct itself may amount to a significant entry barrier). Absent purchasing several rock radio stations in the Denver market, these promoters cannot obtain cheaper access to artists, radio advertising, radio promotional support, and radio air play, so as to enable them to keep ticket prices at a competitive level in the wake of monopolistic ticket pricing by Clear Channel. NIPP has provided sufficient evidence that the cost of acquiring a radio station or obtaining a radio license is a significant barrier to entry, which has arguably become necessary to compete successfully in the Denver geographic market. *Reazin*, 899 F.2d at 971 (holding that licensing requirements can present a substantial barrier to entry); (Pls.' Resp. at 74.) Accordingly, because a country music promoter cannot easily acquire a rock radio station, NIPP has presented sufficient evidence that a country music promoter could not easily enter into the rock concert promotions services business and compete successfully for rock artists. Cross-elasticity of supply and practical indicia, therefore, support NIPP's allegations of relevant market.

### (2) The Two Markets Relevant to the Tying Claim

### (a) Market for Rock Promotional Services

As stated earlier, in NIPP's tying claim, NIPP alleges that Clear Channel covertly manipulates artists, their agents, and their record labels into choosing SFX/Clear Channel Entertainment or Clear Channel Concerts/Clear Channel Radio Festivals promotional services by threatening to withhold air play of the artists' songs. In the market for promotional services, the artist, his agent, and his record label are the buyers and the promoter is the seller. Whether or not rock concert promotion services and country concert promotion services are separate service markets can only be determined after a factual inquiry into the commercial realities faced by artists and their management, who are the relevant consumers in this case. *Eastman Kodak*, 504 U.S. at 481–482, 112 S.Ct. at 2090. The same questions involved in finding a submarket for rock concerts, such as the relevant uses, qualities, and prices of the product, therefore, arise in the context of attempting to define the concert promotions service market. *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524; *Lantec*, 146 F.Supp.2d at 1148.

The record before the court demonstrates that NIPP has utterly failed to define by economic data or lay testimony a relevant market for rock concert promotions services where the consumers are artists and their management. NIPP has set forth no information whatsoever about the transactions that occur between artists and promoters. NIPP has provided no information concerning the qualities or uses of the services received by artists from the promoter, such as monetary payment, backstage catering, specific types of advertising, or other negotiated consideration. Furthermore, NIPP has provided no polling data or other consumer information concerning what artists and their management perceive to be the differences in promotion services offered by various promoters. Finally, NIPP has provided no information on bids provided to rock or non-rock artists or any other pricing information relevant to this submarket. NIPP has failed, as a matter of law, to adduce sufficient evidence for a jury to define the market for concert promotional services where the artist, his manager, and his record label are the consumer, and the promoter is the seller. Accordingly, there is insufficient evidence to prove one of the two markets relevant to NIPP's tying claim.

### (b) The Market for Rock Radio Air Play

■ In its tying claim, NIPP seeks to define a relevant market as rock radio air play of songs, where the relevant seller is the rock radio station and the consumer is the rock artist. Whether or not rock radio air play is distinct from non-rock radio air play can only be determined after a factual inquiry into the commercial realities faced by the consumer. *Eastman Kodak*, 504

U.S. at 481–482, 112 S.Ct. at 2090. Here, NIPP has set forth sufficient evidence of practical indicia of qualities, prices, and uses to survive summary judgment on the market definition of rock radio air play for both its tying claims. *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524; *Lantec*, 146 F.Supp.2d at 1148.

First, NIPP provides data supporting the assertion that the radio industry and the public view rock radio stations as distinct from non-rock radio stations. Radio stations classify and categorize themselves based on the specific format of music played by the station, whether it be rock, country, jazz, or oldies. (Pls.' Resp., Ex. 1 [Phillips Decl. at 7].) This categorization permeates all of a radio station's promotional literature, whether the literature is directed at listening audiences or potential advertisers. Similarly, companies that research and report on radio industry trends, such as Arbitron and Duncan's, categorize radio stations based on the format of music they play. (*Id.*, Ex. 1 [Phillips Decl. at 7].) Radio industry data shows that the public views rock radio as distinct from non-rock radio. As shown by "duplicate cume" data compiled by the radio industry, listeners of rock radio stations usually only switch between other rock radio stations when listening to the radio.[6] (*Id.*, Ex. 1 [Phillips Decl. at 14, 37].)

Because the industry and the public view rock radio as a distinct commodity, artists also view rock radio air play as a distinct commodity. When a rock radio station advertises its rock format categorization, the radio station attracts a particular demographic of listener, a younger individual who prefers listening to rock music. (*Id.*, Ex. 1 [Phillips Decl. at 14].) The rock radio station does not attract an

---

**6.** "Duplicate cume" data is a term of art used by the radio industry for data showing how often radio listeners switch between stations and which stations the listeners choose when switching.

older listener who hates rock music. Undoubtedly, an artist desires his or her songs to be played on a station that will attract the types of listeners who enjoy the style of music that the artist plays. (Pls. Resp., Ex. 1 [Phillips Decl. at 6].) Accordingly, a rock artist will not view air play of his or her songs on a country format station as a substitute for air play on a rock station. (*Id.*, Ex. 1 [Phillips Decl. at 6].)

Secondly, NIPP sets forth evidence that rock radio has distinctive uses and qualities from non-rock radio. NIPP has demonstrated that rock radio reaches a specifically defined demographic of listeners, which non-rock radio does not reach. (Pls. Resp., Ex. 1 [Phillips Decl. at 3–4, 5–7].) This distinction is quite important to the artist who wants his or her type of music to reach the demographic of consumer who is most likely to enjoy it. Finally, play list data from self-described rock radio stations shows that rock radio stations play the same songs from the same artists more often than not. (*Id.*, Ex. 1 [Phillips Decl. at 37].) Accordingly, a different type of music is played on rock radio stations. Although Clear Channel makes a compelling argument that non-rock stations play many of the same songs as rock stations, NIPP's evidence that non-rock stations play rock songs more infrequently than non-rock songs creates a dispute of fact that it best resolved by the jury. (Defs.' Br. at 47–48; *disputed at* Pls.' Resp., Ex. 1 [Phillips Decl. at 37].)

The third practical indicia of relevant, separate market is distinct pricing. Dr. Phillips, NIPP's expert, does not set forth any information regarding the alleged cost to artists to obtain air play on the radio. Although NIPP suggests in its briefing that indies make payments to radio stations, such a statement does not amount to evidence of pricing which suggests a separate market for rock radio air play. Nev-

ertheless, this omission is not fatal to NIPP's position at the summary judgment stage. Courts have recognized that tying may provide a way for a monopolist to hide activities that are illegal or disfavored by the law. *Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 476 (3d Cir.1992) (citing *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495, 513, 89 S.Ct. 1252, 1263, 22 L.Ed.2d 495 [1969] ). A monopolist may seek to evade regulatory control in the tying product market by hiding the price in the tied product's price. *Id.* Here, NIPP alleges that Clear Channel evades regulations prohibiting payola by incorporating payola into the concert promotions services contracts with artists. Because Clear Channel allegedly hides payola pricing information, there is no price information for the market for radio air play.

A final tool that may be useful in defining the scope of the relevant market is cross-elasticity of supply. *Rebel Oil Co.*, 51 F.3d at 1436. Even if artists do not view non-rock radio air play as a substitute for rock radio air play, if producers of non-rock radio can readily shift their production facilities to produce rock radio in response to a price shift in rock radio air play, then the sales of both should be included in the relevant market. *Id.* Construing the facts in the light most favorable to NIPP, producers of non-rock radio in the Denver area market cannot easily shift to rock radio due to barriers to entry. NIPP cites barriers to entry into the rock radio industry in the Denver market, including the high cost of switching formats, customer goodwill and name recognition, and Clear Channel's large size nationwide. (*Id.*, Ex. 1 [Phillips Decl. at 8–9].); *Multistate Legal Studies*, 63 F.3d at 1555. Additionally, NIPP notes that the Denver market is so saturated with rock radio stations that it cannot support another rock radio station. (*Id.*) Based on evi-

dence of barriers to entry, sufficient dispute of material fact regarding cross-elasticity of supply exists so that summary judgment on rock radio air play market definition is inappropriate. Accordingly, the lack of price information on the market for radio air play is not fatal to the definition. Disputes of fact concerning the availability of pricing information make summary judgment inappropriate.

### (3) The Market for Rock Radio Advertising and Promotional Support (Essential Facilities Claim)

■ In its essential facilities claim, NIPP seeks to define the relevant market as rock radio advertising and promotional support, where the seller is the rock radio station and the consumer is the concert promoter. Whether or not rock radio advertising and promotional support is a distinct product from all radio advertising can only be determined after a factual inquiry into the commercial realities faced by the consumer. *Eastman Kodak,* 504 U.S. at 481–482, 112 S.Ct. at 2090. Here, NIPP has set forth sufficient evidence of practical indicia of qualities, prices, and uses to survive summary judgment on the market definition of rock radio advertising and promotional support for its essential facilities claim. *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1524; *Lantec,* 146 F.Supp.2d at 1148.

First, as set forth above, NIPP provides data supporting the assertion that the public views rock radio stations as distinct from non-rock radio stations. NIPP has also cited testimony by Clear Channel showing that the radio industry views advertising and promotional support for concert promoters as distinct from advertising for other advertisers. Michael O'Connor of Clear Channel Radio in Denver specifically states that radio stations gain valuable consideration when they advertise and provide promotional support for concerts because listeners tune in more regularly to obtain information on the concert of their favorite artist. (Defs.' Br., Exs. Vol. 2, Ex. A–24 [O'Connor Dep. at 385–386].) Additionally, electronic mail messages sent by Clear Channel personnel to record labels and artist managers demonstrate that radio stations highly value the right to engage in certain types of promotional support, such as having radio studio appearances of artists. (Pls.' Resp., Exs. Vol. 3, Ex. 67[Electronic Mail Messages between O'Connor and Spivak of 8/23/2001], Ex. 68 [Electronic Mail Messages between O'Connor, Scott Arbough, and Sabrina Saunders of 11/13/2001–11/14/2001].) Accordingly, NIPP has set forth sufficient evidence that advertising and promotional support for concerts is a distinct product from advertising for general consumer goods.

Secondly, NIPP sets forth evidence that rock radio advertising and promotional support has uses and qualities distinct from non-rock radio advertising and promotional support. When a rock radio station advertises its rock format categorization, the radio station attracts a particular demographic of listener, a younger individual who prefers listening to rock music. (*Id.,* Ex. 1 [Phillips Decl. at 14].) The rock radio station does not attract a listener who hates rock music. Undoubtedly, a promoter prefers to advertise and promote a rock concert on a station that will attract the type of listeners who enjoy rock music. (Pls. Resp., Ex. 1 [Phillips Decl. at 6].) Accordingly, a rock concert promoter will not view advertising and promotional support for a rock concert on a country format station as a substitute for advertising and promotional support on a rock radio station. (*Id.,* Ex. 1 [Phillips Decl. at 6].)

Clear Channel argues that the relevant inquiry is not whether a rock concert promoter views advertising on a pop radio station as a reasonable substitute for ad-

vertising on a rock radio station; instead, the relevant inquiry is whether an advertiser of any product views advertising on a pop radio station as a substitute for advertising on a rock radio station. (Defs.' Br. at 44.) According to Clear Channel, advertisers may view these as reasonable substitutes because the stations may reach the same age group demographic of consumers. Although this argument has merit as to commercial advertisers, it also highlights why advertising and promotional support for concert promoters may be defined as a distinct product market from advertising for other businesses. When purchasing advertising spots on radio, advertisers of products and services seek to reach a particular age or other demographic of consumers, some of whom may like their product. When purchasing advertising and seeking promotional support for a rock concert, however, rock concert promoters seek to reach an audience who enjoys rock music, regardless of age or other demographic information. Radio advertising and promotional support for a concert puts the promoter directly in touch with his consumer, at the very instant the consumer is enjoying the product sold by the promoter, rock music. Advertising rock concerts on other non-rock format stations does not provide this reach. (Pls.' Resp., Ex. 2 [Morreale Decl. ¶¶ 16–19], Ex. 4 [Mickelson Decl. ¶ 3], Ex. 22 [Loncao Dep. at 35–36], Ex. 39 [Sievers Dep. 101–102].) Similarly, advertising in newspapers or magazines, or on television stations, even if these forms of media are targeted to rock audiences, do not carry the advertisement for a concert to an end-consumer who necessarily is enjoying at that moment the very product advertised. (*Id.*, Ex. 92 [Electronic Mail Message Between Clear Channel Personnel regarding the Value of Radio Promotion Compared to Print Promotion].)

Third, NIPP provides evidence of distinct prices involved in advertising and promotional support of rock concerts as compared to general advertising. (*Id.*, Ex. 90 [Synopsis of Promotional Support Value Provided to U2 by KTCL].) NIPP demonstrates the value obtained by the promoter for promotional support which offsets the cost of the advertising, a pricing adjustment which does not occur in regular advertising.

A final tool that may be useful in defining the scope of the relevant market is cross-elasticity of supply. *Rebel Oil Co.,* 51 F.3d at 1436. Even if rock concert promoters do not view non-rock radio advertising and promotional support as a substitute for rock radio advertising and promotional support, if producers of non-rock radio can readily shift their production facilities to produce rock radio in response to a price shift in rock radio advertising, then the sales of both should be included in the relevant market. *Id.* Construing the facts in the light most favorable to NIPP, producers of non-rock radio in the Denver area market cannot easily shift to rock radio due to barriers to entry. NIPP cites barriers to entry into the rock radio industry in the Denver market, including the high cost of switching formats, customer goodwill and name recognition, and Clear Channel's large size nationwide. (*Id.*, Ex. 1 [Phillips Decl. at 8–9].); *Multistate Legal Studies,* 63 F.3d at 1555. Additionally, NIPP notes that the Denver market is so saturated with rock radio stations that it cannot support another rock radio station. Based on evidence of barriers to entry, and practical indicia of distinct markets, sufficient disputes of material fact regarding market definition exist so that summary judgment on the rock radio advertising and promotional market definition is inappropriate.

### (4) Rock vs. Non–Rock Generally

Clear Channel argues that NIPP's proposed relevant markets fail as a matter of

law because the markets are too narrow, and a jury will have no evidentiary basis to distinguish between rock and non-rock. (Defs.' Br. at 43.) NIPP, however, has demonstrated sufficient evidence for a reasonable jury to find that the relevant market definitions in this case are properly categorized in terms of rock music. Although these markets are narrowly drawn submarkets, such narrow markets are appropriate when commercial realities faced by the consumer dictate this stricture. Other courts have found sufficient evidence to support narrow submarkets for antitrust purposes in similar circumstances. *Eastman Kodak,* 504 U.S. at 481–482, 112 S.Ct. at 2090 (holding that a market for purchase and repair of Kodak photography equipment exists separately from market for purchase of all photography equipment); *Full Draw,* 182 F.3d at 756 (holding that archery-only trade shows may be a separate market from gun shows that include archery); *Olin Corp. v. FTC,* 986 F.2d 1295, 1304 (9th Cir.1993), (*cert. denied,* 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 373 [1994] ) (holding that dry sanitizer swimming pool products are in a separate market from liquid pool bleach); *Omni Outdoor Adver., Inc. v. Columbia Outdoor Adver., Inc.,* 891 F.2d 1127, 1142 (4th Cir.1989), (*rev'd on other grounds,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 [1990] ) (finding that billboard advertising is a separate market from other advertising); *Flip Side Prods., Inc. v. Jam Prods., Ltd.,* 843 F.2d 1024, 1032 (7th Cir.1988), (*cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 109 S.Ct. 261 [1988] ) (finding that "the relevant market in this case was the promotion of arena level concerts in the Chicago metropolitan area"); *Ad–Vantage Tel. Directory Consultants v. GTE Directories Corp.,* 849 F.2d 1336 (11th Cir.1987) (holding that yellow pages advertising is in separate market from other advertising); *Danny Kresky Enters. Corp. v. Magid,* 716 F.2d 206, 208 (3d Cir.1983) (reinstating jury verdict for plaintiff who had alleged antitrust violations in connection with "the promotion of 'black-oriented' concerts in Pittsburgh").

Additionally, Clear Channel argues that those markets that NIPP's attempts to delineate markets based on a distinction between rock and non-rock artists or music fail because NIPP has provided no criteria to aid the jury in determining why some artists and radio stations are defined as rock, while others are considered pop. (Defs.' Br. at 39.) Although Clear Channel concedes that distinguishing between country and rock may not be difficult for a jury, it more specifically argues that, because NIPP cannot properly justify why certain fringe artists, such as Jewel and Sheryl Crow, fall into the rock or non-rock category, any market definition that makes distinctions on this basis is flawed and erroneous. (*Id.* at 41.)

While the court is mindful of the difficulty of categorizing certain fringe artists, such as the Neville Brothers and the Cowboy Junkies, such difficulty does not justify a holding that no submarket for rock, therefore, exists. Just as "customers know a department store when they see it," customers know a rock concert when they hear it, as will the jury. *Bon–Ton Stores,* 881 F.Supp. at 870. That the outer edge of a market's boundaries are a disputed does not mean the market is legally flawed for purposes of a motion for summary judgment. Market boundaries of necessity may be imprecise. Antitrust Law Developments (Fifth) at 525. Therefore, the question of boundaries is most properly answered by the jury.

Finally, Clear Channel argues that plaintiffs' expert's distinction between rock and non-rock fails because it is based solely on his subjective judgments. (Defs.' Br. at 39–40.) Plaintiffs' expert, however, cites many reports from the radio industry

and from SFX/Clear Channel Entertainment itself as evidence to aid the jury in determining what qualifies as rock music for purposes of the rock concert promotions and rock radio industries. (Defs.' Br., Ex. A–8 [Prelim. Phillips' Report at 40–47].) Because the expert utilized industry materials in defining rock music, this distinction is not subjective, and the expert's opinions are sufficiently grounded to be admissible.

Furthermore, because Clear Channel's derives its alleged market power in the rock concert promotions industry based on its control of "rock radio," an alleged source of advertising, promotional, and air play inputs for rock concert promotions, definitions of rock according to the radio industry are extremely relevant to any jury's inquiry into the definition of rock music in this case. After all, NIPP alleges that the rock radio industry and the rock concert promotions industry have a symbiotic relationship, both affecting what consumers of concerts consider to be rock or non-rock music. Accordingly, the music defined as rock and played by rock radio stations in Denver is extremely relevant to defining the scope of the "rock" market in this case. At the summary judgment stage, therefore, the court cannot hold as a matter of law that there is insufficient evidence in the record for the jury to properly distinguish between rock and non-rock music. Having evaluated the sufficiency of NIPP's evidence of relevant market definition, the court turns to NIPP's individual claims for relief under the Sherman Act.

### 2. Section 1 of the Sherman Act: Tying

NIPP claims that Clear Channel has violated section 1 of the Sherman Act by conditioning air-play of an artist's songs and promotional support for the artist's concerts on the artist's use of SFX/Clear Channel Entertainment or Clear Channel Concerts/Clear Channel Radio Festivals for the artist's concert-promotions needs in the Denver market. (Pls.' Resp. at 91.) NIPP argues that this conditioning creates an illegal tying arrangement. Section 1 of the Sherman Act states, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal ...." 15 U.S.C.A. § 1 (West 1997 & Supp. 2003). Section 1 of the Sherman Act proscribes anticompetitive conduct as part of concerted action or a conspiracy; it does not apply to unilateral conduct. *Systemcare, Inc. v. Wang Labs. Corp.,* 117 F.3d 1137, 1139–1140 (10th Cir.1997). A tying arrangement exists when a seller conditions the purchase of a highly desirable product on the purchase of an additional product. *Id.* Whenever a buyer consents to the tying arrangement by purchasing the tied product so as to obtain the tying product, concerted action occurs between buyer and seller so as to implicate section 1 of the Sherman Act. *Systemcare,* 117 F.3d at 1139–1140. Here, NIPP argues that Clear Channel conditions the "sale" of air play to artists (tying product) on the artist's purchase of Clear Channel's concert promotion services (tied product).

■ Every refusal to sell two products separately does not amount to an illegal tying arrangement. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 11–12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). If each product can be purchased separately in a competitive market, one seller's decision to sell both products in a single package does not impose an unreasonable restraint on the market for either product. *Id.* at 11–12, 104 S.Ct. at 1558. If, however, the seller has significant market power in the market for one product and exploits its control over this "tying" market to force the buyer to purchase a different product in the "tied" market, which the buyer either did not want or would have purchased elsewhere, the tying

arrangement violates section 1 of the Sherman Act. *Id.* at 12, 104 S.Ct. at 1558.

The fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product. This distortion injures the buyers of the second product, who, because of their preference for the seller's brand of the first are artificially forced to make a less than optimal choice in the second. And even if the customer is indifferent among brands of the second product and therefore loses nothing by agreeing to use the seller's brand of the second ... such tying agreements may work significant restraints on competition in the tied product. The tying seller may be working toward a monopoly position in the tied product, and, even if he is not, the practice of tying forecloses other sellers of the tied product and makes it more difficult for new firms to enter the market. They must be prepared not only to match existing sellers in the tied product in price and quality, but to offset the attraction of the tying product itself. Even if this is possible through simultaneous entry into production of the tying product, entry into both markets is significantly more expensive than simple entry into the tied market, and shifting buying habits in the tied product is considerably more cumbersome and less responsive to variations in competitive offers. In addition to these anticompetitive effects in the tied product, tying arrangements may be used to evade [regulations] concerning [prices] in the tying product through clandestine transfer of the profit to the tied product.

*Id.* at 12, 104 S.Ct. at 1558 n. 19 (citing *Fortner I,* 394 U.S. at 512–514, 89 S.Ct. at 1263–1264 [J. White, *dissenting* ] ). When there is an unlawful tying arrangement, the consumer's freedom to select the best bargain the second market is impaired by his need to purchase the tying product and perhaps by an inability to evaluate the true cost of either product when they are available only as a package. *Id.* at 14, 104 S.Ct. at 1560. Tying claims are analyzed under two different tests: (1) *per se* analysis, and (2) rule of reason analysis. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 512–513 (3d Cir.1998). Here, NIPP sets forth sufficient evidence and disputes of material fact regarding NIPP's *per se* tying claim to survive summary judgment. NIPP's tying claim based on rule of reason analysis, however, fails as a matter of law because of its failure to define one of the two relevant markets.

#### a. Per Se Liability

■ The *per se* rule condemns practices that are devoid of redeeming competitive rationales. *SCFC ILC,* 36 F.3d at 963. When a seller's share of the tying market is high, or when the seller offers a unique product that competitors are not able to offer, the Supreme Court has held that the likelihood that market power is being used to restrain competition in a separate market is sufficient to make *per se* condemnation appropriate. *Jefferson Parish,* 466 U.S. at 17, 104 S.Ct. at 1560–1561. Based on the record, NIPP has sufficiently demonstrated that Clear Channel's share of the rock radio market is sufficiently high to justify *per se* analysis in this case. Dr. Phillips, NIPP's expert witness, defined the scope of the rock radio air play market (tying market) based on play list data, "duplicate cume" data, and radio station and industry materials. Based on his calculations, Clear Channel controls four of the six rock radio stations in the Denver area, or 66.6%.[7] (Defs.' Br.,

---

7. In April 2002, Dr. Phillips found that Seven rock radio stations constitute the rock radio

Ex. A–8 [Prelim. Economic Report of Phillips at 18]; Pls.' Resp., Ex. 1 [Phillips Decl. at 15].) If the number of listeners is considered, as reflected in advertising revenue for the rock radio stations and Arbitron data, Clear Channel controls 73% of the rock radio air play market. (Pls.' Resp. at 58, Ex. 1 [Phillips Decl. at 14].) Additionally, Clear Channel allegedly controls a unique product, radio, for which there are arguably high entry barriers. Construing this data in the light most favorable to NIPP, Clear Channel's alleged market share of the rock radio industry is sufficient to justify *per se* analysis of NIPP's tying claim.

The elements of a *per se* violation are: (1) two separate products; (2) a tie, or conditioning of the sale of one product on the sale of another; (3) sufficient economic power in the tying product market (rock radio air play), and (4) a substantial volume of commerce affected in the tied product market (rock concert promotions services). *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1546 (10th Cir.1995). Plaintiff is not required to show anticompetitive effects in the tied market. *Law v. Nat'l Collegiate Athletic Assoc.*, 134 F.3d 1010, 1016 (10th Cir.1998). Similarly, the court need not consider defendant's procompetitive justifications for the practice. *Id.* Here, NIPP has demonstrated sufficient evidence of the *per se* elements to create disputes of material fact, making summary judgment on the *per se* tying claim inappropriate.

### (1) Two Separate Products

In determining the validity of a tying arrangement, the court must first identify the two separate products that are

the subject of the arrangement. *Jefferson Parish*, 466 U.S. at 15, 104 S.Ct. at 1560. Here, NIPP claims that Clear Channel forces artists and their management to purchase rock concert promotional services from Clear Channel in order to purchase rock radio air play of the artists' songs and promotional support for the artists' concerts. To NIPP, therefore, the tying product is rock radio air play and promotional support, and the tied product is rock concert promotional support services.

Apparently conceding that concert promotional services provided to artists are a product, Clear Channel argues that there is no tying product because radio air play and promotional support are not sold, but are freely given. (Defs.' Br. at 80–82.) As stated earlier in this order, however, NIPP has provided evidence that radio air play is sold to artists through "indies," and perhaps through the tying arrangement itself. Additionally, as stated earlier in this opinion, NIPP has set forth sufficient evidence that radio stations receive an amount of consideration when providing air play and promotional support, indicative of an actual product. Accordingly, there is a legitimate dispute of fact whether air play and promotional support are actually sold, and, therefore, could potentially be considered products.

The test for determining whether two objects are separate products, as opposed to the same product, turns not on their function, but on the nature of any consumer demand for them. *Multistate Legal Studies*, 63 F.3d at 1547. Here, NIPP has shown that the demand for rock radio air play and radio promotional support, as evidenced through the existence of "indies,"

market in Denver: KBPI (CC), KRFX (CC), KTCL (CC), KBCO (CC), KALC (Emmis), KXPK (Emmis), and KKHK (Tribune). Since then, however, KXPK has exited the rock ra-

dio market. KKHK ("the Hawk") has changed its name and ownership but maintains its rock format. It is now KQMT ("the Mountain").

exists separately from the demand for concert promotional services, just as it did prior to the time that Clear Channel entered the concert promotions market. At the summary judgment stage, the court cannot say, as a matter of law, that NIPP will not be able to adduce sufficient evidence at trial to prove the existence of two products.

### (2) Tie

The second element of a *per se* tying claim is a tie, or conditioning of the sale of one product on the sale of another. *Multistate Legal Studies,* 63 F.3d at 1547. The seller must force the buyer to purchase the tied product. *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.,* 131 F.3d 874, 887 (10th Cir.1997). To establish forcing, a plaintiff must show that: (1) he himself complied with the tying practice by purchasing the tying and tied product; *or* (2) although he did not make the purchase, other buyers agreed to the arrangement under threat of losing the tying product. *Systemcare,* 117 F.3d at 1140. Clear Channel argues that NIPP provides no evidence that any buyer agreed to this arrangement under threat of losing air play. (Defs.' Br. at 80.) More specifically, Clear Channel argues that NIPP has produced no artist who will testify that he or she felt forced to utilize Clear Channel's promotional services in order to prevent losing air play. (*Id.*)

Although no artists have stepped forward to testify against Clear Channel, a fact that may be equally indicative of their fear of losing air play and promotional support as not, NIPP has provided evidence of at least four record labels and/or agents agreeing to the tying arrangement under threat of losing air play and/or promotional support. First, NIPP cites electronic mail messages passed between a director at Reprise Records, Todd Sievers, and Michael O'Connor at Clear Channel. (Pls.' Resp. Exs. Vol. 3, Exs. 52–55A [Electronic Mail Messages and Letters between O'Connor and Sievers of 3/2000–6/2000].) In these messages, Sievers arguably agrees to allow Clear Channel Concerts/Clear Channel Radio Festivals to promote the band Orgy's concert in the Denver market in order to prevent loss of air play for Orgy songs and other Reprise artists' songs. During his deposition, Sievers admitted agreeing to this tying arrangement. (*Id.,* Exs. Vol. 3, Ex. 55A [Sievers Dep. at 73].) Similarly, other electronic messages show instances where artists, their agents, or their record labels agreed to use Clear Channel Concerts/Clear Channel Radio Festivals or SFX/Clear Channel Entertainment in order to ensure that they received air play and promotional support. (*Id.,* Exs., Vol. 3, Exs. 42, 58, 64 [Electronic Mail Messages and Letters between Clear Channel Personnel and Various Artists' Agents and Record Labels].) Although Clear Channel argues that these artists were mistaken about Clear Channel's willingness to withhold air play, NIPP has provided these documents containing party-opponent admissions creating a dispute of material fact as to whether this was the case. Furthermore, NIPP provides several admissions by O'Connor himself that, if artists and their management desire air play and effective promotional support for their concerts from Clear Channel radio stations, they must choose Clear Channel for their concert promotions needs. (*Id.,* Exs., Vol. 3, Exs. 71–72, 75 [O'Connor statements].)

 Clear Channel counters that all of the above-mentioned evidence is inadmissible and, therefore, cannot be used to create a dispute of material fact on summary judgment. (Defs.' Br. at 65.) Clear Channel is correct that the court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep,* 756 F.2d at 1474. All of the elec-

tronic mail messages from O'Connor and other Clear Channel personnel, such as Bob Richards and Sabrina Saunders, are admissible under Federal Rule of Evidence 801(d)(2). Fed. R. of Evid. 801(d)(2)(C)-(D) provides that a statement is not hearsay if made by a party-opponent or its agent and offered against the party, if the agent is an employee who is authorized to engage in the type of correspondence at issue. Here, because the electronic mail messages were written by Clear Channel personnel who are authorized to engage in this type of correspondence with record labels, the messages are admissible for the purposes of summary judgment and at trial. A more difficult question concerns the correspondence drafted and sent by record labels, which confirm the labels and artists' consent to the tying arrangement. Because the parties do not significantly address the issue, the court is left to its own devices.

■ Based on a review of the Federal Rules of Evidence, the court finds several exceptions to the hearsay rule indicating that the electronic mail messages from record labels are admissible. First, Rule 801(d)(2)(E) provides that a statement is not hearsay if the statement is offered against a party, and the statement is a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. This rule is not limited to criminal cases, but applies to civil antitrust case as well. *World of Sleep,* 756 F.2d at 1474. Because section 1 of the Sherman Act states, "[e]very ... conspiracy, in restraint of trade or commerce ... is declared to be illegal ...," 15 U.S.C.A. § 1, and tying arrangements have been found to be illegal conspiracies under section 1, the coconspirator exception to the hearsay rule may be properly applied to correspondence confirming a tying agreement if the other requirements of the exception are fulfilled. The coconspirator exception only allows admittance of statements in further-

ance of a conspiracy if there is sufficient independent evidence, besides the statements, to establish the existence of the conspiracy. *World of Sleep,* 756 F.2d at 1474; *State of New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1073 (2d Cir. 1988). Here, there is other evidence of the conspiracy besides the messages written by record labels. The other evidence includes testimony from witnesses, such as Sievers, the messages written by Clear Channel personnel, and the play list data for songs. Accordingly, this exception likely applies to the electronic mail messages written by record labels and artists' management.

Even if the coconspirator exception is inapplicable, the evidence itself is very likely not hearsay. A verbal act is not considered hearsay if it is a statement that bears on the rights of the parties to the statement. Fed. R. of Evid. 801(c) advisory committee note. Conversations as to the making and terms of an oral agreement may be presented into evidence because the proof of the words spoken is not made to establish their truth but to establish the fact that they were spoken. *First Nat'l Bankshares of Beloit, Inc. v. Geisel,* 853 F.Supp. 1344, 1355 (D.Kan.1994) (citing *Creaghe v. Iowa Home Mut. Cas. Co.,* 323 F.2d 981, 984–985 [10th Cir.1963] ). Here, because the electronic mail messages show record labels agreeing to a tying arrangement, and because the agreement itself is the relevant act for stating a tying claim under section 1 of the Sherman Act, the electronic mail messages are not hearsay but are verbal acts under the Federal Rules of Evidence.

Finally, assuming the statements were hearsay, the state of mind exception to the hearsay rule provides:

the following are not excluded by the hearsay rule, even though the declarant is available as a witness: ... [a] state-

ment of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . .

Fed. R. of Evid. 803(3). Under this rule, written correspondence showing evidence of intention is admitted to prove the doing of the act intended. *Id.* advisory committee notes. Here, to the extent the electronic mail messages from the record labels show the intention of the labels to commit their artists to Clear Channel concert promotions, the electronic mail messages are admissible under the state of mind exception. Any statements of the record labels' beliefs as to why they chose to commit their artists may not be admitted under the exception, however, because it is a statement of belief. Fed. R. of Evid. 803(3). Accordingly, based on review of the hearsay rule and its exceptions, the electronic mail messages set forth by NIPP are admissible as evidence of a "tie."

 As stated earlier, Clear Channel also argues that there is no evidence of a "tie" because radio air play and radio promotional support are freely given away by radio stations and not purchased. Once again, NIPP has set forth evidence that radio air play is bought and sold through the use of "indies." Furthermore, to the extent that NIPP has provided no evidence of the cost of radio air play, NIPP has shown that the price of a bundled product may reflect both the costs of the tied product and the tying product. In this situation, when customers purchase the bundled product, customers are purchasing the tying product, even if it is touted as being free. *Multistate Legal Studies,* 63 F.3d at 1548 (citing *Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.,* 833 F.2d 606, 610 [6th Cir.1987] ). Here, because NIPP alleges that the cost of acquiring radio air play is implicit in the artist's choice to use Clear Channel's concert promotions services, the fact that radio air play independently costs nothing is irrelevant. Additionally, NIPP has presented evidence that consideration is exchanged in transactions for radio promotional support, because both the radio station and the promoter benefit from the transaction. (Defs.' Br., Exs. Vol. 2, Ex. A–24 [O'Connor Dep. at 385–386].) Because the evidence demonstrates that radio air play and radio promotional support are exchanged for consideration, the court finds that NIPP has set forth sufficient evidence of a "tie" to create a dispute of material fact. Summary judgment on this issue, therefore, is inappropriate.

### (3) *Market Power in Tying Product Market*

 In examining a tying claim, once the distinct products are identified, the question arises whether the consumer has sufficient choice to forgo the tying product altogether and, hence, the tied product, or whether the defendant has sufficient market power to force the consumer to purchase the tied product against his desire, based on defendant's control of the tying product. *Jefferson Parish,* 466 U.S. at 24–25, 104 S.Ct. at 1565. If the consumer has sufficient choice, no forcing is present, and the tying arrangement is perfectly lawful. *Id.,* 466 U.S. at 25, 104 S.Ct. at 1565. This determination is made by focusing on market power in the tying product market. The existence of market power in the tying product market is ordinarily inferred from the seller's possession of a predominant share of the market. *Eastman Kodak,* 504 U.S. at 464, 112 S.Ct. at 2081 (citations omitted). NIPP claims that Clear Channel controls the market for rock radio air play, the tying market, in Denver, based on the number of rock stations it owns and the percentage of rock radio advertising it controls.

NIPP has adequately shown that Clear Channel's share of the rock radio market is sufficiently high to fulfill this element of a tying claim. Dr. Phillips, NIPP's expert witness, defined the scope of the rock radio air play market (tying market) based on play list data, duplicate cume data, and radio station and industry materials. Based on his calculations, Clear Channel controls four of the six rock radio stations in the Denver area, or 66.6%. (Defs.' Br., Ex. A–8 [Prelim. Economic Report of Phillips at 18]; Pls.' Resp., Ex. 1 [Phillips Decl. at 15].) If the number of listeners is considered, as reflected in advertising revenue for the rock radio stations and Arbitron data, Clear Channel controls 73% of the rock radio air play market. (Pls.' Resp. at 58, Ex. 1 [Phillips Decl. at 14].) Construing this data in the light most favorable to NIPP, Clear Channel's alleged market share of the rock radio industry is, therefore, sufficient to demonstrate market power in proving a *per se* tying claim.

### (4) Substantial Volume Affected in Tied Product Market

■ The final element that a plaintiff must demonstrate in proving a tying claim is that a substantial volume of commerce has been affected in the tied product market. *Multistate Legal Studies*, 63 F.3d at 1546. In demonstrating *per se* liability, however, this element is loosely applied because, once the defendant is found to have appreciable market power in the tying market, the ability to leverage this power to restrain trade in the tied market is presumed. *Brokerage Concepts*, 140 F.3d at 511. This presumption arises because the foundational principle of *per se* liability is that some acts are so inherently anticompetitive that no examination of their impact on the market as a whole is required. *Datagate, Inc. v. Hewlett–Packard Co.*, 60 F.3d 1421, 1425 (9th Cir.1995) (citing *Fortner I*, 394 U.S. at 501, 89 S.Ct. at 1258). No inquiry, therefore, need be made into the actual prevailing market conditions in the tied market. *Digidyne Corp. v. Data Gen'l Corp.*, 734 F.2d 1336, 1347 (9th Cir.1984). Instead, all that is required is that the restraint in the tied market caused by the tie affect a substantial volume of commerce, which in this context means only an amount greater than a *de minimis*. *Id.*

Clear Channel has not addressed this issue in its briefing on summary judgment, and the court, therefore, will not dispose of NIPP's tying claim based on this element on summary judgment. Accordingly, sufficient disputes of material fact exist as to NIPP's *per se* tying claim that Clear Channel's motion for summary judgment on NIPP's *per se* tying claim is denied.

### b. Rule of Reason Analysis

If a plaintiff is unable to prevail on a theory of *per se* liability, a plaintiff can seek to prove a tying claim under a different analysis. In order to prevail in the absence of *per se* liability, a plaintiff has the burden of proving that the tying arrangement unreasonably restrains competition in the tied product market. *Jefferson Parish*, 466 U.S. at 29, 104 S.Ct. at 1567. This is known as "rule of reason" analysis. *Tarabishi*, 951 F.2d at 1571. Rule of reason analysis first requires a determination of whether the challenged restraint has a substantially adverse effect on competition in the tied market. *Law*, 134 F.3d at 1016–1017. The arrangement must lead to an increase in the price charged to the consumer or a decrease in the quality of the tied product offered by the seller. *Jefferson Parish*, 466 U.S. at 31, 104 S.Ct. at 1568 n. 52. The tied product market and defendant's market share, therefore, must be closely examined to prove tying under rule of reason analysis.

As stated earlier, NIPP has set forth no evidence of the tied product market (the

tied product market here is the market for the sale of concert promotions services to artists by concert promoters). NIPP has provided no information concerning pricing of the tied product or market share of various concert promoters. Specifically, there is no evidence of what payment is made to artists in exchange for the right to promote their concerts, or what value artists confer on promoters when choosing their promotions services. More importantly, NIPP has not provided information on which promoters hold the lion's share of prominent artist contracts. While this information may be reflected to a certain extent in the end-use market for ticket sales, NIPP has not sufficiently set forth evidence on the input market to prove a tying claim under rule of reason analysis.

### 3. Section 2 of the Sherman Act: Monopolization

NIPP alleges that Clear Channel has monopolized the market for rock-concert tickets in the Denver metropolitan area by engaging in anticompetitive conduct such as predatory pricing, tying, and preventing its competitors from using radio for promotions. Section 2 of the Sherman Act makes it unlawful for a firm to "monopolize." 15 U.S.C.A. § 2 (West 1997 & Supp. 2003). In order to prove monopolization, a plaintiff must show (1) defendant's possession of monopoly power in the relevant market, and (2) the willful acquisition of monopoly power, as opposed to growth as a result of a superior product, business acumen, or historic accident. *Reazin*, 899 F.2d at 973; *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). While concerted conduct under section 1 of the Sherman Act is subject to sanction if it merely restrains trade, unilateral conduct under section 2 is subject to sanction only if it actually monopolizes. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541 (9th Cir.1991).

As stated earlier, in order to prove a monopolization claim, plaintiff must first define the relevant market. NIPP has set forth sufficient evidence for a jury to conclude that the relevant market for purposes of NIPP's monopolization and attempted monopolization claims is the market for rock concerts. Second, in proving a monopolization claim, plaintiff must demonstrate that the defendant has monopoly power in the relevant market. While merely possessing monopoly power is not itself an antitrust violation, it is a necessary element of a monopolization charge. *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C.Cir.2001). Monopoly power under section 2 of the Sherman Act requires something greater than market power under section 1. *Eastman Kodak*, 504 U.S. at 481, 112 S.Ct. at 2090 (citations omitted). Proof of monopoly power requires a showing of the power *both* to control prices and to exclude competition. *United States v. E.I. du Pont Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Tarabishi*, 951 F.2d at 1567. Monopoly power may be inferred from a firm's possession of a dominant share of the relevant market, which is protected by entry barriers. *Microsoft*, 253 F.3d at 51.

Here, although NIPP has set forth some evidence that Clear Channel has charged supercompetitive prices and excluded competition by limiting access to certain inputs, such as artists, rock radio air play and rock radio promotional support, Clear Channel's alleged market share does not currently rise to the level necessary to indicate monopoly power. According to NIPP, as of the commencement of this lawsuit Clear Channel held a 50.48% share of the rock concert market. While this figure is impressive, it is not monopolistic. "While the Supreme Court has refused to specify a minimum market share

necessary to indicate a defendant has monopoly power, lower courts generally require a minimum market share between 70% and 80%." *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 694 n. 18 (10th Cir.1989). Based on Clear Channel's market share, therefore, the court finds that NIPP cannot prove its monopolization claim. Accordingly, Clear Channel's motion for summary judgment is granted as to NIPP's monopolization claim under section 2 of the Sherman Act.

### 4. Section 2 of the Sherman Act: Attempted Monopolization

■ In the Tenth Circuit, four elements must be proven to establish an attempt to monopolize under section 2 of the Sherman Act: (1) relevant market, including both geographic and product market, in which the alleged attempt occurred; (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such attempt. *Colo. Interstate Gas*, 885 F.2d at 693. Additionally, any plaintiff seeking treble damages under section 4 of the Clayton Act must show antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Here, plaintiffs have already demonstrated sufficient evidence that the relevant market is the market for rock concerts. Plaintiffs must, therefore, have sufficient evidence of the other three elements for a reasonable jury to find Clear Channel liable for attempted monopolization under section 2 of the Sherman Act.

### a. Probability of Success in Monopolization: Market Power

■ In order to satisfy the dangerous probability of success element on an attempt claim, the plaintiff must show that there is a dangerous probability that defendant will achieve monopoly status as the result of the predatory conduct alleged by the plaintiff. *Colo. Interstate Gas*, 885 F.2d at 693. Because we are talking about probabilities, it is not necessary for the defendant to already possess monopoly power in the target market. *Multistate Legal Studies*, 63 F.3d at 1554. Factors to be considered in determining dangerous probability include (1) the defendant's ability to control prices *or* exclude competition, (2) defendant's market share, (3) the number and strength of other competitors, or whether defendant is a multimarket firm, (4) market trends, and (5) entry barriers. *Full Draw*, 182 F.3d at 756 (citing *Bacchus Indus.*, 939 F.2d at 894). Where predatory pricing is alleged, the defendant's financial strength and ability to absorb losses are also relevant. *Multistate Legal Studies*, 63 F.3d at 1554 (citing *Brooke Group*, 509 U.S. at 225, 113 S.Ct. at 2589). The court addresses each consideration, in turn.

### (1) Raise Prices or Exclude Competition

■ To demonstrate 'market power,' a plaintiff may show evidence of power to control prices *or* exclude competition. *Reazin*, 899 F.2d at 966. NIPP has demonstrated that Clear Channel may have the ability to control prices and/or exclude competition. One measure of a firm's ability to monopolize is the **persistence** of a firm's ability to profitably charge monopoly prices. *Colo. Interstate Gas*, 885 F.2d at 695. If the evidence demonstrates that a firm's ability to charge monopoly prices will necessarily be temporary, the firm does not possess the degree of market power required for attempted monopolization. *Id.* at 693. To justify a finding that a defendant has the power to persistently control prices, entry barriers must be significant—they must be capable of constraining the normal operation of the market so that the problem is unlikely to be

self-correcting. *Rebel Oil Co.,* 51 F.3d at 1439. If entry barriers exist, a firm is a monopolist if it can profitably raise prices substantially above the competitive level. *Microsoft,* 253 F.3d at 51. When evidence shows that a firm has in fact profitably done so, monopoly power exists. *Id.* at 51.

NIPP points to testimony and expert analysis in the record showing that barriers to entering the rock concert industry are significant. To NIPP, these barriers to entry include relationships with rock industry insiders, including rock artists, Clear Channel's ownership of rock radio stations and commensurate access to rock radio promotional support and rock radio air play, Clear Channel's ownership of venues in Denver and nationwide, Clear Channel's accumulated customer goodwill, Clear Channel's large, national size, and Clear Channel's significant capital. (Pls.' Resp. at 69.) Potentially, a reasonable jury could find that such barriers are capable of constraining the normal operation of the rock concert market, allowing Clear Channel to charge monopoly prices persistently. *Multistate Legal Studies,* 63 F.3d at 1555.

Secondly, NIPP asserts that Clear Channel has actually charged prices above the competitive level. The ability to raise prices above the industry average while increasing market share demonstrates entry barriers and a potential ability to control prices. Dr. Phillips, NIPP's expert, points to pricing patterns that demonstrate that Clear Channel has raised ticket prices high above the industry average and increased its market share simultaneously. (Defs.' Br., Ex. A–8 [Prelim. Economic Report of Phillips at 25–26].) According to NIPP's expert and available Pollstar data, from 2000 to 2001 the average increase in the price of rock concert tickets in the Denver area was 3.7%. (Defs.' Br., Ex. A–8 [Prelim. Economic Report of Phillips at 25–26].) Consistent with this average, NIPP raised the price of its rock concert tickets by 3.8%. (*Id.,* Ex. A–8 [Prelim. Economic Report of Phillips at 25, Ex. E].) Similarly, in 2001, House of Blues raised its rock concert tickets by 2.2%. (*Id.,* Ex. A–8 [Prelim. Economic Report of Phillips at 25, Ex. E].) Clear Channel rock concert ticket prices, however, increased at a rate high above the industry average. Rock concerts promoted by Clear Channel Concerts/Clear Channel Radio Festivals experienced a 46.5% increase, and rock concerts promoted by SFX/Clear Channel Entertainment increased by 23.5%. (*Id.,* Ex. A–8 [Prelim. Economic Report of Phillips at 25, Ex. E].) Despite these above market average price increases, Clear Channel still increased its market share, according to Dr. Phillips, from .27% to 43.81%. (Pls.' Resp., Exs. Vol. I, Ex. 1 [Phillips Decl., Table 5].)

Clear Channel argues that this data is invalid and should not be considered by the court because it does not take into account the quality of the artist being promoted, and the concomitant greater costs to the promoter to produce the concert. (Defs.' Br. at 58–59.) As pointed out by Clear Channel, the more popular the rock artist, the more the concert promoter is forced to bid on the right to promote the artists concert. (*Id.*) Higher bidding results in higher costs to the concert promoter and, hence, a higher ticket price. (*Id.*) Clear Channel, therefore, argues that NIPP's pricing data is of no use in proving attempted monopolistic pricing because the data does not consider the costs incurred by Clear Channel, as opposed to NIPP or House of Blues. (*Id.*) Monopoly power is "the ability to profitably raise price above marginal cost." (*Id.* at 59.)

To the extent that NIPP argues that Clear Channel's prices are above industry average based on a comparison between average ticket prices charged in a given year by Clear Channel versus average

ticket prices charged by other promoters, Clear Channel is correct that NIPP's failure to consider the different costs born by Clear Channel is fatal to NIPP's argument. If Clear Channel promotes all of the most expensive, top artists, Clear Channel's ticket prices will be higher than tickets sold by other promoters, and this price difference does not indicate monopolistic pricing or conduct.

To the extent, however, that NIPP attempts to show that Clear Channel's prices are above industry average based on a comparison between the percentage increase in prices charged by Clear Channel versus the percentage increase in prices charged by other promoters, NIPP's failure to consider the different costs is not detrimental to their argument for two reasons. First, in 1999, SFX/Clear Channel Entertainment and Clear Channel Concerts/Clear Channel Radio Festivals arguably promoted rock artists of equal or greater quality in the eyes of consumers than the rock artists they promoted in 2001. (Defs.' Br., Ex. A–01 [List of Concerts and Promoters from 1995–2001].) In 1999, SFX/Clear Channel Entertainment and Clear Channel Concerts/Clear Channel Radio Festivals solely promoted the Rolling Stones, Limp Bizkit, and Bonnie Raitt, three arguably top quality performers. (*Id.*, Ex. A–01 [List of Concerts at 53, 57, 60].) In 2001, they promoted some rock performers that are arguably equally popular, such as U2 and Bob Dylan, but also some arguably less popular performers, such as Echo and the Bunnymen and Dark Star Orchestra. (*Id.*, Ex. A–01 [List of Concerts at 83, 90, 95, 98].) Assuming Clear Channel promotes artists of equal popularity and, hence, quality every year, a dispute of a material fact which increases Clear Channel's costs, this does not explain why Clear Channel Concert's costs may have risen by 45%, while everyone else's rose by approximately 3%. It does not appear that the popularity of artists promoted by Clear Channel corresponds to a 45% increase in price.

Second, the fact that NIPP's expert did not consider Clear Channel's costs in attempting to show monopolistic pricing is not fatal to NIPP's claim because NIPP claims that Clear Channel creates its own higher costs by upbidding the costs of artists in order to eliminate competition. (Pls.' Resp., Exs. Vol. 1, Ex. 4 [Mickelson Decl. ¶¶ 5–6, 10].) If Clear Channel engages in this predatory bidding in order to raise costs and drive competition from the market, as alleged by NIPP, evidence of Clear Channel's higher costs does not necessarily show that Clear Channel's increase in ticket practices is unrelated to monopolistic activity. Although ticket prices vary according to the public's perception of the quality of the artist, the ticket prices also vary based on the amount of money the promoter is willing to bid on the artist. Because costs of artists are disputably manipulated by Clear Channel, NIPP need not necessarily include costs to demonstrate monopolistic pricing. Thus, material disputes of fact exist as to Clear Channel's ability to control prices in the rock concert market.

Another factor indicative of a defendant's probability of success in monopolization is the defendant's ability to exclude competition and thereby control output. *Reazin*, 899 F.2d at 966. If the predator has control of market-wide output at the supply level, other firms cannot increase their output because they have no access to the necessary inputs to increase output. *Id.* When a business firm is in a position to use its leverage over one industry in order to exclude or slow down the development of additional competitors in another industry, the business firm may have the power to exclude competition and, therefore, market power. *Reazin*, 899 F.2d at 970; *Full Draw*, 182 F.3d at 757.

Here, as stated earlier, NIPP has effectively demonstrated that Clear Channel's control of the rock radio industry in Denver gives it the ability to limit other promoters' access to rock artists and rock radio promotional support, two inputs that are disputably necessary for the output of rock concerts. NIPP has cited electronic mail messages from O'Connor and others showing Clear Channel's ability and willingness to deny radio promotional support to other promoters and to manipulate artists with threats of lost air play. (Pls.' Resp., Exs. Vol. 3, Ex. 41 [Electronic Mail Message from O'Connor to All Denver Clear Channel Radio Program Directors, Music Directors, and Promotions Directors of 6/19/2001], Ex. 55 [Letter from Sievers to Michael Papale of 6/27/2000], Ex. 55A [Letter from Sievers to Saunders of 8/22/2000], Ex. 43 [Electronic Mail Message from Sievers to Saunders of 8/25/2000], Ex. 43A [Electronic Mail Message from Sievers to O'Connor].) Accordingly, a dispute of material fact exists as to whether Clear Channel has the ability to control output and exclude competition in the rock concert market.

### (2) Market Share

■ The likelihood of successful monopolization is typically evaluated by examining the defendant's share of the relevant market. *Colo. Interstate Gas,* 885 F.2d at 693. The plaintiff must show that there is a dangerous probability that the defendant's conduct will propel it from a non-monopolistic market share to a market share that is large enough to constitute a monopoly. *Id.* at 693. The higher the firm's initial market share, the more likely it will eventually gain monopolistic control over the market. *Id* at 694. Market share is relevant but not conclusive as to the existence of market power. *Reazin,* 899 F.2d at 966.

Here, NIPP has set forth evidence that Clear Channel holds a 50.48% share of the market for rock concerts. (Pls.' Resp., Exs. Vol. I, Ex. 1 [Phillips Decl., Table 5].) A market share of 41% indicates that a firm has substantial economic power in the market, and, therefore, has the tools at its disposal to elevate its market share to monopolistic levels. *Colo. Interstate Gas,* 885 F.2d at 694; see also *Rebel Oil,* 51 F.3d at 1438 (holding that a market share of 44% is sufficient as a matter of law to support a finding of market power, if entry barriers are high and competitors are unable to expand their output in response to supercompetitive pricing). Accordingly, Clear Channel's market share, construed in the light most favorable to NIPP, supports NIPP's claim for attempted monopolization.

### (3) Defendants' Resources & Competitors

■ NIPP has produced evidence that Clear Channel is a multimarket firm with significant market power in other cities across the United States and significant resources to absorb short term losses. NIPP has also shown that, as of December 31, 2001, Clear Channel controlled more than 100 venues for live entertainment performances in the country and accounted for 70% of concert ticket revenue in the United States. (Pls.' Resp., Exs. Vol. 3., Ex. 78 [Clear Channel 2001 Annual Report], Exs. Vol. 4, Ex. 87 [Clear Channel 2001 Shareholder's Report].) Based on the record, it is clear that Clear Channel has significant economies of scale in its chosen industries.

Clear Channel's sheer size dwarfs all other concert promoters in the Denver area. Although SFX/Clear Channel Entertainment and Clear Channel Concerts/Clear Channel Radio Festivals have a large number of competitors in the Denver metropolitan market, few of these competitors have a fraction of the market

share or financial strength of Clear Channel. Additionally, unlike Clear Channel, these competitors own no rock radio stations, further hindering their access to inputs readily available to SFX/Clear Channel Entertainment and Clear Channel Concerts/Clear Channel Radio Festivals for the production of rock concerts. Based on a review of the record, therefore, the court concludes that Clear Channel's financial strength, multimarket domination, and competitors in the Denver market support NIPP's claim for attempted monopolization.

### (4) Market Trends

■ Market trends may demonstrate a probability of success in monopolization. Specifically, when the defendant's market share grows significantly in a short period of time, while the market share of its major competitors shrinks significantly in a short period of time, a probability of monopolization may exist. *Multistate Legal Studies*, 63 F.3d at 1554–1555. Here, NIPP has set forth evidence that Clear Channel's share of revenue in the rock concert market rose from .45% in 1999 to over 50.48% in 2001.[8] (Pls.' Resp., Exs. Vol. 1, Ex. 1 [Phillips Decl., Table 5].) Additionally, NIPP and House of Blues' market shares shrunk during that time period. (*Id.*, Exs. Vol. 1, Ex. 1 [Phillips Decl., Table 5].) That Clear Channel entered the marketplace and immediately propelled itself to this high market share supports NIPP's claim for attempted monopolization.

### (5) Entry Barriers

■ Entry barriers are relevant to the analysis of market power because the significance of market power depends upon its durability. *Reazin*, 899 F.2d at 968. Entry barriers are particular characteristics of a market which impede entry by new firms into that market. *Id.* They may include high capital costs or regulatory or legal requirements such as patents or licenses. *Id.* Other examples include: (1) control over an essential or superior resource, (2) entrenched buyer preferences, and (3) high capital costs for new entrants. *Id.* When significant and continuing barriers to entry are present, substantial market power can persist unimpeded. *Id.*

NIPP claims that the barriers to entry include (1) Clear Channel's ownership of rock radio stations and commensurate access to rock radio promotional support and air play, (2) relationships with rock industry insiders, including rock artists, (3) Clear Channel's ownership of venues in Denver and nationwide, (4) Clear Channel's accumulated customer goodwill, (5) Clear Channel's large, national size, and (5) Clear Channel's significant capital. (Pls.' Resp. at 69.) Importantly, NIPP emphasizes the difficulty for any promoter to obtain a rock radio station due to the significant cost of purchasing a station and the licensing requirements to operate a station. (*Id.*) A reasonable jury could find that such barriers are capable of constraining the normal operation of the rock concert market. *Multistate Legal Studies*, 63 F.3d at 1555.

Entry barriers may also be created by the defendant's conduct itself. *Full Draw*, 182 F.3d at 756. For example, an organized boycott of the plaintiff's product may constitute an entry barrier that confirms the defendant's dangerous probability of monopolization. *Id.* Similarly, here, according to NIPP, Clear Channel has allegedly utilized an illegal tying arrangement to limit other promoters' access to artists. This limited access to artists is a legitimate entry barrier, if proven.

---

**8.** NIPP calculates Clear Channel's share of the rock concert market in 1999 by examining the shares of Clear Channel, Jacor Communications, and SFX combined.

Clear Channel argues that the high numbers of concert promoters in the Denver area demonstrate that significant entry barriers do not exist in the relevant market. (Defs.' Br. at 53.) The number of competitors does not conclusively show a lack of entry barriers, however. *Rebel Oil Co.,* 51 F.3d at 1440. Likewise, the fact that entry has occurred does not preclude the existence of significant entry barriers. *Id.* at 1440. If the output of the new entrant is insufficient to take significant business away from the predator, the entrant is unlikely to represent a challenge to the predator's market power. *Id.* Indeed, the important inquiry regarding competitors is whether any competitors approach Clear Channel's financial strength in the relevant market. *Reazin,* 899 F.2d at 971.

Based on a review of the record, the court concludes that no promoters approach the financial strength or current market share of Clear Channel. As evidence of significant entry and competition in the rock concert market, Clear Channel states that the following promoters entered the rock concert industry in 2001: Alex Crothers, Eric Pirritt, Jason Colter, Soda Jerk Presents, Concerts West, and Jam Productions. (Defs.' Br. at 53.) Of these six promoters, however, four, Crothers, Pirritt, Colter, and Soda Jerk, combined to grab a mere .7% of the market. (Pls.' Resp., Exs. Vol. 1, Ex. 1 [Phillips Decl., Table 6].) Although Concerts West posted a 4.63% market share in 2001, it has since completely exited the Denver market. (*Id.* at 71, Exs. Vol. 1., Ex. 2 [Morreale Decl. ¶ 31].) Similarly, while Jam Productions held a 14.91% market share in 2001, this share was due solely to a single concert, the Eagles Concert that opened Invesco Field at Mile High, and Jam exited the market immediately thereafter. (*Id.* at 71, Exs. Vol. 1, Ex. 4 [Mickelson Decl. ¶ 13].) Whether the brief entry and hurried exit of Concerts West and

Jam Productions demonstrates additional entry barriers or the opposite is a question of fact for the jury. The sole remaining promoters that booked over $250,000 in 2001 are NIPP, House of Blues, and Clear Channel, and, since 1999, Clear Channel's share of the rock concert market has increased, while that of NIPP and House of Blues has decreased. (*Id.,* Exs. Vol. 1, Ex. 1 [Phillips' Decl., Table 5].)

Finally, Clear Channel argues that the entry barriers alleged by NIPP exist for entering the concert market as a whole but not for entering the rock concert market specifically. (Defs.' Br. at 51, 54.) According to Clear Channel, therefore, NIPP has failed to demonstrate any barriers to entry into the rock concert market. (*Id.*) While some of the entry barriers set forth by NIPP pertain to the concert market as a whole, many of the alleged barriers apply solely to the rock concert market. For example, ownership of a rock radio station, and the commensurate access to rock artists and rock radio promotional support, is not a barrier to entering the country music concert market, but only the rock concert market. Similarly, relationships with rock industry insiders and artists is an entry barrier to the rock concert market and not the general concert market.

Furthermore, just because a barrier to entry exists for entry into the all music concert market does not mean it cannot also be a barrier to entry for the rock concert market. Specifically, that Clear Channel owns numerous venues nationwide is a deterrent for newcomers' entry into the rock concert market, just as it is a deterrent to entry into the general concert market. The same holds true for Clear Channel's financial strength. Clear Channel's economies of scale make entry into the rock concert market difficult because of Clear Channel's hold on rock radio. Thus, NIPP has demonstrated sufficient

disputes of material fact as to entry barriers to support its claim for attempted monopolization. Accordingly, plaintiff has satisfied its burden on summary judgment to show Clear Channel's probability of success in monopolization.

### b. Specific Intent

■ After a plaintiff has defined the relevant market and shown a probability of success in monopolization, the third element that must be proven by plaintiff is the specific intent to monopolize. *Colo. Interstate Gas Co.*, 885 F.2d at 693. Specific intent to monopolize is a necessary element of an "attempt to monopolize" claim under section 2. *Aspen Skiing*, 472 U.S. at 601, 105 S.Ct. at 2857. Improper exclusion is always deliberately intended. *Id.* at 601, 105 S.Ct. at 2856.

Here, NIPP has set forth sufficient evidence of improper exclusion, as demonstrated throughout this order, to create a question of fact regarding Clear Channel's specific intent. Additionally, electronic mail messages between Michael O'Connor and Clear Channel personnel indicate that Clear Channel had the specific intent to deny radio promotional support and advertising to other promoters, despite the fact that providing the support would have financially benefited the radio stations. (Pls.' Resp., Exs. Vol. 3, Ex. 41 [Electronic Mail Message from O'Connor to All Denver Clear Channel Radio Program Directors, Music Directors, and Promotions Directors of 6/19/2001].) Clear Channel's decision against its own financial interest demonstrates an intent to monopolize because Clear Channel would rather injure its competitors reap monopoly profits in the long run than gain benefits in the short run. Similarly, electronic mail messages between O'Connor and record label personnel create a dispute of fact as to whether Clear Channel had the specific intent to manipulate artists with threat withholding radio air play. (*Id.*, Exs. Vol. 3, Ex. 55 [Letter from Sievers to Michael Papale of 6/27/2000], Ex. 55A [Letter from Sievers to Saunders of 8/22/2000], Ex. 43 [Electronic Mail Message from Sievers to Saunders of 8/25/2000], Ex. 43A [Electronic Mail Message from Sievers to O'Connor].)

### c. Anticompetitive Conduct

■ The final element of an attempted monopolization claim is proof that the defendant engages in anticompetitive conduct. *Colo. Interstate Gas Co.*, 885 F.2d at 693. Anticompetitive or exclusionary conduct under section 2 is "conduct constituting an abnormal response to market opportunities." *Multistate Legal Studies*, 63 F.3d at 1550. Such predatory practices are illegal if the conduct appears reasonably capable of contributing to the creation or maintenance of monopoly power, **and** the practices (1) do not constitute competition on the merits *or* (2) are more restrictive than reasonably necessary for competition. *Id.* A defendant may avoid liability by showing a legitimate business justification for the conduct. *Id.* If, however, the defendant adopts its policies and engages in certain conduct as part of a scheme of willful acquisition of monopoly power, it violates section 2 of the Sherman Act. *Eastman Kodak*, 504 U.S. at 483, 112 S.Ct. at 2090 (citations omitted). Specifically, "[anticompetitive] conduct [is that conduct] directed toward competitors and ... intended to injure competition." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346,1353 (Fed.Cir.1999).

NIPP alleges several different instances of anticompetitive conduct by Clear Channel and argues that this conduct, taken as a whole, demonstrates attempted monopolization. (Pls.' Resp. at 80–81.) First, NIPP alleges that Clear Channel withholds rock radio advertising and promotional support to its promoter competitors and the artists the promoters seek to

promote. (*Id.* at 86.) Secondly, NIPP claims that Clear Channel uses its power over the rock radio market in Denver as leverage to gain control over the rock concert business by baiting artists with radio air play and promotional support in order to get their promotion business. (*Id.* at 83.) Third, NIPP alleges that Clear Channel engages in predatory pricing by intentionally bidding for artists at a rate high above the market rate in order to eliminate other promoters who do not have the financial strength to bear such costs; Clear Channel then allegedly passes these costs on the to the end-use rock concert ticket purchasers by charging monopolistic prices for concert tickets. (*Id.* at 89.) Finally, NIPP claims that Clear Channel has utilized wrongful means to steal NIPP's employees. (*Id.* at 81.) The court addresses each argument, in turn.

### (1) Denial of Radio Advertising and Promotional Support

First, NIPP complains that Clear Channel's refusal to provide equal rock radio advertising and radio promotional support for other promoters is anticompetitive conduct. (*Id.* at 86.) NIPP presents evidence that, for rock concert promoters, rock radio advertising enables promoters to reach the exact end-consumer who prefers music by rock artists, during a moment in time when the end-consumer is enjoying listening to the very musical product that concert tickets also provide. Advertising on other format stations does not provide this reach. (Pls.' Resp., Ex. 2 [Morreale Decl. ¶¶ 16–19], Ex. 4 [Mickelson Decl. ¶ 3], Ex. 22 [Loncao Dep. at 35–36], Ex. 39 [Sievers Dep. 101–102].) Similarly, advertising in newspapers or magazines, or on television stations, even if these forms of media are targeted to rock audiences, do not carry the advertisement for a concert to an end-consumer who necessarily is enjoying at that moment the very product advertised. According to NIPP, therefore, Clear Channels' refusal to provide this advertising and promotional support is anticompetitive conduct.

Clear Channel makes several counterarguments to this proposition. First, Clear Channel argues that its radio stations do not have to accept paid advertising from promoters because the antitrust laws do not compel a company to do business with competitors. (Defs.' Br. at 66.) All business firms have a right to select their customers and associates and to refuse to deal with others. *Aspen Skiing,* 472 U.S. at 601, 105 S.Ct. at 2856. Additionally, there is no duty to cooperate with one's competitors. *Id.* at 601, 105 S.Ct. at 2856.[9] The antitrust laws protect competition but not individual competitors. *Intergraph,* 195 F.3d at 1354. The absence of a duty to cooperate, however, does not mean that the refusal to deal never gives rise to antitrust liability. *Aspen Skiing,* 472 U.S. at 601, 105 S.Ct. at 2856. After all, most rights are qualified. *Id.* Under section 2 of the Sherman Act, the right of the business firm to exercise independent discretion as to the parties with whom it will deal is circumscribed when the firm intends the behavior to create or maintain a monopoly. *Id.* Additionally, the behavior is anticompetitive when it injures competition in the market. *Intergraph,* 195 F.3d at 1360.

Here, NIPP has presented sufficient evidence that Clear Channel's refusal to accept paid advertising is founded upon an

---

9. Under section 1 of the Sherman Act, a business has the right to refuse to deal with whomever it likes as long as it does so independently, without conspiring with others. *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Under section 2, however, independent action may form the basis of liability.

intention to create monopoly power for itself in the rock concert promotions market. As shown earlier in electronic mail messages, Michael O'Connor asked his station personnel to refuse advertising for promoters competing with SFX/Clear Channel Entertainment and/or Radio Festivals. This refusal to deal may not be in the commercial best interest of Clear Channel's radio stations because, as O'Connor himself testified, providing radio advertising and radio promotional support benefits the radio stations. (Defs.' Br., Exs. Vol. 2, Ex. A–24 [O'Connor Dep. at 385–386].) Assuming that the refusal to deal is not in the best commercial interests of the radio stations, an inference could be made that the refusal supports other, more sinister motives, such as the creation of a monopoly. Additionally, Clear Channel's refusal to deal, as defined in O'Connor's electronic mail message to Clear Channel personnel, is not a refusal to deal with an individual competitor, but a refusal to deal with all competitors in the rock concert promotions market. Finally, NIPP has demonstrated evidence of marketwide injury by showing an increase in ticket prices and a decreasing market share for all of Clear Channel's competitors in the rock concert market, not just a single, individual competitor.

Second, Clear Channel argues that Clear Channel does not have to offer its competitors free radio promotional support because "no case has held that . . . the provision of special or privileged treatment to a legal adversary can be compelled on a refusal to deal antitrust premise." (Defs.' Br. at 73 [citing *Intergraph*, 195 F.3d at 1358].) According to Clear Channel, it has the right to refuse to offer its free promotional services to other promoters as part of its independent discretion. (*Id.*) Free promotional support is not special treatment because the radio stations have historically provided it to all promoters; it is not special but a typical exchange that

occurs in the business. This refusal is, arguably, in the worst interest of Clear Channel radio stations, which demonstrates an intent to monopolize. Additionally, what Clear Channel characterizes as free promotional support could equally be characterized as an exchange of consideration, since both the radio stations and the promoters benefit form promotional support. The fact that Clear Channel labels the promotional support as free, therefore, does not affect the analysis for antitrust purposes.

In support of its position that Clear Channel is not required to give its competitors access to radio advertising and promotional support, Clear Channel cites the *Intergraph* case for the proposition that its behavior is not anticompetitive. (Defs.' Br. at 65–68.) Clear Channel's reliance on *Intergraph* is misplaced, however. In *Intergraph*, Intergraph, a manufacturer of computer modems, which purchased computer microprocessors for its modems from Intel, sued Intel for patent infringement. *Intergraph*, 195 F.3d at 1350. In retaliation for filing suit, Intel refused special benefits to Intergraph which Intergraph alone had previously enjoyed when purchasing Intel microprocessors, such as pre-release products and allocation of new products. *Id.* at 1351. Thereafter, Intergraph sued Intel for violation of the Sherman Act based on Intel's refusal to provide these benefits. *Id.*

Although the Court of Appeals for the Federal Circuit ruled in Intel's favor, it did not do so, as alleged by Clear Channel, because a company has no duty to deal under antitrust laws. *Id.* Rather, the court found that Intel's refusal to deal was not anticompetitive conduct because Intel and Intergraph were not competitors in any market. *Id.* at 1356. Furthermore, the court found Intel's behavior was not anticompetitive because it only injured In-

tergraph individually, as opposed to injuring an entire market. *Id.* Specifically, the court noted, "[anticompetitive] conduct [is only that conduct] directed toward competitors and . . . intended to injure competition." *Id.* at 1353. Additionally, the court noted that Intel's market strength was due to its superior product, not to the allegedly wrongful conduct of withholding benefits to Intergraph. *Id.*

Here, in contrast, Clear Channel's refusal to deal is directed against all competitors and, arguably, injures competition. Furthermore, NIPP claims that Clear Channel's refusal to deal is conduct that will impel Clear Channel to monopoly control over the market. *Intergraph* does not lead to the conclusion that Clear Channel's behavior is proper under the Sherman Act. Rather, it compels a trial on the issue of anticompetitive conduct in this case.

### (2) *Tying*

■ NIPP alleges that Clear Channel has conditioned air play of rock artists' songs on their use of Clear Channel rock concert promotional services and that this "tie" amounts to anticompetitive conduct. (Pls.' Resp. at 83.) Illegal tie-ins under section 1 of the Sherman Act may also qualify as anticompetitive conduct for section 2 purposes. *Multistate Legal Studies,* 63 F.3d at 1550. As stated earlier in this order, disputes of material fact exist as to whether Clear Channel engages in tying arrangements with record labels and artists. Accordingly, questions of fact exist as to whether Clear Channel engages in anticompetitive conduct under the Sherman Act.

### (3) *Predatory Pricing*

■ Third, NIPP alleges that Clear Channel engages in predatory pricing by intentionally bidding for artists at a rate high above the market rate in order to eliminate other promoters who do not have the financial strength to bear such costs;

Clear Channel then allegedly passes these costs on the to the end-use rock concert ticket purchasers by charging monopolistic prices for concert tickets. (Pls.' Resp. at 89.) Predatory pricing may qualify as anticompetitive conduct under section 2 of the Sherman Act. *Multistate Legal Studies,* 63 F.3d at 1550. To be predatory, prices must be set below an appropriate measure of costs. *Id.* at 1548–1549 (citing *Brooke Group,* 509 U.S. at 222, 113 S.Ct. at 2587). Accordingly, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs. *Brooke Group,* 509 U.S. at 222, 113 S.Ct. at 2587.

The second prerequisite to holding a competitor liable under section 2 of the Sherman Act for predatory pricing is a dangerous probability of the rival's recouping its losses by charging supercompetitive, monopolistic prices. *Id.* at 224, 113 S.Ct. at 2588. Recoupment is the ultimate object of an unlawful predatory pricing scheme. *Id.* Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced. *Id.* Where evidence indicates that a firm has in fact profitably charged monopolistic prices, the existence of monopoly power is clear. *Microsoft,* 253 F.3d at 51.

Here, NIPP has alleged that Clear Channel engages in a predatory pricing scheme by upbidding costs for artists, driving other promoters out of the market, and recouping its high costs by charging monopolistic prices to the end ticket purchaser. Although NIPP has presented evidence of allegedly monopolistic prices of end-use tickets, NIPP has not demonstrated predatory pricing in terms of the amounts paid in bids for the right to promote artists. NIPP has solely cited an interview from the Bill Moyers Show on

PBS as evidence that Clear Channel is upbidding the costs for artists. This is not sufficient to prove to a reasonable jury that Clear Channel consistently raises costs above market price by upbidding on artists. Because the price of artists is the price allegedly manipulated by Clear Channel, NIPP is required to introduce evidence of Clear Channel bidding above cost in order to state a claim for predatory pricing. *Brooke Group,* 509 U.S. at 222, 113 S.Ct. at 2587. Because NIPP has failed to do so, NIPP cannot prove predatory pricing as anticompetitive conduct.

### (4) Stealing Employees

■ Finally, NIPP alleges that Clear Channel engages in anticompetitive behavior in the market for concert promotion employees. Antitrust laws apply to restraints on competition in the non-unionized labor markets. *Brown v. Pro Football, Inc.,* 50 F.3d 1041, 1054 (D.C.Cir. 1995) (citing *Radovich v. NFL,* 352 U.S. 445, 449–452, 77 S.Ct. 390, 392–394, 1 L.Ed.2d 456 [1957]). Accordingly, if Clear Channel engages in conduct that injures competition in the labor market, the conduct is anticompetitive and grounds for liability under section 2 of the Sherman Act.

Here, NIPP cites one incident, when Clear Channel lured an NIPP employee, Michael DuCharme, NIPP's media director and part-time talent buyer, away from NIPP to work for Clear Channel. (Pls.' Resp. at 27–28.) Specifically, NIPP complains that, after Clear Channel had secretly hired DuCharme, DuCharme and others entered NIPP's offices at night and removed and destroyed various files. (*Id.* at 28.) Additionally, NIPP alleges that DuCharme took NIPP business to Clear Channel. (*Id.*) To NIPP, this behavior constitutes anticompetitive conduct.

Although NIPP may feel betrayed by DuCharme and Clear Channel's actions,

these actions encapsulated in a single event do not amount to anticompetitive conduct. Importantly, antitrust laws are not concerned with conduct's effect on individual competitors, only its effect on competition. *Reazin,* 899 F.2d at 960. This single event is not alleged to have injured competition in the concert promotion labor market. Rather, it involved a single employee and effected a single competitor, NIPP. Because the conduct amounts to a single isolated event, which had no effect on competition in any market, Clear Channel's hiring of DuCharme cannot form the basis for an attempted monopolization claim under section 2 of the Sherman Act.

■ Despite NIPP's failure to demonstrate anticompetitive conduct through Clear Channel's employment practices or predatory pricing alone, the individual aspects or events of a defendant's conduct viewed in isolation need not be supported by sufficient evidence to amount to a section 2 violation for liability to exist. *Aspen Highlands,* 738 F.2d at 1522 n. 18; 2 Phillip E. Areeda, Roger D. Blair & Herbert Hovenkamp, Antitrust Law ¶ 310, at 147 (2d ed.2000). Rather, it is enough that the incidents taken together as a whole create sufficient evidence of attempted monopolization. *Id.* Based on a review of the entire record of alleged anticompetitive conduct, taken as a whole, the court concludes that NIPP has demonstrated sufficient evidence of attempted monopolization that a reasonable jury could find in favor of NIPP. Accordingly, summary judgment for Clear Channel on this claim is inappropriate.

### 5. Section 2 of the Sherman Act: Essential Facility

■ NIPP's final antitrust claim arises under section 2 of the Sherman Act for violation of the essential facilities doctrine.

NIPP claims that Clear Channel violated the essential facilities doctrine by denying rock radio advertising and promotional support to other non-Clear Channel promoters' for their rock concerts. (Pls.' Resp. at 96–100.) As stated earlier, a business firm is generally free to choose the parties with whom it will deal, in the absence of any purpose to create or maintain a monopoly or competitive injury. *Aspen Skiing*, 472 U.S. at 601, 105 S.Ct. at 2856. A firm's refusal to sell or provide its products and services to a competitor, however, may rise to the level of an antitrust violation under the essential facilities doctrine, if the refusal is part of a vertical integration scheme calculated to drive a competitor out of business. *McKenzie v. Mercy Hosp. of Independence, Kansas*, 854 F.2d 365, 368–369 (10th Cir.1988), (*superseded on other grounds, Systemcare*, 117 F.3d at 1137). To establish liability under the doctrine, a plaintiff must show: (1) control of an essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the facility; (3) the denial of the use of the essential facility to a competitor; and (4) the feasibility of providing the facility. *Id.* at 369. In order for an essential facilities claim to succeed, the defendant's power to exclude the plaintiff from such facility must amount to the power to eliminate meaningful competition in the downstream market. *Alaska Airlines*, 948 F.2d at 544. This power to eliminate competition must not be a momentary power, but must have relative permanence. *Id.* at 544 n. 11. Additionally, plaintiff must have evidence that some competitors have been refused access to the facility. *Id.* at 545.

### a. Control of an Essential Facility By a Monopolist

■ First, NIPP has set forth sufficient evidence to create a dispute of fact as to whether Clear Channel controls an essential facility in the form of rock radio in Denver. In order to show control, a plaintiff must define the relevant market and show that the defendant has an actual monopoly in that market. *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 494 (4th Cir.1996); *McKenzie*, 854 F.2d at 369. As stated earlier, NIPP has defined a relevant market for rock radio advertising and promotional support in Denver. Dr. Phillips, NIPP's expert witness, defined the scope of the rock radio advertising and promotional support market based on play list data, "duplicate cume" data, and radio station and industry materials.

Additionally, NIPP has demonstrated that Clear Channel may have monopoly power in this market. Monopoly power may be inferred from a firm's possession of a dominant share of the relevant market, which is protected by entry barriers. *Microsoft*, 253 F.3d at 51. Based on Dr. Phillips' calculations, Clear Channel controls at least four of the six rock radio stations in the Denver area, or 66.6%. (Defs.' Br., Ex. A–8 [Prelim. Economic Report of Phillips at 18]; Pls.' Resp., Ex. 1 [Phillips Decl. at 15].) If the number of listeners is considered, as reflected in advertising revenue for the rock radio stations and Arbitron data, Clear Channel controls 73% of the rock radio advertising and promotional support market. (Pls.' Resp. at 58, Ex. 1 [Phillips Decl. at 14].) A market share of 70% demonstrates monopoly power. *Colo. Interstate Gas*, 885 F.2d at 694 n. 18. Similarly, NIPP has alleged significant entry barriers in the rock radio market, including license requirements, high capital requirements, and significant customer goodwill. (Pls.' Resp. at 69.); *Reazin*, 899 F.2d at 968. Construing this data in the light most favorable to NIPP, Clear Channel's alleged market share of the rock radio industry demonstrates monopoly power in that market.

The next issue is whether Clear Channel's monopoly power relates to a resource that is an essential facility for rock concert promotion. An essential facility is one that is essential to engage in meaningful competition in the market. *McKenzie*, 854 F.2d at 369. An essential facility need not be one that is indispensable; it is sufficient if denial of its use inflicts a severe competitive handicap on market entrants. *Fishman v. Estate of Wirtz*, 807 F.2d 520, 539 (7th Cir.1986).

NIPP argues that rock radio advertising and promotional support is essential to meaningfully compete in the rock concert market. Clear Channel make several counter-arguments. First, Clear Channel argues that other radio stations or forms of media, such as newspapers, magazines, and television, are just as effective as rock radio for advertising and promotional support. (Defs.' Br. at 76–77.) According to Clear Channel, therefore, rock radio is not essential to compete in the rock concert market. (*Id.*) Concerning this issue, NIPP presents evidence that, for rock concert promoters, rock radio advertising enables promoters to reach the exact end-consumer who prefers music by rock artists, during a moment in time when the end-consumer is enjoying listening to the very musical product that rock concert tickets also provide. According to testimony, advertising on other non-rock format stations does not provide this reach. (Pls.' Resp., Ex. 2 [Morreale Decl. ¶¶ 16–19], Ex. 4 [Mickelson Decl. ¶ 3], Ex. 22 [Loncao Dep. at 35–36], Ex. 39 [Sievers Dep. 101–102].) Similarly, advertising in newspapers or magazines, or on television stations, even if these forms of media are targeted to rock audiences, do not carry the advertisement for a concert to an end-consumer who necessarily is enjoying at that moment the very product advertised. NIPP's evidence creates a genuine dispute of material fact as to whether rock radio advertising and promotional support differs enough from other advertising to create a distinct essential facility.

Secondly, Clear Channel argues that rock radio is not an essential facility to NIPP because NIPP did not utilize any rock radio advertising or promotional support for 73% of its concerts in 2001. (Defs.' Br. at 77 [citing Phillips' Rebuttal to Supp. Expert Report at A–11].) NIPP counters that, although rock radio advertising and promotional support is not essential for use on rock concerts that gross under $10,000, as many of the artists are not well-known, it is essential to for concerts that gross over $10,000. (Pls.' Resp. at 99:) According to NIPP, such advertising and promotional support is essential to meaningfully compete because concerts that gross over $10,000 account for the lion's share of NIPP's revenue. (*Id.*) Specifically, the 46 shows where NIPP used rock radio advertising and/or promotional support accounted for 73% of NIPP's gross ticket revenue in 2001. (Defs.' Br., Exs. Vol. 1, Ex. A–11 [Rebuttal to Supp. Expert Report of Gustavo E. Bamberger at 7].) Because the bulk of NIPP's revenue comes from rock concerts utilizing rock radio advertising and promotional support, NIPP has demonstrated sufficient disputes of fact as to whether rock radio is essential to meaningfully compete in the rock concert industry.

### b. Competitor's Inability to Reasonably Duplicate Facility

In order to prove an essential facilities claim, a plaintiff must secondly show that an alternative to the facility is not available, and the facility cannot be duplicated by plaintiff. *City of Chanute, Kansas v. Williams Natural Gas Co.*, 955 F.2d 641, 648 (10th Cir.1992), (*overruled on other grounds, Systemcare*, 117 F.3d at 1137) (citing *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 [2d Cir.

1990] ). The test is not whether it would be impossible to duplicate the facility but whether it would be economically infeasible. *Fishman,* 807 F.2d at 540. The point of the essential facilities doctrine is that a market entrant should not be forced simultaneously to enter a second market, with its own large capital requirements. *Id.* Here, NIPP claims that rock concert promoters cannot feasibly enter the rock radio market because of the expense of acquiring a rock radio station and the strict FCC licensing requirements. The expense of purchasing and operating radio station shows that the essential facility cannot be duplicated.

### c. Denial of Use of Facility to Competitor

To establish the third element of an essential facilities claim, a plaintiff must show that the defendant did not provide access to the facility on reasonable, non-discriminatory terms. *City of Chanute,* 955 F.2d at 648. There need not be an outright refusal to deal in order to determine that denial of an essential facility has occurred. *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 179–180 (2d Cir.1990). To avoid liability, defendant must provide access to an essential facility "upon such just and reasonable terms and regulations as will ... place every ... company upon nearly an equal plane as may be with respect to expenses and charges as that occupied by the proprietary companies." *Id.* (citing *United States v. Terminal R.R. Ass'n,* 224 U.S. 383, 411, 32 S.Ct. 507, 516, 56 L.Ed. 810 [1912] ).

Clear Channel argues that no denial has occurred because Clear Channel still permits NIPP to purchase advertising time and provides rock radio promotional support for NIPP's concerts. (Defs.' Br. at 78–79.) Although Clear Channel still allows some advertising and promotional support, NIPP sets forth evidence that Clear Channel has significantly raised the price of obtaining these services. According to NIPP's expert, Dr. Phillips, in 1999 NIPP received $48 worth of radio support for every $1 spent on radio advertising. (Defs.' Br., Exs. Vol. 1, Ex. A–11 [Rebuttal to Supp. Expert Report of Gustavo Bamberger].) In 2001, however, NIPP claims that NIPP received $9 worth of radio promotional support for every $1 spent on radio advertising. (*Id.,* Exs. Vol. 1, Ex. A–11 [Rebuttal to Supp. Expert Report of Gustavo Bamberger].)

Additionally, Clear Channel has informed its own personnel and record labels that outside promoters are discriminated against for radio time when compared to SFX/Clear Channel Entertainment and Clear Channel Concerts/Clear Channel Radio Festivals. (Pls.' Resp., Exs. Vol. 3, Ex. 41 [Electronic Mail Message from O'Connor to All Denver Clear Channel Radio Program Directors, Music Directors, and Promotions Directors of 6/19/2001], Ex. 75 [Electronic Mail Message from O'Connor to Clear Channel personnel of 7/11/2001], Ex. 94 [HOB Memoranda re: Stone Temple Pilots of 10/24/2000].) Finally, NIPP presents evidence that Clear Channel has avoided giving NIPP promotional support on certain occasions for allegedly pretextual reasons. (Pls.' Resp., Exs. Vol. 4, Ex. 110 [Electronic Mail Messages Between Clear Channel and NIPP of 07/03/2001].) NIPP's evidence creates a dispute of material fact as to whether Clear Channel has denied other promoters access to rock radio advertising and promotional support on a discriminatory basis.

Clear Channel argues that a recent Supreme Court case, *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,* —— U.S. ——, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004), defeats NIPP's antitrust claim under the essential facilities doctrine. (Mot. by Defs. for Leave to

File Supplemental Briefs In Supp. of Mot. for Summ. J. Based on Recent Supreme Court Authority [filed February 20, 2004] [hereinafter "Mot. to File Supplement"].) In *Verizon*, the Supreme Court, in holding that a class of plaintiffs had no valid antitrust claim under the essential facilities doctrine, stated that "where access exists, the [essential facilities] doctrine serves no purpose." *Verizon*, —— U.S. at ——, 124 S.Ct. at 881, 157 L.Ed.2d 823. According to Clear Channel, therefore, because NIPP still has access to paid advertising and a *de minimis* amount of unpaid promotional support, NIPP cannot invoke the essential facilities doctrine. (Mot. to File Supplement.)

However, a closer look at *Verizon* demonstrates that the case actually supports NIPP's claim under the essential facilities doctrine. In *Verizon*, a class of AT & T telephone customers sued Verizon under section 2 of the Sherman Act for failing to fill orders from AT & T for service on Verizon's network, as required under the Telecommunications Act of 1996. *Id.* at 877. Prior to the 1996 Act, Verizon was not required to give its competitors access to its local network and did not do so. *Id.* at 876–877. At the time of the filing of the lawsuit, the Federal Communications Commission had the day before disciplined and fined Verizon for failing to fill orders from AT & T and other LECs, as compelled by the 1996 Act. *Id.* at 877. The complaint alleged that Verizon's refusal to fill orders was a wrongful refusal to deal and denial of an essential facility. *Id.* at 878.

In analyzing the case, the Supreme Court first noted that the Sherman Act does not restrict a trader from refusing to deal with another party, except in narrow circumstances, such as those in the *Aspen Skiing* case. *Id.* at 879 (citing *Aspen Skiing*, 472 U.S. at 601, 105 S.Ct. at 2847). The Court then distinguished the *Verizon* case from *Aspen Skiing* on the following basis.

First, the Court contrasted *Verizon* with *Aspen Skiing*, noting that Verizon had not engaged in a course of dealing with its rivals; and its prior conduct, therefore, did not shed light on whether its motivation in refusing to deal was prompted by competitive zeal or anticompetitive malice. *Id.* at 880. Additionally, in contrast to *Aspen Skiing*, the product offered by Verizon to its rivals was not offered to other customers. *Id.* Rather, it was only offered because of the force of statute. *Id.* The Supreme Court, in analyzing an essential facilities case, therefore, focused on the monopolistic intent of the defendant. In *Aspen Skiing*, the plaintiff prevailed because the defendant (1) refused to provide a product that it had in the past, despite the fact that defendant would benefit financially from the transaction, and (2) chose to thereby sacrifice short-term gains in hopes of making long term monopolistic profits. *Id* at 879–880. In *Verizon*, the plaintiffs failed because there was no evidence of monopolistic intent since no course of dealing profitable to *Verizon* had ever occurred; therefore, Verizon's conduct did not suggest a willingness to forsake short-term profits to achieve an anticompetitive end. *Id.* Here, NIPP alleges that Clear Channel provided advertising and concert promotional support in the past because concert promotions benefit the radio station as well as the promoter. Furthermore, NIPP claims that Clear Channel now refuses this support and sacrifices short-term gains in hopes of destroying other promoters and reaping long-term monopolistic profits. Clearly, the conduct alleged in this case bears striking resemblance to the refusal to deal in *Aspen Skiing*, conduct that the Supreme Court states is proscribed by the Sherman Act.

Importantly, as well, although the Supreme Court in *Verizon* stated that the essential facilities doctrine serves no purpose when access to the facility exists, this statement was an explanation of why an "essential facilities claim should be denied where a state or federal agency has effective power to compel sharing and regulate its scopes and terms." *Id.* at 881. Because the Federal Communications Commission was compelling access to Verizon's network, plaintiffs could not bring a claim for denial of an essential facility under the Sherman Act. Here, no government agency is compelling Clear Channel to allow access to it airwaves. Rather, Clear Channel may freely restrict access and had done so already without hindrance of federal or state law. Antitrust law is the only mechanism by which Clear Channel's behavior may be policed. Accordingly, this court finds that Clear Channel's behavior does fall into the limited category of cases where refusal to deal implicates the Sherman Act.

### d. Feasibility of Providing Facility

The final element of an essential facilities claim is defendant's feasibility of providing the facility. Feasibility of providing the facility can be demonstrated by showing that defendant provided the facility on non-discriminatory terms in the past, and no intermittent business reason has arisen to justify an inability to provide the facility. *Delaware & Hudson Ry.*, 902 F.2d at 179. Here, NIPP has demonstrated sufficient evidence that it is feasible for Clear Channel to provide rock radio advertising and promotional support to other promoters. Clear Channel has provided non-discriminatory access to rock radio in the past. Furthermore, as stated earlier, O'Connor admits that providing promotional support to concert promoters usually benefits the radio stations. Accordingly, no business justification on the radio side has arisen for refusing to provide promoters with access to advertising and promotional support. Accordingly, NIPP has demonstrated sufficient evidence of a viable claim for violation of section 2 of the Sherman Act under the essential facilities doctrine. Summary judgment on this claim, therefore, is inappropriate.

### B. Consumer Protection Act

Besides its state antitrust claims, NIPP makes three claims under state law. First, NIPP claims that Clear Channel violated Colorado's Consumer Protection Act ("CCPA"), Colo.Rev.Stat. § 6–1–105, by disparaging NIPP to its record label and artist customers. Specifically, NIPP claims that personnel at KBCO informed John Hiatt's manager that KBCO would not promote John Hiatt because NIPP does not pay its bills to KBCO for advertising time. (Pls.' Resp. at 102.) Additionally, NIPP alleges that Michael O'Connor of Clear Channel Radio informed the senior vice president of Roadrunner Records that NIPP did not contact KBPI in attempts to get KBPI to promote the Tattoo the Earth Tour, despite the fact that NIPP did do so. (*Id.*)

 A person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person "disparages the goods, services, property, or business of another by false or misleading representation of fact." Colo.Rev.Stat. § 6–1–105(1)(g). In order to show violation of the CCPA, plaintiff must demonstrate that (1) defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally

protected interest; and (5) the challenged practice caused the plaintiff's injury. *Hall v. Walter*, 969 P.2d 224, 235 (Colo.1998). Evidence that a person has engaged in a deceptive trade practice shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition. Colo.Rev.Stat. § 6–1–105(2).

Although NIPP has arguably met the first three factors in proving a claim, NIPP has utterly failed to show any injury to NIPP's reputation or business. NIPP has adduced no testimony that any record label or artist changed its opinion of NIPP or decided not to do business with NIPP as a result of the alleged representations. NIPP has only provided the self-serving deposition testimony of Douglas Kauffman that record labels, artists, and their managers generally would likely lose faith in NIPP based on these representations. (Pls.' Resp., Ex. 19 [Kauffman Dep. at 177–178].) Accordingly, Clear Channel's motion for summary judgment is granted as to NIPP's claim for violation of the Colorado Consumer Protection Act.

## C. Tortious Interference with Contractual Relations

■ NIPP's second state law claim, other than antitrust, is a claim for tortious interference with contractual relations. One who intentionally and improperly interferes with the performance of a contract between another and a third party by causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract. *Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984) (quoting Restatement (Second) of Torts § 766 [1977]). In order to prove tortious interference with contract, a plaintiff must show: (1) a contract existed; (2) the defendant had knowledge of the contract; (3) the defendant interfered and

induced the other party to breach the contract; and (4) the plaintiff was injured as a result. *Westfield Dev. Co. v. Rifle Inv. Assoc.*, 786 P.2d 1112, 1117 (Colo.1990) (en banc). Most importantly, the interference must be intentional and improper. *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 501 (Colo. 1996) (en banc) (citing Restatement (Second) of Torts § 767 cmt. a).

■ Here, first, NIPP alleges that Clear Channel interfered with NIPP's at-will employment contract with Michael DuCharme by hiring DuCharme away from NIPP. (Pls.' Resp. at 103.) Clear Channel counters that NIPP has failed to state a claim in relation to DuCharme's employment because DuCharme's employment was at-will, and Clear Channel did not cause DuCharme to *breach* any contract. (Defs.' Br. at 84.) Contrary to Clear Channel's argument, "even a contract terminable at will is entitled to some protection from tortious unwarranted interference." *Zappa v. Seiver*, 706 P.2d 440, 442 (Colo.App.1985). Nevertheless, as stated earlier, for liability to descend on defendants, the interference with the at-will contract must have been improper. *Ervin*, 908 P.2d at 501. Interference with a contract is not improper when it involves a matter of competition between the parties. More specifically, a defendant who intentionally causes a third person to breach a contract with the plaintiff does not engage in improper conduct if: (1) it concerns a matter of competition between the defendant and plaintiff; (2) the defendant does not employ wrongful means; (3) the action does not amount to an unlawful restraint of trade; and (4) the defendant's purpose is, at least in part, to advance its own interest. *Ervin*, 908 P.2d at 501 (citing Restatement (Second) of Torts § 768). 'Wrongful means' include physical violence, fraud, civil suits, and criminal prosecu-

tions. *Ervin,* 908 P.2d at 502 (citing Restatement [Second] of Torts § 768 cmt. e).

■ Here, Clear Channel's behavior in luring DuCharme away from NIPP to work for Clear Channel was not improper. First, the interference concerns a matter of competition between NIPP and Clear Channel because NIPP and Clear Channel compete for concert promotions employees who have significant contacts in the music industry. Secondly, even if DuCharme snuck into the NIPP offices at night and removed various files improperly, NIPP has set forth no evidence that Clear Channel directed this behavior or utilized any other wrongful means in hiring DuCharme. Thirdly, hiring one employee away from a competitor does not amount to a restraint of trade because it does not injure competition, as explained earlier in this order. Finally, Clear Channel's purpose was to advance its own interest because DuCharme has many contacts in the music industry that might be utilized by Clear Channel. Accordingly, Clear Channel's motion for summary judgment is granted as to NIPP's tortious interference claim based on DuCharme's departure from NIPP.

■ NIPP secondly alleges that Clear Channel tortiously interfered with NIPP's contract with the band Lennon for Lennon to play at the Bluebird Theatre in February 2002. (Pls.' Resp. at 103.) Specifically, Jeffrey Pringle, the owner of the record label and management company Next Level Records, declares that he negotiated a contract with NIPP on behalf of Lennon, a band managed by Pringle, for promotion of a Denver concert in February 2002. (Pls.' Resp., Ex. 6 [Decl. of Jeffrey Pringle ¶ 5].) Pringle further declares that, after confirmation of the concert, Lennon's record label, Arista Records, demanded that Pringle cancel Lennon's concert with NIPP to avoid losing radio air play for Lennon on KBPI, because Clear Channel had elimi-

nated air play for other Arista artists booking with NIPP, like Adema. (*Id.,* Ex. 6 [Pringle Decl. ¶¶ 6–7].) Pringle complied with Arista's request. (*Id.,* Ex. 6 [Pringle Decl. ¶ 7].)

Clear Channel counters that Pringle's declaration is inadmissible, because it is hearsay, and, therefore, cannot be used to create a dispute of material fact on summary judgment. Clear Channel is correct that the court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep,* 756 F.2d at 1474. A statement is not considered hearsay, however, if the significance of the statement lies solely in the fact that it was made, not in the truth of its contents. Fed. R. of Evid. 801(c) advisory committee note. Here, the statements made by Arista may be offered to show that Arista caused Pringle to breach the contract, because the statements are being offered to show that Arista made such statements to Pringle. The statements cannot be offered to show, however, that Clear Channel took air play away from Adema. NIPP, however, provides a declaration from Victoria Lovato with radio air play data attached from KBPI for Adema during the relevant time period. (Pls.' Resp., Ex. 8 [Decl. of Victoria Lovato, Ex. J].) This data confirms that Adema's air play was eliminated by Clear Channel after Adema signed with NIPP for a concert. Because portions of Pringle's testimony and radio air play data are admissible, NIPP has provided sufficient evidence to support its factual assertions.

■ More problematic, however, is whether NIPP's factual assertions regarding the Lennon concert are sufficient to support a claim for tortious interference with contract. As stated earlier, in order to prove tortious interference with contract, a plaintiff must show: (1) a contract existed; (2) the defendant had knowledge

of the contract; (3) the defendant interfered and induced the other party to breach the contract; and (4) the plaintiff was injured as a result. *Westfield Dev. Co.*, 786 P.2d at 1117. Most importantly, the interference must be intentional and improper. *Id.* Here, assuming there was a contract, NIPP has presented no evidence that Clear Channel knew about the contract between Lennon and NIPP. In fact, Arista and Pringle's behavior seems to have been driven by a desire to prevent Clear Channel from learning about the contract between Lennon and NIPP. Because NIPP provides no evidence that Clear Channel had knowledge of the contract, an essential element of the claim, NIPP's claim for tortious interference with contract based on the Lennon contract fails.[10] Accordingly, Clear Channel's motion for summary judgment on that claim is granted.

### D. Tortious Interference with Prospective Business Relations

▮▮▮▮▮ Clear Channel's final state law claim is for tortious interference with prospective business relations. Colorado has adopted the Restatement (Second) of Torts §§ 766B, 767 and 768 in determining whether a party is liable for intentional interference with prospective business advantage. *Ervin*, 908 P.2d at 500–501 (citing Restatement [Second] of Torts §§ 766B–768 [1979] ); *Wasalco, Inc. v. El Paso County*, 689 P.2d 730, 732 (Colo.Ct. App.1984); *Dolton v. Capitol Fed. Sav. & Loan Ass'n*, 642 P.2d 21, 23 (Colo.App. 1981). To establish a claim for tortious interference with prospective business relations under Colorado law, a plaintiff must show **intentional and improper** interference with another's prospective con-

tractual relation. *Dolton*, 642 P.2d at 23 (citing Restatement [Second] of Torts § 766B) (emphasis added). For liability to attach, defendant's intentional and improper interference must either **induce or cause** the third party not to enter into or continue relations. *Wasalco, Inc.*, 689 P.2d at 732 (citing Restatement [Second] of Torts § 766B) (emphasis added). It is not necessary to prove an underlying contract. *Plaza Esteban v. La Casa Nino, Inc.*, 738 P.2d 410, 412 (Colo.Ct.App.1987), (*rev'd on other grounds*, 762 P.2d 669 [Colo.1988] ). Rather, a continuing business or customary relationship, which includes a prospective quasi-contract, suffices to create rights against intentional interference. Restatement (Second) of Torts § 766B cmt. c (emphasis added).

NIPP points to several different incidents as evidence of tortious interference with prospective business relations. (Pls.' Resp., Ex. 2 [Morreale Decl. ¶¶ 34–39].) Specifically, NIPP claims that Clear Channel tortiously interfered with NIPP's relationship with the bands Cold, Eve 6, the Toadies, and Puddle of Mudd, and the talent agencies The Agency Group, Evolution Talent, and Chaotica. (*Id.*, Ex. 2 [Morreale Decl. ¶¶ 34–39].) NIPP's arguments related to Cold, the Toadies, and Puddle of Mudd fail because NIPP provides no admissible evidence that these bands discontinued relations with NIPP on account of Clear Channel or at all. NIPP's arguments related to the talent agencies also fail because NIPP provides no evidence that it has a customary relationship with these agencies, of the type that is protected against tortious interference. NIPP's only remaining evidence of intentional interference with prospective

---

**10.** NIPP provides other alleged examples of interference with contract. (Pls.' Resp., Ex. 84 [Chart of Alleged Interference].) However, the chart set forth by NIPP contains merely conclusory allegations about interference

and does not point to admissible evidence proving the elements of the claim. Accordingly, NIPP cannot use the chart to support its tortious interference claim with contract or with prospective business relations.

business relationships is its experience with the band Eve 6.

In his declaration, Morreale of NIPP states that, on June 21, 2000, NIPP, in competition with Clear Channel, submitted a bid to promote Eve 6 for a July 14th concert in Denver. (*Id.*, Ex. 2 [Morreale Decl. ¶ 35].) Thereafter, Ken Fermaglich of the Agency Group, which represented Eve 6, informed Morreale that Eve 6 would have to use Clear Channel to avoid loss of air play. (*Id.*, Ex. 2 [Morreale Decl. ¶ 35].) Subsequently, the Agency Group awarded the Eve 6 concert to SFX/ Clear Channel Entertainment. (*Id.*, Ex. 2 [Morreale Decl. ¶ 35].) Clear Channel argues that this evidence is inadmissible hearsay.

The court disagrees for two reasons. First, a statement is not considered hearsay if the significance of the statement lies solely in the fact that it was made, not in the truth of its contents. Fed. R. of Evid. 801(c) advisory committee note. Here, the statements made by Fermaglich may be offered to show that Fermaglich refused NIPP's bid based on a fear of losing air play. The statements cannot be offered to show, however, that Clear Channel took air play away from any other artists in retaliation for their failure to utilize Clear Channel promotions services. NIPP, however, provides a declaration from Victoria Lovato with radio air play data attached, which arguably demonstrates Clear Channel's practice of pulling radio air play for artists signing with NIPP. (Pls.' Resp., Ex. 8 [Decl. of Victoria Lovato, Ex. J].) Be-

cause portions of Fermaglich's statement and radio air play data are admissible, NIPP has provided sufficient evidence to support its factual assertions.[11]

■ More problematic is whether NIPP's factual assertions, if true, are sufficient to state a claim for tortious interference with prospective business relations. As stated earlier, to establish a claim for tortious interference with prospective business advantage, a plaintiff must show that defendant engaged in (1) improper conduct with (2) the intention to induce or cause a third party not to enter into or continue business relations with the plaintiff, and (3) defendant actually induced or caused such result. *Dolton*, 642 P.2d at 23 (citing Restatement [Second] of Torts § 766B) (emphasis added).

First, NIPP provides sufficient evidence that Clear Channel engaged in improper conduct. Improper conduct is a necessary element of a claim for intentional interference with prospective business relations. *Dolton*, 642 P.2d at 23. Restatement (Second) of Torts § 767 sets forth seven factors a judge or jury should balance to determine whether a defendant's conduct is improper. *Ervin*, 908 P.2d at 500 (citing Restatement (Second) of Torts § 767). These factors include:

(a) the nature of the defendant's conduct,

(b) the defendant's motive,

(c) the plaintiff's interests interfered with,

---

**11.** Additionally, the state of mind exception to the hearsay rule provides:

the following are not excluded by the hearsay rule, even though the declarant is available as a witness: ... [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief

to prove the fact remembered or believed
. . . .

Fed. R. of Evid. 803(3). Here, the alleged statement from Fermaglich shows his intention to commit Eve 6 to Clear Channel due to fear of losing air play and is admissible to show this intention. His statement is not admissible, however to prove that Clear Channel ceased air play for those artists choosing other concert promoters.

(d) the defendant's interests in interfering,

(e) the social interests in protecting defendant's freedom of action and plaintiff's prospective business relations,

(f) the proximity of the defendant's conduct to the interference,

(g) the relations between the parties.

*Id.* The nature of some conduct, such as fraud and physical violence, is always improper, while other means, such as economic pressure, may be permissible under some circumstances and wrongful under others. *Id.* Whether economic pressure is improper depends on the degree of coercion, the effects upon competition, and the appropriateness of the pressure as a means of accomplishing the defendant's objectives. *Id.*

Here, the conduct is arguably improper for several reasons. First, Clear Channel's behavior, if proven to be an illegal tying arrangement, may be anticompetitive economic pressure and violative of the antitrust laws. Additionally, Clear Channel's conduct in denying air play to artists using NIPP may be inappropriate if it's a means of avoiding payola laws. Accordingly, whether Clear Channel's conduct may be considered improper depends largely on NIPP's success in proving its antitrust claims at trial. NIPP's allegations of improper conduct, therefore, survive summary judgment.

A defendant does not engage in improper conduct, so as to be liable for intentional interference, if: (1) it concerns a matter of competition between the defendant and plaintiff; (2) the defendant does not employ wrongful means; (3) the action does not amount to an unlawful restraint of trade; and (4) the defendant's purpose is, at least in part, to advance its own interest. *Ervin,* 908 P.2d at 501 (citing Restatement (Second) of Torts § 768). 'Wrongful means' include physical violence, fraud, civil suits, and criminal prosecu-

tions. *Ervin,* 908 P.2d at 502 (citing Restatement [Second] of Torts § 768 cmt. e). 'Wrongful means' do not include breach of the duty of good faith and competitive economic pressure. *Id.* at 502–503. At this stage in the litigation, Clear Channel does not qualify for this competitor's privilege because its conduct may involve wrongful means if Clear Channel is circumscribing the payola laws, and Clear Channel's actions may amount to a restraint on trade if the conduct amounts to an illegal tying arrangement.

The second element of tortious interference with prospective business relations is that the improper conduct must be intentional. NIPP provides sufficient evidence that Clear Channel intends its manipulation of air play to interfere with NIPP and other promoters' prospective business relations with artists. It is not necessary that NIPP show that Clear Channel intended to specifically interfere with the Eve 6 booking, as long as NIPP can show that Clear Channel generally desired to interfere with NIPP's bookings as a whole. "The situation may be one in which many persons are induced to act. Thus a boycott campaign may be intended to induce numerous persons to [refuse business relations] with the plaintiff." Restatement (Second) of Torts § 767 cmt. q. Here, NIPP has presented sufficient evidence of a pattern and practice of behavior by Clear Channel whereby Clear Channel lessens radio air play for artists booking with NIPP. Furthermore, NIPP has introduced evidence of electronic mail messages, written by Clear Channel employees, which demonstrate that Clear Channel intends to manipulate artists' promotion decisions and interfere with competitors by withholding air play. Accordingly, NIPP has created a dispute of material fact as to whether Clear Channel intended to interfere with NIPP's prospective relation with Eve 6.

The final element of tortious interference with prospective business relations is that the conduct of the defendant must cause the third party to refuse to enter business relations with the plaintiff. The question whether the actor's conduct caused the third person to refuse to enter relations with the plaintiff raises an issue of fact. Restatement (Second) of Torts § 767 cmt. o. The reasonableness of the claimed reaction of the third person to the actor's conduct is material evidence on this issue, but it is not conclusive. *Id.* Thus the fact that only a fool would have been influenced by the defendant's conduct is evidence that may warrant a finding that the third person was not in fact influenced by it. *Id.* On the other hand, if other evidence establishes that the actor did in fact induce the third person's conduct, the actor is liable even though the third person was foolish or otherwise unreasonable in permitting himself to be so influenced. *Id.* Here, Fermaglich admitted that he was induced and influenced by his perception of Clear Channel's conduct. Accordingly, NIPP provides sufficient evidence to create a dispute of material fact as to whether Clear Channel caused Eve 6 to avoid business relations with NIPP. Based on the forgoing, Clear Channel's motion for summary judgment is denied as to NIPP's claim for tortious interference with prospective business relations with Eve 6.

### IV. Defendants' Motion to Exclude Expert Testimony

■ Defendants argue that the opinion of Dr. Phillips, plaintiffs' expert, should be excluded under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). (Mot. to Exclude Expert.) According to *Daubert,* under Federal Rule of Evidence 702, expert testimony is only admissible if it will assist the trier of fact and if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *Lantec,* 306 F.3d at 1025. Specifically, defendants argues that Dr. Phillips' testimony concerning market definition and damages is not based on sufficient scientific knowledge or criteria to be reliable or admissible under *Daubert.* (*Id.* at 2–5, 9–27.)

■ As to the market definition, defendants claim that Dr. Phillips failed to utilize economic criteria in making a distinction between rock and non-rock artists. (*Id.* at 9–14.) Furthermore, defendants claim that, not only did Dr. Phillips fail to calculate cross-elasticity of demand, but he also relied on his subjective opinions regarding music, a subject in which he has no expertise. (*Id.*) As explained earlier in this order, calculation of cross-elasticity of demand is not always necessary to define a relevant market. Although Dr. Phillips did not calculate cross-elasticity of demand, he did rely on other economic data, including industry materials, pricing data, and public recognition of the market, all of which have been held relevant to determining the scope of a market. Additionally, Dr. Phillips does not base his opinion on his subjective beliefs but on his research of industry materials regarding the industry's categorization of rock music. Because Dr. Phillips relies on sufficient data and applies that data to define the market, his opinion is sufficiently reliable for admission on the issue of market definition under *Daubert.* The court elects to refrain from ruling on defendants' motion as to the admissibility of Dr. Phillips' opinion on damages at this time, since decision is not relevant to the summary judgment motion.

### V. Conclusion

Based on the foregoing, it is therefore

ORDERED as follows:

1. Defendant Parent Clear Channel Communications' motion for summary judgment (# 130 & 163) is DENIED.

2. Defendants' motion for summary judgment (# 158) is GRANTED in part and DENIED in part. It is GRANTED as to plaintiff's claims for (1) monopolization under the Sherman Act, 15 U.S.C.A. § 2, (2) monopolization under the Colorado Antitrust Act, Colo.Rev.Stat. § 6–4–105, (3) violation of the Colorado Consumer Protection Act, Colo.Rev.Stat. § 6–1–101, and (4) tortious interference with contract. Defendants' motion is DENIED in all other respects. At the appropriate date, the clerk will enter judgment in favor of the defendants and against plaintiffs, dismissing their claims with prejudice.

3. Defendants' motion to exclude expert testimony (# 223) is DENIED in part, and RULING IS RESERVED in part. It is DENIED as it pertains to the expert's testimony on liability issues in the case. RULING IS RESERVED as to the damages issues in the case, which will be addressed at a later date by the court.

4. Defendants' motion to file a supplemental brief in support of their motion for summary judgment (# 239) is DENIED.

5. The court will hold a Final Pretrial Conference commencing at 4:00 o'clock p.m. on April 30, 2004 in Courtroom 14, Alfred A. Arraj United States Courthouse, Denver, Colorado. In preparing for and participating in the conference, the parties and counsel will follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which is attached